1    LATHAM & WATKINS LLP
      Gene A. Lucero (Bar No. 060252)
2      *Gene.Lucero@lw.com*
      Kirk A. Wilkinson (Bar No. 128367)
3      *Kirk.Wilkinson@lw.com*
     355 South Grand Avenue
4    Los Angeles, California  90071-1560
     Telephone:  (213) 485-1234
5    Facsimile:  (213) 891-8763

6    LATHAM & WATKINS LLP
      Charity M. Gilbreth (Bar No. 223504)
7      *Charity.Gilbreth@lw.com*
      Jason R. Liljestrom (Bar No. 254593)
8      *Jason.Liljestrom@lw.com*
     650 Town Center Drive, Suite 2000
9    Costa Mesa, California  92626-1925
     Telephone:  (714) 540-1235
10    Facsimile:  (714) 755-8290

11    Attorneys for Defendants THE WALT
    DISNEY COMPANY, DISNEY
12    ENTERPRISES, INC., and DISNEY
    WORLDWIDE SERVICES, INC.

13

14             UNITED STATES DISTRICT COURT

15       CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

16

| | |
|---|---|
| ENVIRONMENTAL WORLD WATCH, INC., DENNIS JACKSON, ROBERT HILL, ROBIN McCALL, AND WILLIAM McCALL, | CASE NO. CV09-4045 DDP PLAx |
| Plaintiffs, | **DECLARATION OF JASON R. LILJESTROM IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS SECOND AMENDED COMPLAINT FOR FAILURE TO STATE A CLAIM AND LACK OF SUBJECT MATTER JURISDICTION** |
| v. | |
| THE WALT DISNEY COMPANY, WALT DISNEY ENTERPRISES, INC., DISNEY WORLDWIDE SERVICES, INC., and DOES 1 through 30, Inclusive, | Assigned To: Hon. Dean D. Pregerson |
| Defendants. | Ctrm:  3, Second Floor<br>Date:  September 28, 2009<br>Time:  10:00 a.m. |

17
18
19
20
21
22
23
24
25
26
27
28

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
ORANGE COUNTY

OC\1028528

DECLARATION OF JASON R. LILJESTROM IN SUPPORT OF
MOTION TO DISMISS SECOND AMENDED COMPLAINT

1    I, Jason R. Liljestrom, declare:

2      1. I am an attorney at law duly admitted to practice in the United

3    States District Court for the Central District of California, and an associate with the

4    law firm of Latham & Watkins LLP, counsel for Defendants.  I have been involved

5    in the collection and review of the documents attached to this declaration and

6    hereby verify their authenticity.

7      2. Attached hereto as Exhibit 1 is a true and correct copy of the

8    February 5, 2009 Judgment of Dismissal and Award of Costs entered in

9    *Environmental World Watch, Inc. v. The Walt Disney Company*, Case No.

10   NC050458, case filed October 29, 2007 in the Superior Court for the State of

11   California, County of Los Angeles.

12     3. Attached hereto as Exhibit 2 is a true and correct copy of the

13   State of California, California Regional Water Quality Control Board Los Angeles

14   Region, Order No. 01-182, NPDES Permit No. CAS004001, Waste Discharge

15   Requirements For Municipal Storm Water and Urban Runoff Discharges Within

16   the County of Los Angeles, and the Incorporated Cities Therein, Except the City of

17   Long Beach, December 13, 2001 (Amended on September 14, 2006 by Order R4-

18   2006-0074 and on August 9, 2007 by Order R4-2007-0042) ("MS4 Permit").  The

19   copy of the MS4 Permit attached hereto as Exhibit 2 was downloaded from the

20   California State Regional Water Quality Control Board for the Los Angeles

21   Regions's website at

22   http://www.swrcb.ca.gov/rwqcb4/water_issues/programs/stormwater/municipal/ind

23   ex.shtml, on September 3, 2009.

24     Pursuant to 28 U.S.C. § 1746, I declare, under penalty of perjury

25   under the laws of the United States and the State of California, that the foregoing is

26   true and correct, and that this declaration was executed this 3rd day of September,

27   2009, at Costa Mesa, California.

28                  Jason R. Liljestrom

EWW v Disney 40815-0030
WEP, SMS, SMB, MIL
BC, WM, SM, EM
OC_Mail

*original*
**FILED**
LOS ANGELES SUPERIOR COURT

FEB 0 5 2009

John A. Clarke, Executive Officer/Clerk
By _____
LILIAN GIRON, CLERK

1  Warren E. Platt (#154086)
   Sean M. Sherlock (#161627)
2  Ahmed Ibrahim (#238739)
   **SNELL & WILMER L.L.P.**
3  **600 Anton Boulevard, Suite 1400**
   **Costa Mesa, California  92626-7689**
4  Telephone: (714) 427-7000
   Facsimile: (714) 427-7799
5
6  Attorneys for Defendant
   The Walt Disney Company
7

8           **SUPERIOR COURT OF THE STATE OF CALIFORNIA**

9              **FOR THE COUNTY OF LOS ANGELES**

10              **SOUTH DISTRICT – LONG BEACH**

11  ENVIRONMENTAL WORLD              CASE NO. NC050458
    WATCH, INC., acting in the public
12  interest,                        **[PROPOSED] JUDGMENT OF**
                                     **DISMISSAL AND AWARD OF COSTS**
13              Plaintiff,
                                     CTRM:    11
14  vs.

15  THE WALT DISNEY COMPANY, a       DATE OF FILING:  October 29, 2007
    Delaware Corporation, AND DOES 1
16  - 100,

17              Defendant.

18          WHEREAS, on November 7, 2008, plaintiff Environmental World Watch, Inc.

19  filed with this Court a Request for Dismissal without prejudice of the complaint in this

20  action;

21          WHEREAS, the Clerk entered the dismissal on November 7, 2008;

22          IT IS HEREBY ORDERED AND ADJUDGED that this action is dismissed, and

23  that defendant The Walt Disney Company shall be entitled to recover from plaintiff,

24  Environmental World Watch, Inc., its costs of suit in the amount of $ 7761.88 .

25  Dated: 2-5-09

26                              **ROSS M. KLEIN**
                                JUDGE OF THE SUPERIOR COURT
27

28

*Snell & Wilmer*
*L.L.P.*
*LAW OFFICES*
*600 Anton Boulevard, Suite 1400*
*Costa Mesa, California 92626-7689*
*(714) 427-7000*



**EXHIBIT** 1
**PAGE** 2 **OF** 80

## PROOF OF SERVICE BY ALL OPTIONS

I am employed in the County of Orange, State of California. I am over the age of 18 and not a party to the within action; my business address is 600 Anton Boulevard, Suite 1400, Costa Mesa, CA 92626-7689.

On December 12, 2008, I served, in the manner indicated below, the foregoing document described **[PROPOSED] JUDGMENT OF DISMISSAL AND AWARD OF COSTS** on the interested parties in this action by placing true copies thereof, enclosed in sealed envelopes, at Costa Mesa, addressed as follows:

| | |
|---|---|
| Anthony G. Graham | Attorney for Plaintiffs |
| Michael J. Martin | Environmental World Watch, Inc. |
| Graham & Martin, LLP | |
| 950 South Coast Drive, Suite 220 | Telephone: (714) 850-9390 |
| Costa Mesa, California 92626 | Facsimile: (714) 850-9392 |

☒  BY REGULAR MAIL:  I caused such envelopes to be deposited in the United States mail at Costa Mesa, California, with postage thereon fully prepaid. I am readily familiar with the firm's practice of collection and processing correspondence for mailing. It is deposited with the United States Postal Service each day and that practice was followed in the ordinary course of business for the service herein attested to  (C.C.P. § 1013(a)).

☐  BY FACSIMILE: (C.C.P. § 1013(e)(f)).

☐  BY OVERNITE EXPRESS:  I caused such envelopes to be delivered by courier, with next day service, to the offices of the addressees. (C.C.P. § 1013(c)(d)).

☐  BY PERSONAL SERVICE:  I caused such envelopes to be delivered by hand to the offices of the addressees. (C.C.P. § 1011(a)(b)).

\*\*\*\*\*\*\*\*

I declare under penalty of perjury under the laws of the State of California that the above is true and correct.

Executed on December 12, 2008, at Costa Mesa, California.

_Wendy J. Merkle_
Wendy J. Merkle

5555122.1

Proof of Service



**EXHIBIT** _1_
**PAGE** _3_ **OF** _80_

**STATE OF CALIFORNIA**

**CALIFORNIA REGIONAL WATER QUALITY CONTROL BOARD**
**LOS ANGELES REGION**

**ORDER NO. 01-182**
**NPDES PERMIT NO. CAS004001**
**WASTE DISCHARGE REQUIREMENTS**
**FOR**
**MUNICIPAL STORM WATER AND URBAN RUNOFF DISCHARGES WITHIN THE**
**COUNTY OF LOS ANGELES, AND THE INCORPORATED CITIES THEREIN,**
**EXCEPT THE CITY OF LONG BEACH**

**December 13, 2001**
**(Amended on September 14, 2006 by Order R4-2006-0074**
**and**
**on August 9, 2007 by Order R4-2007-0042)**

December 13, 2001 (As amended on September 14, 2006 by Order R4-2006-0074 and on
August 9, 2007 by Order R4-2007-0042)



EXHIBIT 2
PAGE 4 OF 80

## Table of Contents

A.   Existing Permit .................................................................................................... 3
B.   Nature of Discharges and Sources of Pollutant ............................................... 3
C.   Permit Background ............................................................................................ 7
D.   Permit Coverage ............................................................................................... 8
E.   Federal, State, and Regional Regulations ....................................................... 9
F.   Implementation ................................................................................................18
G.   Public Process ................................................................................................20
Part 1.   DISCHARGE PROHIBITIONS ...................................................................21
Part 2.   RECEIVING WATER LIMITATIONS ...........................................................23
Part 3.   STORM WATER QUALITY MANAGEMENT PROGRAM (SQMP)
IMPLEMENTATION ....................................................................................................24
A.   General Requirements ....................................................................................24
B.   Best Management Practice Implementation ....................................................25
C.   Revision of the Storm Water Quality Management Program ...........................25
D.   Designation and Responsibilities of the Principal Permittee ..........................25
E.   Responsibilities of the Permittees ..................................................................26
F.   Watershed Management Committees (WMCs) ...............................................27
G.   Legal Authority ................................................................................................27
Part 4.   SPECIAL PROVISIONS .............................................................................29
Maximum Extent Practicable Standard .....................................................................29
A.   General Requirements ....................................................................................29
B.   Public Information and Participation Program (PIPP) ......................................29
C.   Industrial/Commercial Facilities Control Program ..........................................33
D.   Development Planning Program ......................................................................40
E.   Development Construction Program ...............................................................48
F.   Public Agency Activities Program ...................................................................51
G.   Illicit Connections and Illicit Discharges Elimination Program ........................58
Part 5.   DEFINITIONS .............................................................................................60
Part 6.   STANDARD PROVISIONS ..........................................................................71
A.   Standard Requirements ..................................................................................71
B.   Regional Board Review ...................................................................................71
C.   Public Review ..................................................................................................71
D.   Duty to Comply ...............................................................................................71
E.   Duty to Mitigate [40 CFR 122.41 (d)] ..............................................................72
F.   Inspection and Entry [40 CFR 122.41(i), CWC § 13267] .................................72
G.   Proper Operation and Maintenance [40 CFR 122.41 (e), CWC § 13263(f)] .............72
H.   Signatory Requirements [40 CFR 122.41(k) & 122.22] ...................................72
I.   Reopener and Modification [40 CFR 122.41(f) & 122.62] ...............................72
J.   Severability .....................................................................................................73
K.   Duty to Provide Information [40 CFR 122.41(h)] ..............................................73
L.   Twenty-four Hour Reporting [40 CFR 122.41(l)(6)] .........................................74
M.   Bypass [40 CFR 122.41(m)] ...........................................................................74
N.   Upset [40 CFR 122.41(n)] ...............................................................................75
O.   Property Rights [40 CFR 122.41(g)] ................................................................75
P.   Enforcement ....................................................................................................75
Q.   Need to Halt or Reduce Activity not a Defense [40 CFR 122.41(c)] ................77
R.   Rescission ......................................................................................................77
S.   Expiration ........................................................................................................77

December 13, 2001 (As amended on September 14, 2006 by Order R4-2006-0074 and on
August 9, 2007 by Order R4-2007-0042)



EXHIBIT _2_
PAGE _5_ OF _80_

Case 2:09-cv-04045-DMG-PLA   Document 23   Filed 09/03/09   Page 7 of 81   Page ID #:256

**STATE OF CALIFORNIA**

**CALIFORNIA REGIONAL WATER QUALITY CONTROL BOARD
LOS ANGELES REGION**

**ORDER NO. 01-182
NPDES PERMIT NO. CAS004001
WASTE DISCHARGE REQUIREMENTS
FOR
MUNICIPAL STORM WATER AND URBAN RUNOFF DISCHARGES WITHIN THE
COUNTY OF LOS ANGELES, AND THE INCORPORATED CITIES THEREIN,
EXCEPT THE CITY OF LONG BEACH**

The California Regional Water Quality Control Board, Los Angeles Region (hereinafter referred to as the Regional Board) finds:

**A.      Existing Permit**

The Los Angeles County Flood Control District, the County of Los Angeles, and 84 incorporated cities within the Los Angeles County Flood Control District (see Attachment A, List of Permittees), hereinafter referred to separately as Permittees and jointly as the Discharger, discharge or contribute to discharges of storm water and urban runoff from municipal separate storm sewer systems (MS4s), also called storm drain systems. The discharges flow to water courses within the Los Angeles County Flood Control District and into receiving waters of the Los Angeles Region.  These discharges are covered under countywide waste discharge requirements contained in Order No. 96-054 adopted by this Regional Board on July 15, 1996, which replaced Order No. 90-079 adopted by this Regional Board on June 18, 1990.  Order No. 96-054 also serves as a National Pollutant Discharge Elimination System (NPDES) permit for the discharge of municipal storm water.

**B.      Nature of Discharges and Sources of Pollutant**

1.     Storm water discharges consist of surface runoff generated from various land uses in all the hydrologic drainage basins that discharge into water bodies of the State.  The quality of these discharges varies considerably and is affected by the hydrology, geology, land use, season, and sequence and duration of hydrologic events. The primary constituents of concern currently identified by the Los Angeles County Flood Control District Integrated Receiving Water Impacts Report (1994-2000) are cyanide, indicator bacteria, total dissolved solids, turbidity, total suspended solids, nutrients, total aluminum, dissolved cadmium, copper, lead, total mercury, nickel, zinc, bis(2-ethylhexyl)phthalate, polycyclic aromatic hydrocarbons (PAHs), diazinon, and chlorpyrifos.

2.     Certain pollutants present in storm water and/or urban runoff may be derived from extraneous sources that Permittees have no or limited jurisdiction over.  Examples of such pollutants and their respective

December 13, 2001 (As amended on September 14, 2006 by Order R4-2006-0074 and on August 9, 2007 by Order R4-2007-0042)



EXHIBIT  2
PAGE 6 OF 80

sources are: PAHs which are products of internal combustion engine operation, nitrates, bis (2-ethylhexyl) phthalate and mercury from atmospheric deposition, lead from fuels, copper from brake pad wear, zinc from tire wear, dioxins as products of combustion, and natural-occurring minerals from local geology.  However, the implementation of the measures set forth in this Order is intended to reduce the entry of these pollutants into storm water and their discharge to receiving waters.

3.   Water quality assessments conducted by the Regional Board identified impairment, or threatened impairment, of beneficial uses of water bodies in the Los Angeles Region.  The causes of impairments include pollutants of concern identified in municipal storm water discharges by the County of Los Angeles in the Integrated Receiving Water Impacts Report (1994-2000). Pollutants in storm water can have damaging effects on both human health and aquatic ecosystems.

4.   The Los Angeles County Grand Jury, September 2000, completed an investigation into the health risks of swimming near beaches in Los Angeles County and made several recommendations to reduce public health risks (Final Report, Grand Jury, Los Angeles County, 1999-2000). The Grand Jury recommended that the Regional Board consider among other actions, (i) a focus on setting contaminant limits rather than programmatic evaluations, (ii) audit of MS4 Permittee programs; and (iii) clarifying enforcement responsibilities between the State and local governments.

5.   Studies and research conducted by other Regional agencies, academic institutions, and universities have also identified storm water and urban runoff as significant sources of pollutants to surface waters in Southern California. See, e.g., [*Surface Runoff to the Southern California Bight*, Southern California Coastal Water Research Project, (1992); *Impacts of Urban Runoff on Santa Monica Bay and Surrounding Ocean Waters* (Gersberg, R.M., 1995); *State of the Bay 1998*, Santa Monica Bay Restoration Project; *Storm Water Impact*, In, Southern California Environmental Report Card 1999, Institute of the Environment, University of California, Los Angeles (Stenstrom, M.S., 1999); *Distribution of Anthropogenic and Natural Debris on the Mainland Shelf of Southern California Bight*, Shelly L. Moore and M. James Allen (1999); *The Health Effects of Swimming in Ocean Water Contaminated by Storm Drain Runoff*, Haile, R.W. et al. (1999); *Huntington Beach Closure Investigation: Technical Review* (University of Southern California, 2000); *A Regional Survey of the Microbiological Water Quality Along the Shoreline of the Southern California Bight,* Rachel T. Noble *et al.* (2001*); Integrated Receiving Water Impacts Report (1994-2000)*, County of Los Angeles (2001)].

6.   Development and urbanization increase pollutant load, volume, and discharge velocity. First, natural vegetated pervious ground cover is converted to impervious surfaces such as paved highways, streets, rooftops and parking lots. Natural vegetated soil can both absorb rainwater and remove pollutants providing an effective natural purification process. In contrast, pavement and concrete can neither absorb water

December 13, 2001 (As amended on September 14, 2006 by Order R4-2006-0074 and on August 9, 2007 by Order R4-2007-0042)



EXHIBIT _2_
PAGE _7_ OF _80_

Case 2:09-cv-04045-DMG-PLA   Document 23   Filed 09/03/09   Page 9 of 81   Page ID #:258

nor remove pollutants, and thus the natural purification characteristics are lost.  Second, urban development creates new pollution sources as the increased density of human population brings proportionately higher levels of vehicle emissions, vehicle maintenance wastes, municipal sewage waste, pesticides, household hazardous wastes, pet wastes, trash, and other anthropogenic pollutants. Development and urbanization especially threaten environmentally sensitive areas. Such areas have a much lower capacity to withstand pollutant shocks than might be acceptable in the general circumstance. In essence, development that is ordinarily insignificant in its impact on the environment may in a particular sensitive environment become significant. These environmentally sensitive areas designated by the State and/or the County of Los Angeles include Areas of Special Biological Significance (ASBS), water bodies designated as supporting a RARE beneficial use, Significant Natural Areas (SNAs), and Significant Ecological Areas (SEAs).

7. The increased volume, increased velocity, and discharge duration of storm water runoff from developed areas has the potential to greatly accelerate downstream erosion and impair stream habitat in natural drainages.  Studies have demonstrated a direct correlation between the degree of imperviousness of an area and the degradation of its receiving waters. Significant declines in the biological integrity and physical habitat of streams and other receiving waters have been found to occur with as little as 10 percent conversion from natural to impervious surfaces. Percentage impervious cover is a reliable indicator and predictor of potential water quality degradation expected from new development. (*Impervious Cover as An Urban Stream Indicator and a Watershed Management Tool*, Schueler, T. and R. Claytor, In, Effects of Water Development and Management on Aquatic Ecosystems (1995), ASCE, New York; Leopold, L. B., (1973), *River Channel Change with Time: An Example*, Geological Society of America Bulletin, v. 84, p. 1845-1860; Hammer, T. R., (1972), *Stream Channel Enlargement Due to Urbanization: Water Resources Research*, v. 8, p. 1530-1540; Booth, D. B., (1991), *Urbanization and the Natural Drainage System--Impacts, Solutions and Prognoses*: The Northwest Environmental Journal, v. 7, p. 93-118; Klein, R. D., (1979), *Urbanization and Stream Quality Impairment*: Water Resources Bulletin, v. 15, p. 948-963; May, C. W., Horner, R. R., Karr, J. R., Mar, B. W., and Welch, E. B., (1997), *Effects of Urbanization on Small Streams in the Puget Sound Lowland Ecoregion*: Watershed Protection Techniques, v. 2, p. 483-494; Morisawa, M. and LaFlure, E. *Hydraulic Geometry, Stream Equilibrium and Urbanization* In Rhodes, D. P. and Williams, G. P. *Adjustments to the Fluvial System* p.333-350. (1979); Dubuque, Iowa, Kendall/Hunt. Tenth Annual Geomorphology Symposia Series; and *The Importance of Imperviousness*: Watershed Protection Techniques, 1(3), Schueler, T. (1994).)

8. The County of Los Angeles has identified as the seven highest priority industrial and commercial critical source types, (i) wholesale trade (scrap recycling, auto dismantling); (ii) automotive repair/parking; (iii) fabricated metal products; (iv) motor freight; (v) chemical and allied products; (vi)

December 13, 2001 (As amended on September 14, 2006 by Order R4-2006-0074 and on August 9, 2007 by Order R4-2007-0042)



EXHIBIT  2
PAGE 8 OF 80

automotive dealers/gas stations; (vii) primary metal products (*Critical Source Selection and Monitoring Report*, Los Angeles County Department of Public Works -Sept 1996). Monitoring conducted by Los Angeles County and the Regional Board demonstrates that the priority industrial sectors and auto repair facilities (one of the commercial sectors) on the list, contribute significant concentrations of heavy metals to storm water (*Los Angeles County 1999-2000 Storm Water Monitoring Report*, Los Angeles County Department of Public Works -July 2000; *Compliance Assessment of the Auto Dismantling Industry; Evaluation of the California General Industrial Storm Water Permit*, H. Chang, (2001), 70 pp., California Regional Water Quality Control Board, Los Angeles Region).

9.  The discharge of washwaters and contaminated storm water from industries and businesses specified in this Order for inspection by Permittees is an environmental threat and can also adversely impact public health and safety.  For example, a review of industrial waste/ pretreatment records performed in 1995 in the County of Los Angeles on illicit discharges indicates that automotive service facilities and food service facilities sometimes discharge polluted washwaters to the MS4. The pollutants of concern in such washwaters include food waste, oil and grease, and toxic chemicals. Other storm water/industrial waste programs in California have reported similar observations. Illicit discharges from automotive service facilities and food service facilities have been identified elsewhere as a major cause of widespread contamination and water quality problems (Washtenaw County Statutory Drainage Board - 1987 Huron River Pollution Abatement Program).

10. Studies indicate that facilities with paved surfaces subject to frequent motor vehicular traffic (such as parking lots and fast food restaurants), or facilities that perform vehicle repair, maintenance, or fueling (automotive service facilities) are potential sources of pollutants of concern in storm water.  [References:  Pitt *et al*., *Urban Storm Water Toxic Pollutants: Assessment, Sources, and Treatability*, Water Environment Res., 67, 260 (1995)*; Results of Retail Gas Outlet and Commercial Parking Lot Storm Water Runoff Study*, Western States Petroleum Association and American Petroleum Institute, (1994); *Action Plan Demonstration Project, Demonstration of Gasoline Fueling Station Best Management Practices*, Final Report, County of Sacramento (1993); *Source Characterization*, R. Pitt, In Innovative Urban Wet-Weather Flow Management Systems (2000) Technomic Press, Field, R *et al.* editors;  *Characteristics of Parking Lot Runoff Produced by Simulated Rainfall*, , L.L. Tiefenthaler *et al.* Technical Report 343, Southern California Coastal Water Research Project (2001).]

11. Retail Gasoline Outlets (RGOs) are points of convergence for vehicular traffic and are similar to parking lots and urban roads. Studies indicate that storm water discharges from RGOs have high concentrations of hydrocarbons and heavy metals. [*The Quality of Trapped Sediments and Poor Water within Oil Grit Separators in Suburban MD*, Schueler T. and Shepp D. (1992), and *Concentrations of Selected Constituents in Runoff*

December 13, 2001 (As amended on September 14, 2006 by Order R4-2006-0074 and on August 9, 2007 by Order R4-2007-0042)



EXHIBIT 2
PAGE 9 OF 80

*from Impervious Surfaces in Four Urban Catchments of Different Landuse*, Ranabal, F.I., and T.J. Gizzard (1995), In Proceedings of the Fourth Biennial Stormwater Research Conference, Florida, pp-42-52]. Pilot studies indicate that treatment control best management practices installed at retail gasoline stations are effective in removing pollutants, reasonable in capital cost, easy to operate, and do not present safety risks [*Rouge River National Wet Weather Demonstration Project, Task Product Memorandum – Evaluation of On-line Media Filters RPO-NPS-TPM59.00*, Wayne County, MI, March 1999]. The Regional Board and the San Diego Regional Board have jointly prepared a Technical Report on the applicability of new development BMP design criteria for retail gasoline outlets, (*Retail Gasoline Outlets: New Development Design Standards for Mitigation of Storm Water Impacts*, (June 2001)).  Retail Gasoline Outlets in Western U.S. States (such as Washington and Oregon) are already subject to numerical BMP design criteria, as well in other U.S. States.

**C.     Permit Background**

1.     The essential components of the Storm Water Management Program, as established by federal regulations [40 CFR 122.26(d)] are: (i) Adequate Legal Authority, (ii) Fiscal Resources, (iii) Storm Water Quality Management Program (SQMP) - (Public Information and Participation Program, Industrial/Commercial Facilities Program, Development Planning Program, Development Construction Program, Public Agency Activities Program, Illicit Connection and Illicit Discharges Elimination Program), and (iv) Monitoring and Reporting Program.

2.     The Permittees have filed a Report of Waste Discharge (ROWD), dated February 1, 2001, and applied for renewal of their waste discharge requirements that serves as an NPDES permit to discharge wastes to surface waters.  The ROWD includes a proposed SQMP and a Monitoring Program. The proposed SQMP contains programs previously approved under Board Order No. 96-054 in the following areas:

           Public Information and Participation
           Development Planning
           Development Construction
           Public Agency Activities
           Illicit Connection/Illicit Discharge Elimination Program

       These programs are revised pursuant to the provisions of this Order after adoption.

3.     The County of Los Angeles has previously conducted source identification and pollutant characterization consistent with 40 CFR 122.26(d)(1)(ii) and (iii) under its storm water Monitoring Program.  The Monitoring Program submitted with the ROWD proposes to advance the assessment of receiving water impacts, identification of sources of pollution, evaluation of Best Management Practices (BMPs), and measurement of long term trends in mass emissions.

December 13, 2001 (As amended on September 14, 2006 by Order R4-2006-0074 and on August 9, 2007 by Order R4-2007-0042)



EXHIBIT ___2___
PAGE _10_ OF _80_

4.  The Regional Board has reviewed the ROWD and has determined it to be complete under the reapplication policy of MS4s issued by the U.S. Environmental Protection Agency (USEPA) (61 *Fed. Reg.* 41697). The Regional Board finds that the Permittees' proposed SQMP, incorporating the additional and/or revised provisions contained in this Order would meet the minimum requirements of federal regulations.

5.  The City of Los Angeles has conducted shoreline and nearshore water quality monitoring off the Santa Monica Bay since the 1950s under the monitoring program for the Hyperion Waste Water Treatment Plant (NPDES No. CA0109991). The monitoring results indicate that effluent from Hyperion's 5-Mile Outfall does not impinge the shoreline, and that elevated bacterial counts are associated with runoff from storm drains and discharges from piers. In 1994, the Regional Board approved the relocation of Hyperion's shoreline stations to implement a bay-wide, regional shoreline-monitoring program associated with storm drain outfalls in the Santa Monica Bay. The City of Los Angeles requested that the shoreline-monitoring requirement be incorporated in this Order. The shoreline pathogen monitoring requirements are outlined in the Monitoring Program for this Order.

**D.   Permit Coverage**

1.  The requirements in this Order cover all areas within the boundaries of the Permittee municipalities (see Attachment A) over which they have regulatory jurisdiction as well as unincorporated areas in Los Angeles County within the jurisdiction of the Regional Board. The Permittees serve a population of about 9.5 million [Reference: *2000 Census of Population and Housing,* Bureau of the Census, U.S. Department of Commerce (2001)] in an area of approximately 3,100 square miles.

2.  Federal, state, regional or local entities within the Permittees' boundaries or in jurisdictions outside the Los Angeles County Flood Control District, and not currently named in this Order, may operate storm drain facilities and/or discharge storm water to storm drains and watercourses covered by this Order. The Permittees may lack legal jurisdiction over these entities under state and federal constitutions. The Regional Board will coordinate with these entities to implement programs that are consistent with the requirements of this Order. The Regional Board will consider such facilities for coverage in 2003 under its NPDES permitting scheme pursuant to USEPA Phase II storm water regulations.

3.  Sources of discharges into receiving waters in the County of Los Angeles but in jurisdictions outside its boundary include the following:

    About 34 square miles of unincorporated area in Ventura County, which drain into Malibu Creek and then to Santa Monica Bay,

    About 9 square miles of the City of Thousand Oaks, which also drain into Malibu Creek and then to Santa Monica Bay, and

December 13, 2001 (As amended on September 14, 2006 by Order R4-2006-0074 and on August 9, 2007 by Order R4-2007-0042)



EXHIBIT _2_

PAGE _//_ OF _80_

About 86 square miles of area in Orange County, which drain into Coyote Creek and then into the San Gabriel River.

The Regional Board will ensure that storm water management programs for the areas in Ventura County and the City of Thousand Oaks that drain into Santa Monica Bay are consistent with the requirements of this Order. The Regional Board will coordinate with the Santa Ana Regional Board so that storm water management programs for the areas in Orange County that drain into Coyote Creek are consistent with the requirements of this Order.

4.   This permit is intended to develop, achieve, and implement a timely, comprehensive, cost-effective storm water pollution control program to reduce the discharge of pollutants in storm water to the Maximum Extent Practicable (MEP) from the permitted areas in the County of Los Angeles to the waters of the U.S. subject to the Permittees' jurisdiction.

5.   Permittees have expressed their intention to work cooperatively to control the contribution of pollutants from one portion of the MS4 to another portion of the system. Permittees may control the contribution of pollutants to the MS4 from non-permittee dischargers such as Caltrans, the U.S. Department of Defense, and other state and federal facilities, through interagency agreements.

**E.   Federal, State, and Regional Regulations**

1.   The Water Quality Act of 1987 added Section 402(p) to the federal Clean Water Act (CWA) (33 U.S.C. § 1251-1387). This section requires the USEPA to establish regulations setting forth NPDES requirements for storm water discharges in two phases.

- The USEPA Phase I storm water regulations were directed at MS4s serving a population of 100,000 or more, including interconnected systems and storm water discharges associated with industrial activities, including construction activities. The Phase I Final Rule was published on November 16, 1990 (55 *Fed. Reg.* 47990).

- The USEPA Phase II storm water regulations are directed at storm water discharges not covered in Phase I, including small MS4s (serving a population of less than 100,000), small construction projects (one to five acres), municipal facilities with delayed coverage under the Intermodal Surface Transportation Efficiency Act of 1991, and other discharges for which the USEPA Administrator or the State determines that the storm water discharge contributes to a violation of a water quality standard, or is a significant contributor of pollutants to waters of the United States. The Phase II Final Rule was published on December 8, 1999 (64 *Fed. Reg.* 68722).

2.   The USEPA published an 'Interim Permitting Approach for Water Quality-Based Effluent Limitations in Storm Water Permits' on August 26, 1996 (61 *Fed. Reg.* 43761). This policy discusses the appropriate kinds of

December 13, 2001 (As amended on September 14, 2006 by Order R4-2006-0074 and on August 9, 2007 by Order R4-2007-0042)



EXHIBIT   2
PAGE *12* OF *80*

water quality-based effluent limitations to be included in NPDES storm water permits to provide for the attainment of water quality standards.

3.  The USEPA published an 'Interpretative Policy Memorandum on Reapplication Requirements' for MS4 permits on August 9, 1996 (61 *Fed. Reg.* 41697).  This policy requires that MS4 reapplication for reissuance for a subsequent five-year permit term contain certain basic information and information for proposed changes and improvements to the storm water management program and monitoring program.

4.  The USEPA has entered into a Memorandum of Agreement (MOA) with the U.S. Fish and Wildlife Service and the National Marine Fisheries Service for enhancing coordination regarding the protection of endangered and threatened species under Section 7 of the Endangered Species Act and the CWA's Water Quality Standards and NPDES programs.  Among other actions, the MOA establishes a framework for coordination of actions by the USEPA, the Services, and CWA delegated States on CWA permit issuance under Section 402 of the CWA [66 *Fed. Reg.* 11202 – 11217].

5.  USEPA regulations at 40 CFR 122.26(d)(2)(iv)(A) and 40 CFR 122.26(d)(2)(iv)(C) require that MS4 permittees implement a program to monitor and control pollutants in discharges to the municipal system from industrial and commercial facilities that contribute a substantial pollutant load to the MS4.  The regulations require that permittees establish priorities and procedures for inspection of industrial facilities and priority commercial establishments.  This permit, consistent with the USEPA policy, incorporates a cooperative partnership, including the specifications of minimum expectations, between the Regional Board and the Permittees for the inspection of industrial facilities and priority commercial establishments to control pollutants in storm water discharges (58 *Fed. Reg.* 61157).

6.  Section 402 (p) of the CWA (33 U.S.C. § 1342(p) provides that MS4 permits must "require controls to reduce the discharge of pollutants to the maximum extent practicable, including management practices, control techniques and system, design engineering method and such other provisions as the [EPA] Administrator or the State determines appropriate for the control of such pollutants."  The State Water Resources Control Board's (State Board) Office of Chief Counsel (OCC) has issued a memorandum interpreting the meaning of MEP to include technical feasibility, cost, and benefit derived with the burden being on the municipality to demonstrate compliance with MEP by showing that a BMP is not technically feasible in the locality or that BMPs costs would exceed any benefit to be derived (dated February 11, 1993).

7.  The CWA authorizes the USEPA to permit a state to serve as the NPDES permitting authority in lieu of the USEPA.  The State of California has in-lieu authority for an NPDES program.  The Porter-Cologne Water Quality Control Act authorizes the State Board, through the Regional Boards, to regulate and control the discharge of pollutants into waters of the State. The State Board entered into a MOA with the USEPA, on

December 13, 2001 (As amended on September 14, 2006 by Order R4-2006-0074 and on August 9, 2007 by Order R4-2007-0042)


EXHIBIT  2
PAGE 13 OF 80

September 22, 1989, to administer the NPDES Program governing discharges to waters of the U.S.

8. Section 303(d) of the CWA requires that the State identify a list of impaired water-bodies and develop and implement Total Maximum Daily Loads (TMDLs) for these waterbodies (33 U.S.C. §1313(d)(1)). A TMDL specifies the maximum amount of a pollutant that a water-body can receive, still meet applicable water quality standards and protect beneficial uses. The USEPA entered into a consent decree with the Natural Resources Defense Council (NRDC), Heal the Bay, and the Santa Monica BayKeeper on March 22, 1999, under which the Regional Board must adopt all TMDLs for the Los Angeles Region within 13 years from that date. This permit incorporates a provision to implement and enforce approved load allocations for municipal storm water discharges and requires amending the SQMP after pollutants loads have been allocated and approved.

9. Section 6217(g) of the Coastal Zone Act Reauthorization Amendments of 1990 (CZARA) requires coastal states with approved coastal zone management programs to address non-point pollution impacting or threatening coastal water quality. CZARA (16 U.S.C. § 1451-1465) amends the Coastal Zone Management Act of 1972, to address five sources of non-point pollution: agriculture, silviculture, urban, marinas, and hydromodification. This NPDES permit addresses the management measures required for the urban category, with the exception of septic systems. The Regional Board addresses septic systems through the administration of other programs.

10. On May 18, 2000, the USEPA established numeric criteria for priority toxic pollutants for the State of California (California Toxics Rule (CTR)) 65 *Fed. Reg.* 31682 (40 CFR 131.38), for the protection of human health and aquatic life. These apply as ambient water quality criteria for inland surface waters, enclosed bays, and estuaries. The State Board adopted the *Policy for Implementation of Toxics Standards for Inland Surface Waters, Enclosed Bays, and Estuaries of California (SIP) – 2000,* on March 2, 2000, for implementation of the CTR (State Board Resolution No. 2000-15 as amended by Board Resolution No. 2000-030). This policy requires that discharges comply with TMDL-derived load allocations as soon as possible but no later than 20 years from the effective date of the policy.

11. The State Board adopted a revised Water Quality Control Plan for Ocean Waters of California (Ocean Plan) on July 23, 1997. The Ocean Plan contains water quality objectives which apply to all discharges to the coastal waters of California.

12. The State Board in *In Re*: California Department of Transportation (State Board Order WQ 2001-08), determined that the discharge of storm water to ASBS is subject to the prohibition in the Ocean Plan against the discharge of wastes to an ASBS.

December 13, 2001 (As amended on September 14, 2006 by Order R4-2006-0074 and on August 9, 2007 by Order R4-2007-0042)



EXHIBIT __2__
PAGE _14_ OF _80_

13. The Regional Board adopted an updated Water Quality Control Plan (Basin Plan) for the Los Angeles Region on June 13, 1994, '*Water Quality Control Plan, Los Angeles Region: Basin Plan for the Coastal Watersheds of Los Angeles and Ventura Counties*, (1994).' The Basin Plan designates beneficial uses of receiving waters and specifies both narrative and numerical water quality objectives for the receiving waters in Los Angeles County.

14. The Regional Board on September 19, 2001, adopted amendments to the Basin Plan, to incorporate TMDLs for trash in the Los Angeles River (Resolution No. 01-013) and Ballona Creek (Resolution No. 01-014). After approval by the State Board, the Office of Administrative Law, and the USEPA, the TMDLs for trash will be effective and enforceable.

15. The Regional Board on April 13, 1998, approved BMPs for sidewalk rinsing to minimize the discharge of wash waters to the storm drain system (Resolution No. 98-08). By the same resolution, the Regional Board prohibited the discharge of municipal street wash waters to the storm drain system.

16. The Regional Board on April 13, 1998, approved recommended BMPs for industrial/commercial facilities (Resolution No. 98-08).

17. The Regional Board on April 22, 1999, approved a list of BMPs for use in development planning and development construction (Resolution No. 99-03)

18. The Regional Board adopted and approved requirements for new development and significant redevelopment projects in Los Angeles County to control the discharge of storm water pollutants in post-construction storm water, on January 26, 2000, in Board Resolution No. R-00-02.  The Regional Board Executive Officer issued the approved Standard Urban Storm Water Mitigation Plans (SUSMPs) on March 8, 2000. The State Board in large part affirmed the Regional Board action and SUSMPs in State Board Order No. WQ 2000-11 issued on October 5, 2000.

- The State Board's Chief Counsel has issued a statewide policy memorandum (dated December 26, 2000), which interprets the Order to provide broad discretion to Regional Boards and identifies potential future areas for inclusion in SUSMPs and the types of evidence and findings necessary.  Such areas include ministerial projects, projects in environmentally sensitive areas, and water quality design criteria for RGOs.

- The State Board's Chief Counsel interprets the Order to encourage regional solutions and endorses a mitigation fund or "bank" that may be funded by developers who obtain waivers from the numerical design standards for new development and significant redevelopment.

19. 40 CFR 131.10(a) prohibits states from designating waste transport or waste assimilation as a use for any water of the U.S.  Authorizing the

December 13, 2001 (As amended on September 14, 2006 by Order R4-2006-0074 and on August 9, 2007 by Order R4-2007-0042)


EXHIBIT ___2___
PAGE _15_ OF _80_

construction of a storm water/ urban runoff treatment facility in a jurisdictional water body would be tantamount to accepting waste assimilation as an appropriate use for that water body.  Furthermore, the construction and operation of a pollution control facility in a water body can impact the physical, chemical, and biological integrity as well as the beneficial uses of the water body.  Therefore, storm water treatment and/or mitigation in accordance with SUSMPs and any other requirements of this Order must occur prior to the discharge of storm water into a water of the U.S.

20.    The Regional Board supports a Watershed Management Approach to address water quality protection in the region.  The objective of the Watershed Management Approach should be to provide a comprehensive and integrated strategy towards water resource protection, enhancement, and restoration while balancing economic and environmental impacts within a hydrologically defined drainage basin or watershed.  It emphasizes cooperative relationships between regulatory agencies, the regulated community, environmental groups, and other stakeholders in the watershed to achieve the greatest environmental improvements with available resources.

21.    To promote a watershed management approach, the County of Los Angeles is divided into six Watershed Management Areas (WMAs) as follows:

> Malibu Creek and Rural Santa Monica Bay WMA
> Ballona Creek and Urban Santa Monica Bay WMA
> Los Angeles River WMA
> San Gabriel River WMA
> Dominguez Channel/Los Angeles Harbor WMA, and
> Santa Clara River WMA

Attachment A shows the list of Permittees under each WMA and some Permittees have expressed an intent to form sub-watershed groups within the WMA to promote regional solutions for the mitigation of storm water discharge pollution.

22.    To facilitate compliance with federal regulations, the State Board has issued two statewide general NPDES permits for storm water discharges: one for storm water from industrial sites [NPDES No. CAS000001, General Industrial Activity Storm Water Permit (GIASP)] and the other for storm water from construction sites [NPDES No. CAS000002, General Construction Activity Storm Water Permit (GCASP)].  The GCASP was reissued on August 19, 1999.  The GIASP was reissued on April 17, 1997.  Facilities discharging storm water associated with industrial activities and construction projects with a disturbed area of five acres or more are required to obtain individual NPDES permits for storm water discharges, or to be covered by a statewide general permit by completing and filing a Notice of Intent (NOI) with the State Board.  The USEPA guidance anticipates coordination of the state-administered programs for

December 13, 2001 (As amended on September 14, 2006 by Order R4-2006-0074 and on August 9, 2007 by Order R4-2007-0042)



EXHIBIT ___2___
PAGE _16_ OF _80_

industrial and construction activities with the local agency program to reduce pollutants in storm water discharges to the MS4.

The Regional Board is the enforcement authority in the Los Angeles Region for the two statewide general permits regulating discharges from industrial facilities and construction sites, and all NPDES storm water and non-storm water permits issued by the Regional Board.  These industrial and construction sites and discharges are also regulated under local laws and regulations.

23.    The State Board, on October 28, 1968, adopted Resolution No. 68-16, which established an anti-degradation policy for the State and Regional Boards.  This policy restricts the degradation of surface waters and protects waterbodies where existing water quality is higher than is necessary for the protection of beneficial uses.

24.    The State Board, on June 17, 1999, adopted Order No. WQ 99-05, which, in a precedential decision, identifies acceptable receiving water limitations language to be included in municipal storm water permits issued by the State and Regional Boards.  The receiving water limitations included herein are consistent with the State Board Order, USEPA Policy, and the U.S. Appellate court decision in, *Defenders of Wildlife v. Browner* (9th. Cir, 1999).  The State Board OCC has determined that the federal court decision did not conflict with State Board Order No. WQ 99-05 (memorandum dated October 14, 1999)

25.    California Water Code (CWC) § 13263(a) requires that waste discharge requirements issued by the Regional Board shall implement any relevant water quality control plans that have been adopted; shall take into consideration the beneficial uses to be protected and the water quality objectives reasonably required for that purpose; other waste discharges; the need to prevent nuisance; and provisions of CWC § 13241.  The Regional Board has considered the requirements of § 13263 and § 13241, and applicable plans, policies, rules, and regulations in developing these waste discharge requirements.

26.    CWC § 13370 *et seq.* requires that waste discharge requirements issued by the Regional Boards be consistent with provisions of the federal CWA and its amendments.

27.    On March 12, 2001, the U.S. Court of Appeals ruled that it is necessary to obtain a NPDES permit for application of aquatic pesticides to waterways. (*Headwaters, Inc. vs. Talent Irrigation District,* 243 F.3d. 526 (9th Cir., 2001)) This decision is controlling in California for nonagricultural applications of pesticides to waterways.  The State Board adopted a general NPDES permit (Order No. 2001-12-DWQ) on July 19, 2001, for public entities that discharge pollutants to waters of the U.S. associated with the application of aquatic pesticides for resource or pest management.  Public entities that conduct such activities must seek coverage under the general permit.

December 13, 2001 (As amended on September 14, 2006 by Order R4-2006-0074 and on August 9, 2007 by Order R4-2007-0042)



EXHIBIT ___2___
PAGE _17_ OF _80_

Case 2:09-cv-04045-DMG-PLA   Document 23   Filed 09/03/09   Page 19 of 81   Page ID #:268

**Findings Related To The Incorporation Of The Santa Monica Bay Beaches Dry Weather Bacteria TMDL And The Marina Del Rey Harbor Mothers' Beach And Back Basins Bacteria TMDL**

28.  The Regional Board adopted the Santa Monica Bay Beaches Dry Weather TMDL for Bacteria (hereinafter "Dry Weather Bacteria TMDL") on January 24, 2002. The TMDL was subsequently approved by the State Board, the Office of Administrative Law (OAL), and the USEPA and became effective on July 15, 2003.

29.  The Regional Board adopted the Marina del Rey Harbor Mothers' Beach and Back Basins Bacteria TMDL (hereinafter "MDR Bacteria TMDL") on August 7, 2003. The TMDL was subsequently approved by the SWRCB, the OAL, and the USEPA and became effective on March 18, 2004.

30.  The Waste Load Allocations (WLAs) in the Dry Weather Bacteria TMDL and the MDR Bacteria TMDL are expressed as the number of allowable days that the Santa Monica Bay beaches, Mothers' Beach and Basins D, E, and F in Marina del Rey Harbor may exceed the Basin Plan water quality objectives for protection of Water Contact Recreation (REC-1) in marine waters, specifically the water quality objectives for bacteria. Appropriate modifications to this order are therefore included in Parts 1 (Discharge Prohibitions) and 2 (Receiving Water Limitations), pursuant to 40 CFR 122.41(f) and 122.62, and Part 6.I.1 of this Order. Additionally, 40 CFR 122.44(d)(1)(vii)(B) requires that NPDES permits be consistent with the assumptions and requirements of any available waste load allocation. Tables 7-4.1, 7-4.2a, and 7-4.3 of the Basin Plan set forth the pertinent provisions of the Dry Weather Bacteria TMDL. Tables 7-5.1, 7-5.2, and 7-5.3 of the Basin Plan set forth the pertinent provisions of the MDR Bacteria TMDL. They require that during Summer Dry Weather there shall be no exceedances in the Wave Wash of the single sample or the geometric mean bacteria objectives set to protect the Water Contact Recreation (REC-1) beneficial use in marine waters. Accordingly, a prohibition is included in this Order barring discharges from a MS4 to Santa Monica Bay or Marina del Rey Harbor that result in exceedance of these objectives. Since the TMDL and the WLAs contained therein are expressed as receiving water conditions, Receiving Water Limitations have been included in this Order that are consistent with and implement the zero exceedance day WLAs.

31.  Pursuant to federal regulations at 40 CFR 124.8, and 125.56, Fact Sheets were prepared to provide the bases for incorporating the Dry Weather Bacteria TMDL and the MDR Bacteria TMDL into this Order. These Fact Sheets are hereby incorporated by reference into these findings.

32.  The iterative approach to regulating municipal storm water is not an appropriate means of implementing the Santa Monica Bay beaches or the MDR Summer Dry Weather WLAs for any and all of the following reasons: (a) The WLAs do not regulate the discharge of storm water; (b) The harm to the public from violating the WLAs is dramatic both in terms

December 13, 2001 (As amended on September 14, 2006 by Order R4-2006-0074 and on August 9, 2007 by Order R4-2007-0042)



**EXHIBIT** _2_
**PAGE** _18_ **OF** _80_

of health impacts to exposed beachgoers, and the economic cost to the region associated with related illnesses; (c) Under the iterative approach over three permit cycles, required elements of the MS4 permit (e.g., elimination of illicit connections/illicit discharges (IC/ID) into their MS4s, revisions to their SQMP, etc.) have not resulted in the elimination of exceedances of water quality standards at the beaches or in Basins D, E, and F of Marina del Rey Harbor.

33. On March 14, 2007, Marina del Rey watershed responsible agencies submitted to the Regional Board the results of a non-point source study conducted over a one year period between July 2005 and July 2006, which was required under the terms of the MDR TMDL. The study was designed to determine the relative bacterial loading to the harbor from sources including but not limited to storm drains, boats, birds, and other non-point sources. The study has not yet been peer reviewed, and is currently under review by Regional Board staff.

34. On January 8, 2007, as required by the MDR Bacterial TMDL, Marina del Rey watershed responsible agencies submitted to the Regional Board an implementation plan describing the strategy by which they intend to comply with the MDR Bacterial TMDL. This implementation plan was developed through a process that included both Regional Board staff and representatives from Heal the Bay and Santa Monica Baykeeper.

35. The Regional Board acknowledges the County's timely submittals of reports required by the TMDL and implementation measures initiated thus far towards meeting water quality standards for bacteria in Marina del Rey. As a result of the adoption of the MDR Bacterial TMDL in 2003, the County has funded or received grants to initiate the following activities:

- Marina Beach Water Quality Improvement Project, Phase I and Phase II through a CBI grant;
- Mothers' Beach and Back Basins Bacterial TMDL Non-point Source Study;
- Marina del Rey Harbor Mothers' Beach and Back Basins Report of Small Drain Identification;
- Marina del Rey Vessel Discharge Report;
- Marina del Rey Harbor Mothers' Beach and Back Basins Bacterial TMDL Coordinated Monitoring Plan; and
- Three low-flow diversion projects, which were partially funded by a grant, two of which have been completed.

In addition to participation in the above studies, the County and other Marina del Rey watershed responsible agencies continue to implement BMPs proposed in the January 8, 2007, Implementation Plan.

36. The Receiving Water Limitations have been revised to implement the Summer Dry Weather WLAs set forth in Basin Plan Tables 7-4.1 and 7-5.1. These Receiving Water Limitations apply at the compliance

December 13, 2001 (As amended on September 14, 2006 by Order R4-2006-0074 and on August 9, 2007 by Order R4-2007-0042)



EXHIBIT ___2___
PAGE _19_ OF _80_

monitoring sites identified in the *Santa Monica Bay Beaches Bacterial TMDLs Coordinated Shoreline Monitoring Plan* dated April 7, 2004[1] and the *Marina del Rey Harbor Mothers' Beach and Back Basins Bacterial TMDL Coordinated Monitoring Plan* dated April 13, 2007. Compliance with the Receiving Water Limitations shall be determined using monitoring data obtained in conformance with the *Santa Monica Bay Beaches Bacterial TMDLs Coordinated Shoreline Monitoring Plan* dated April 7, 2004; the *Marina del Rey Harbor Mothers' Beach and Back Basins Bacterial TMDL Coordinated Monitoring Plan* dated April 13, 2007; and the Monitoring and Reporting Program CI 6948.

37.   If the Receiving Water Limitations are exceeded at a compliance monitoring site, the Regional Board will generally issue an appropriate investigative order pursuant to Cal. Water Code § 13267 or § 13225 to the Permittees and other responsible agencies or jurisdictions within the relevant subwatershed to determine the source of the exceedance. Following these actions, Regional Board staff will generally evaluate the need for further enforcement as follows:

a)   If the Regional Board determines that the exceedance did not result from discharges from the MS4, then the MS4 Permittees would not be responsible for violations of these provisions.

b)   If the Regional Board determines that Permittees in the relevant subwatershed have demonstrated that their MS4 does not discharge dry weather flow into Santa Monica Bay or Basins D, E, or F in Marina del Rey Harbor, those Permittees would not be responsible for violations of these provisions even if the Receiving Water Limitations are exceeded at an associated compliance monitoring site.

c)   If the Regional Board determines that Permittees in the relevant subwatershed have demonstrated that their MS4 summer dry weather discharge into Santa Monica Bay or Basins D, E, or F in Marina del Rey Harbor is treated to a level that does not exceed either the single sample or the geometric mean bacteria objectives, those Permittees shall not be responsible for violations of these provisions even if the Receiving Water Limitations are exceeded at an associated compliance monitoring site.

d)   If the Regional Board determines that one or more Permittees have caused or contributed to violations of these Receiving Water Limitations, the Regional Board will consider appropriate enforcement action, including a cease and desist order with or without a time schedule for compliance, or other appropriate

---

[1] If the Regional Board determines that publicly owned storm drains that flow during dry weather are situated at additional shoreline locations, the *Santa Monica Bay Beaches Bacterial TMDLs Coordinated Shoreline Monitoring Plan* may be revised by the Regional Board Executive Officer approval, after providing the opportunity for public comment, to include these locations as compliance monitoring sites.

December 13, 2001 (As amended on September 14, 2006 by Order R4-2006-0074 and on August 9, 2007 by Order R4-2007-0042)



EXHIBIT ____2____
PAGE _20_ OF _80_

enforcement action depending upon the circumstances and the extent to which the Permittee(s) has endeavored to comply with these provisions.

38.   A Permittee would not be responsible for violations of these provisions if the Regional Board Executive Officer determines that the Permittee has adequately documented through a source investigation of the subwatershed, pursuant to protocols established under Cal. Water Code 13178, that bacterial sources originating within the jurisdiction of the Permittee have not caused or contributed to the exceedance of the Receiving Water Limitations.

39.   Water Code section 13389 exempts the Regional Board from compliance with Chapter 3 (commencing with Section 21100) of Division 13 of the Public Resources Code prior to the adoption of waste discharge requirements.  Therefore the Regional Board is not required to prepare environmental documents to evaluate this permit modification.  Nevertheless, the Regional Board has considered the policies and requirements set forth in Chapters 1 through 2.6 of CEQA, and further, has considered the final substitute environmental documents for the Santa Monica Bay Beaches Bacteria TMDL and the MDR Bacteria TMDL.

## F.   Implementation

1.   The California Environmental Quality Act (CEQA) (Cal. Pub. Resources Code § 21000 *et seq.*) requires that public agencies consider the environmental impacts of the projects they approve for development.  CEQA applies to projects that are considered discretionary and does not apply to ministerial projects, which involve the use of established standards or objective measurements.  A ministerial project may be made discretionary by adopting local ordinance provisions or imposing conditions to create decision-making discretion in approving the project.  In the alternative, Permittees may establish standards and objective criteria administratively for storm water mitigation for ministerial projects.  For water quality purposes, the Regional Board considers that all new development and significant redevelopment activity in specified categories, that receive approval or permits from a municipality, are subject to storm water mitigation requirements.

2.   The objective of this Order is to protect the beneficial uses of receiving waters in Los Angeles County.  To meet this objective, this Order requires that the SQMP specify BMPs that will be implemented to reduce the discharge of pollutants in storm water to the maximum extent practicable. Further, Permittees are to assure that storm water discharges from the MS4 shall neither cause nor contribute to the exceedance of water quality standards and objectives nor create conditions of nuisance in the receiving waters, and that the discharge of non-storm water to the MS4 has been effectively prohibited.

3.   The SQMP required in this Order builds upon the programs established in Order Nos. 90-079, and 96-054, consists of the components recommended in the USEPA guidance manual, and was developed with



EXHIBIT 2
PAGE 21 OF 80

the cooperation of representatives from the regulated community and environmental groups.   The SQMP includes provisions that promote customized initiatives, both on a countywide and watershed basis, in developing and implementing cost-effective measures to minimize discharge of pollutants to the receiving water.  The various components of the SQMP, taken as a whole rather than individually, are expected to reduce pollutants in storm water and urban runoff to the maximum extent practicable.  Provisions of the SQMP are fully enforceable under provisions of this Order.

4.  The emphasis of the SQMP is pollution prevention through education, public outreach, planning, and implementation as source control BMPs first and then Structural and Treatment Control BMPs next.  Successful implementation of the provisions of the SQMP will require cooperation and coordination of all public agencies in each Permittee's organization, among Permittees, and with the regulated community.

5.  The implementation of a Public Information and Participation Program is a critical component of a storm water management program. An informed and knowledgeable community is critical to the success of a storm water management program since it helps insure the following: (i) greater support for the program as the public gains a greater understanding of the reasons why it is necessary and important, and (ii) greater compliance with the program as the public becomes aware of the personal responsibilities expected of them and others in the community, including the individual actions they can take to protect or improve the quality of area waters.

6.  This Order includes a Monitoring Program that incorporates Minimum Levels (MLs) established under the SIP.  The SIP's MLs represent the lowest quantifiable concentration for priority toxic pollutants that is measurable with the use of proper method-based analytical procedures and factoring out matrix interference. The SIP's MLs therefore represent the best available science for determining MLs and are appropriate for a storm water monitoring program.  The use of MLs allows the detection of toxic priority pollutants at concentrations of concern using recent advances in chemical analytical methods.

7.  This Order provides flexibility for Permittees to petition the Regional Board Executive Officer to substitute a BMP under the SQMP with an alternative BMP, if they can provide information and documentation on the effectiveness of the alternative, equal to or greater than the prescribed BMP in meeting the objectives of this Order.

8.  This Order contemplates that the Permittees are responsible for considering potential storm water impacts when making planning decisions in order to fulfill the Permittees' CWA requirement to reduce the discharge of pollutants in municipal storm water to the MEP from new development and redevelopment activities. However, the Permittees retain authority to make the final land-use decisions and retain full statutory authority for deciding what land uses are appropriate at specific locations within each Permittee's jurisdiction.   This Order and its

December 13, 2001 (As amended on September 14, 2006 by Order R4-2006-0074 and on August 9, 2007 by Order R4-2007-0042)



EXHIBIT ___2___
PAGE _22_ OF _80_

requirements are not intended to restrict or control local land use decision-making authority.

9. This Order is not intended to prohibit the inspection for or abatement of vectors by the State Department of Health Services or local vector agencies in accordance with Cal. Health and Safety Code § 2270 *et seq.* and §116110 *et seq.* Certain Treatment Control BMPs if not properly designed, operated or maintained may create habitats for vectors (e.g. mosquito and rodents). This Order contemplates that the Permittees will closely cooperate and collaborate with local vector control agencies and the State Department of Health Services for the implementation, operation, and maintenance of Treatment Control BMPs in order to minimize the risk to public health from vector borne diseases.

## G.   Public Process

1. The Regional Board has notified the Permittees and interested agencies and persons of its intent to issue waste discharge requirements for this discharge, and has provided them with an opportunity to submit their written view and recommendations.

2. The Regional Board, in a public hearing, heard and considered all comments pertaining to the discharge and to the tentative requirements.

3. The Regional Board has conducted public workshops to discuss drafts of the permit. On April 24, 2001, Regional Board staff conducted a workshop outlining the reasoning behind the changes proposed for the new permit and received input from the Permittees and the public regarding those proposed changes. On July 26, 2001, a second public workshop was held at a special Regional Board meeting. The Permittees and the public had another opportunity to express their opinions regarding the proposed changes to the permit in front of the Regional Board members. A significant number of working meetings with the Permittees and other interested parties have occurred throughout the period from the submittal of the ROWD and completion of the tentative draft, in an attempt to incorporate and address all the comments presented.

4. The Los Angeles County Flood Control District, the County of Los Angeles and the other municipalities are co-permittees as defined in 40 CFR 122.26 (b)(1). Los Angeles County Flood Control District will coordinate with the other municipalities and facilitate program implementation. Each Permittee is responsible only for a discharge for which it is the operator.

5. This Order shall serve as a NPDES Permit, pursuant to CWA § 402, or amendments thereto, and shall take effect 50 days from Order adoption provided the Regional Administrator of the USEPA has no objections.

6. The action to adopt an NPDES permit is exempt from the provisions of Chapter 3 of CEQA (Cal. Pub. Resources Code § 21100 *et seq.*), in accordance with CWC § 13389.

December 13, 2001 (As amended on September 14, 2006 by Order R4-2006-0074 and on August 9, 2007 by Order R4-2007-0042)



EXHIBIT ___2___
PAGE _23_ OF _80_

7. Pursuant to CWC §13320, any aggrieved party may seek review of this Order by filing a petition with the State Board. A petition must be sent to: State Water Resources Control Board, P.O. Box 100, Sacramento, California, 95812, within 30 days of adoption of the Order by the Regional Board.

8. This Order may be modified or alternatively revoked or reissued prior to its expiration date, in accordance with the procedural requirements of the NPDES program, and the CWC for the issuance of waste discharge requirements.

**IT IS HEREBY ORDERED** that the Los Angeles County Flood Control District, Los Angeles County, and the Cities of Agoura Hills, Alhambra, Arcadia, Artesia, Azusa, Baldwin Park, Bell, Bellflower, Bell Gardens, Beverly Hills, Bradbury, Burbank, Calabasas, Carson, Cerritos, Claremont, Commerce, Compton, Covina, Cudahy, Culver City, Diamond Bar, Downey, Duarte, El Monte, El Segundo, Gardena, Glendale, Glendora, Hawaiian Gardens, Hawthorne, Hermosa Beach, Hidden Hills, Huntington Park, Industry, Inglewood, Irwindale, La Cañada Flintridge, La Habra Heights, Lakewood, La Mirada, La Puente, La Verne, Lawndale, Lomita, Los Angeles, Lynwood, Malibu, Manhattan Beach, Maywood, Monrovia, Montebello, Monterey Park, Norwalk, Palos Verdes Estates, Paramount, Pasadena, Pico Rivera, Pomona, Rancho Palos Verdes, Redondo Beach, Rolling Hills, Rolling Hills Estates, Rosemead, San Dimas, San Fernando, San Gabriel, San Marino, Santa Clarita, Santa Fe Springs, Santa Monica, Sierra Madre, Signal Hill, South El Monte, South Gate, South Pasadena, Temple City, Torrance, Vernon, Walnut, West Covina, West Hollywood, Westlake Village, and Whittier, in order to meet the provisions contained in Division 7 of the CWC and regulations adopted thereunder, and the provisions of the CWA, as amended, and regulations and guidelines adopted thereunder, shall comply with the following:

## Part 1. DISCHARGE PROHIBITIONS

Part 1. A.  The Permittees shall effectively prohibit non-storm water discharges into the MS4 and watercourses, except where such discharges:

1. Are covered by a separate individual or general NPDES permit for non-storm water discharges; or

2. Fall within one of the categories below, and meet all conditions when specified by the Regional Board Executive Officer:

   a) Category A - Natural flow:

      (1) Natural springs and rising ground water;

      (2) Flows from riparian habitats or wetlands;

      (3) Stream diversions, permitted by the State Board; and

      (4) Uncontaminated ground water infiltration [as defined by 40 CFR 35.2005(20)].

   b) Category B - Flows from emergency fire fighting activity.

December 13, 2001 (As amended on September 14, 2006 by Order R4-2006-0074 and on August 9, 2007 by Order R4-2007-0042)



EXHIBIT  2
PAGE 24 OF 80

   c)    Category C - Flows incidental to urban activities:

      (1)    Reclaimed and potable landscape irrigation runoff;

      (2)    Potable drinking water supply and distribution system releases (consistent with American Water Works Association guidelines for dechlorination and suspended solids reduction practices);

      (3)    Drains for foundations, footings, and crawl spaces;

      (4)    Air conditioning condensate;

      (5)    Dechlorinated/debrominated swimming pool discharges;

      (6)    Dewatering of lakes and decorative fountains;

      (7)    Non-commercial car washing by residents or by non-profit organizations; and

      (8)    Sidewalk rinsing.

The Regional Board Executive Officer may add or remove categories of non-storm water discharges above. Furthermore, in the event that any of the above categories of non-storm water discharges are determined to be a source of pollutants by the Regional Board Executive Officer, the discharge will no longer be exempt from this prohibition unless the Permittee implements conditions approved by the Regional Board Executive Officer to ensure that the discharge is not a source of pollutants. Notwithstanding the above, the Regional Board Executive Officer may impose additional prohibitions of non-storm water discharges in consideration of antidegradation policies and TMDLs.

Part 1. B.    Discharges of Summer Dry Weather flows from MS4s into Santa Monica Bay[2] or into Marina del Rey Harbor Basins D, E, or F, including Mothers' Beach, that cause or contribute to exceedances of the bacteria Receiving Water Limitations in Part 2.5 and 2.6 below, are prohibited.[3]

---

[2] Santa Monica Bay encompasses the coastal waters from Point Dume to Point Fermin and seaward to the 500-meter depth contour. It includes all beaches from the Los Angeles/Ventura County line south to the Outer Cabrillo Beach located just south of the Palos Verdes Peninsula.
[3] Responsibility for such prohibited discharges is determined as indicated in Footnote 3 part (2) of Table 7-4.1 and Footnote 2 part (1) of Table 7-5.1 of the Basin Plan. All Permittees within a subwatershed of the Santa Monica Bay Watershed Management Area are jointly responsible for compliance with the limitations imposed in Tables 7-4.1 and 7-5.1 of the Basin Plan.

December 13, 2001 (As amended on September 14, 2006 by Order R4-2006-0074 and on August 9, 2007 by Order R4-2007-0042)



EXHIBIT 2
PAGE 25 OF 80

## Part 2. RECEIVING WATER LIMITATIONS

1. Except as provided in Part 2.5 and 2.6 below, discharges from the MS4 that cause or contribute to the violation of Water Quality Standards or water quality objectives are prohibited.

2. Discharges from the MS4 of storm water, or non-storm water, for which a Permittee is responsible for, shall not cause or contribute to a condition of nuisance.

3. The Permittees shall comply with Part 2.1. and 2.2. through timely implementation of control measures and other actions to reduce pollutants in the discharges in accordance with the SQMP and its components and other requirements of this Order including any modifications. The SQMP and its components shall be designed to achieve compliance with receiving water limitations. If exceedances of Water Quality Objectives or Water Quality Standards (collectively, Water Quality Standards) persist, notwithstanding implementation of the SQMP and its components and other requirements of this permit, the Permittee shall assure compliance with discharge prohibitions and receiving water limitations by complying with the following procedure:

    a) Upon a determination by either the Permittee or the Regional Board that discharges are causing or contributing to an exceedance of an applicable Water Quality Standard, the Permittee shall promptly notify and thereafter submit a Receiving Water Limitations (RWL) Compliance Report (as described in the Program Reporting Requirements, Section I of the Monitoring and Reporting Program) to the Regional Board that describes BMPs that are currently being implemented and additional BMPs that will be implemented to prevent or reduce any pollutants that are causing or contributing to the exceedances of Water Quality Standards. This RWL Compliance Report may be incorporated in the annual Storm Water Report and Assessment unless the Regional Board directs an earlier submittal. The RWL Compliance Report shall include an implementation schedule. The Regional Board may require modifications to the RWL Compliance Report.

    b) Submit any modifications to the RWL Compliance Report required by the Regional Board within 30 days of notification.

    c) Within 30 days following the approval of the RWL Compliance Report, the Permittee shall revise the SQMP and its components and monitoring program to incorporate the approved modified BMPs that have been and will be implemented, an implementation schedule, and any additional monitoring required.

    d) Implement the revised SQMP and its components and monitoring program according to the approved schedule.

4. So long as the Permittee has complied with the procedures set forth above and is implementing the revised SQMP and its components, the Permittee does not

December 13, 2001 (As amended on September 14, 2006 by Order R4-2006-0074 and on August 9, 2007 by Order R4-2007-0042)



**EXHIBIT** ___2___
**PAGE** _26_ **OF** _80_

have to repeat the same procedure for continuing or recurring exceedances of the same receiving water limitations unless directed by the Regional Board to develop additional BMPs.

5.  During Summer Dry Weather there shall be no discharges of bacteria from MS4s into the Santa Monica Bay that cause or contribute to exceedances in the Wave Wash, of the applicable bacteria objectives.  The applicable bacteria objectives include both the single sample and geometric mean bacteria objectives set to protect the Water Contact Recreation (REC-1) beneficial use, as set forth in the Basin Plan.[4]

6.  During Summer Dry Weather there shall be no discharges of bacteria from MS4s into Marina del Rey Harbor Basins D, E, or F, including Mothers' Beach that cause or contribute to exceedances of the applicable bacteria objectives.  The applicable bacteria objectives include both the single sample and geometric mean bacteria objectives set to protect the Water Contact Recreation (REC-1) beneficial use, as set forth in the Basin Plan.[5]

## Part 3.  STORM WATER QUALITY MANAGEMENT PROGRAM (SQMP) IMPLEMENTATION

### A.  General Requirements

1.  Each Permittee shall, at a minimum, implement the SQMP. The SQMP is an enforceable element of this Order.  The SQMP shall be implemented no later than February 1, 2002, unless a later date has been specified for a particular provision in this Order.

2.  The SQMP shall, at a minimum, comply with the applicable storm water program requirements of 40 CFR 122.26(d)(2).  The SQMP and its components shall be implemented so as to reduce the discharges of pollutants in storm water to the MEP.

3.  Each Permittee shall implement additional controls, where necessary, to reduce the discharges of pollutants in storm water to the MEP.

4.  Permittees that modify the countywide SQMP (i.e., implement additional controls, implement different controls than described in the countywide SQMP, or determine that certain BMPs in the countywide SQMP are not applicable in the area under its jurisdiction), shall develop a local SQMP, no later than August 1, 2002.  The local SQMP shall be customized to reflect the conditions in the area under the Permittee's jurisdiction and

---

[4] Samples collected for determining compliance with the receiving water limitations of Part 2.5 shall be processed in accordance with the sampling procedures and analytical methodology set forth in the *Santa Monica Bay Beaches Bacterial TMDLs Coordinated Shoreline Monitoring Plan* dated April 7, 2004 and the Monitoring and Reporting Program CI 6948.

[5] Samples collected for determining compliance with the receiving water limitations of Part 2.6 shall be processed in accordance with the sampling procedures and analytical methodology set forth in the *Marina del Rey Harbor Mothers' Beach and Back Basins Bacterial TMDL Coordinated Shoreline Monitoring Plan* dated April 13, 2007 and the Monitoring and Reporting Program CI 6948.

December 13, 2001 (As amended on September 14, 2006 by Order R4-2006-0074 and on August 9, 2007 by Order R4-2007-0042)



EXHIBIT ___2___
PAGE _27_ OF _80_

shall specify activities being implemented under the appropriate elements described in the countywide SQMP.

**B.      Best Management Practice Implementation**

The Permittees shall implement or require the implementation of the most effective combination of BMPs for storm water/urban runoff pollution control. When implemented, BMPs are intended to result in the reduction of pollutants in storm water to the MEP.

**C.      Revision of the Storm Water Quality Management Program**

The Permittees shall revise the SQMP, at the direction of the Regional Board Executive Officer, to incorporate program implementation amendments so as to comply with regional, watershed specific requirements, and/or waste load allocations developed and approved pursuant to the process for the designation and implementation of Total Maximum Daily Loads (TMDLs) for impaired water bodies.

**D.      Designation and Responsibilities of the Principal Permittee**

The Los Angeles County Flood Control District is hereby designated as the Principal Permittee. As such, the Principal Permittee shall:

1.      Coordinate and facilitate activities necessary to comply with the requirements of this Order, but is not responsible for ensuring compliance of any individual Permittee;

2.      Coordinate permit activities among Permittees and act as liaison between Permittees and the Regional Board on permitting issues;

3.      Provide personnel and fiscal resources for the necessary updates of the SQMP and its components;

4.      Provide technical and administrative support for committees that will be organized to implement the SQMP and its components;

5.      Convene the Watershed Management Committees (WMCs) constituted pursuant to Part F, below, upon designation of representatives;

6.      Implement the Countywide Monitoring Program required under this Order and evaluate, assess and synthesize the results of the monitoring program;

7.      Provide personnel and fiscal resources for the collection, processing and submittal to the Regional Board of annual reports and summaries of other reports required under the SQMP; and

8.      Comply with the "Responsibilities of the Permittees" in Part 3.E., below.



**E.     Responsibilities of the Permittees**

Each Permittee is required to comply with the requirements of this Order applicable to discharges within its boundaries (see Findings D.1, D.2. and D.3.) and not for the implementation of the provisions applicable to the Principal Permittee or other Permittees. Each Permittee shall, within its geographic jurisdiction:

1.     Comply with the requirements of the SQMP and any modifications thereto;

2.     Coordinate among its internal departments and agencies, as appropriate, to facilitate the implementation of the requirements of the SQMP applicable to such Permittee in an efficient and cost-effective manner;

3.     Designate a technically knowledgeable representative to the appropriate WMC;

4.     Participate in intra-agency coordination (e.g. Fire Department, Building and Safety, Code Enforcement, Public Health, etc.) necessary to successfully implement the provisions of this Order and the SQMP.

5.     Prepare an annual Budget Summary of expenditures applied to the storm water management program.  This summary shall identify the storm water budget for the following year, using estimated percentages and written explanations where necessary, for the specific categories noted below:

      a)     Program management
- Administrative costs

      b)     Program Implementation
Where information is available, provide an estimated percent breakdown of expenditures for the categories below:
- Illicit connection/illicit discharge
- Development planning
- Development construction
- Construction inspection activities
- Industrial/Commercial inspection activities
- Public Agency Activities
  - Maintenance of Structural BMPs and Treatment Control BMPs
  - Municipal Street Sweeping
  - Catch basin clean-up
  - Trash collection
  - Capital costs

      c)     Public Information and Participation

      d)     Monitoring Program

      e)     Miscellaneous Expenditures

December 13, 2001 (As amended on September 14, 2006 by Order R4-2006-0074 and on August 9, 2007 by Order R4-2007-0042)



EXHIBIT ___2___
PAGE _29_ OF _80_

6. Each Permittee, in addition to the Budget Summary, shall report any supplemental dedicated budgets for the same categories.

**F.    Watershed Management Committees (WMCs)**

1. Each WMC shall be comprised of a voting representative from each Permittee in the WMA.

2. The WMC's chair and secretary shall be chosen by the WMC upon Order adoption and on an annual basis, thereafter.  In the absence of volunteer Permittee(s) for the positions, the Principal Permittee shall assume those roles until the WMC chooses members of the committee for the positions.

3. Each WMC shall:

   a) Facilitate cooperation and exchange of information among Permittees;

   b) Establish additional goals and objectives and associated deadlines for the WMA, as the program implementation progresses;

   c) Prioritize pollution control efforts based on beneficial use impairment(s), watershed characteristics and analysis of results from studies and the monitoring program;

   d) Develop and/or update and monitor the adequate implementation, on an annual basis, of the tasks identified for the WMA;

   e) Assess the effectiveness of, prepare revisions for, and recommend appropriate changes to the SQMP and its components;

   f) Continue to prioritize the Industrial/Commercial critical sources for investigation, outreach and follow-up; and

   g) Meet four times per year and, as necessary.

**G.    Legal Authority**

1. Permittees shall possess the necessary legal authority to prohibit non-storm water discharges to the storm drain system, including, but not limited to:

   a) Illicit discharges and illicit connections and require removal of illicit connections;

   b) The discharge of wash waters to the MS4 from the cleaning of gas stations, auto repair garages, or other types of automotive service facilities;

   c) The discharge of runoff to the MS4 from mobile auto washing, steam cleaning, mobile carpet cleaning, and other such mobile commercial and industrial operations;

December 13, 2001 (As amended on September 14, 2006 by Order R4-2006-0074 and on August 9, 2007 by Order R4-2007-0042)



**EXHIBIT** _2_
**PAGE** _30_ **OF** _80_

d) The discharge of runoff to the MS4 from areas where repair of machinery and equipment which are visibly leaking oil, fluid or antifreeze, is undertaken;

e) The discharge of runoff to the MS4 from storage areas of materials containing grease, oil, or other hazardous substances, and uncovered receptacles containing hazardous materials;

f) The discharge of chlorinated/ brominated swimming pool water and filter backwash to the MS4;

g) The discharge of runoff from the washing of toxic materials from paved or unpaved areas to the MS4;

h) Washing impervious surfaces in industrial/commercial areas that results in a discharge of runoff to the MS4;

i) The discharge of concrete or cement laden wash water from concrete trucks, pumps, tools, and equipment to the MS4; and

j) Dumping or disposal of materials into the MS4 other than storm water, such as:

   (1) Litter, landscape debris and construction debris;

   (2) Any state or federally banned or unregistered pesticides;

   (3) Food and food processing wastes; and

   (4) Fuel and chemical wastes, animal wastes, garbage, batteries, and other materials that have potential adverse impacts on water quality.

2. The Permittees shall possess adequate legal authority to:

a) Require persons within their jurisdiction to comply with conditions in Permittees' ordinances, permits, contracts, model programs, or orders (i.e. hold dischargers to its MS4 accountable for their contributions of pollutants and flows);

b) Utilize enforcement mechanisms to require compliance with Permittees ordinances, permits, contracts, or orders;

c) Control pollutants, including potential contribution, in discharges of storm water runoff associated with industrial activities (including construction activities) to its MS4 and control the quality of storm water runoff from industrial sites (including construction sites). This requirement applies to Source Control, and Treatment Control BMPs;

d) Carry out all inspection, surveillance and monitoring procedures necessary to determine compliance and non-compliance with permit conditions, including the prohibition of illicit discharges to the MS4. Permittees must possess authority to enter, sample, inspect, review and copy records, and require regular reports from

December 13, 2001 (As amended on September 14, 2006 by Order R4-2006-0074 and on August 9, 2007 by Order R4-2007-0042)



EXHIBIT 2
PAGE 31 OF 80

industrial facilities (including construction sites) discharging polluted or with the potential to discharge polluted storm water runoff into its MS4;

e)   Require the use of BMPs to prevent or reduce the discharge of pollutants to MS4s to MEP; and

f)   Require that Treatment Control BMPs be properly operated and maintained to prevent the breeding of vectors.

3.   Each Permittee shall, no later than November 1, 2002, amend and adopt (if necessary), a Permittee-specific storm water and urban runoff ordinance to enforce all requirements of this permit.

4.   Each Permittee shall submit no later than December 2, 2002, a new or updated statement by its legal counsel that the Permittee has obtained all necessary legal authority to comply with this Order through adoption of ordinances and/or municipal code modifications.

## Part 4. SPECIAL PROVISIONS

### Maximum Extent Practicable Standard

This permit, and the provisions herein, are intended to develop, achieve, and implement a timely, comprehensive, cost-effective storm water pollution control program to reduce the discharge of pollutants in storm water to the MEP from the permitted areas in the County of Los Angeles to the waters of the State.

### A.   General Requirements

1.   Best Management Practice Substitution

The Regional Board Executive Officer may approve any site-specific BMP substitution upon petition by a Permittee(s), if the Permittee can document that:

a)   The proposed alternative BMP or program will meet or exceed the objective of the original BMP or program in the reduction of storm water pollutants; or

b)   The fiscal burden of the original BMP or program is substantially greater than the proposed alternative and does not achieve a substantially greater improvement in storm water quality; and,

c)   The proposed alternative BMP or program will be implemented within a similar period of time.

### B.   Public Information and Participation Program (PIPP)

The Principal Permittee shall implement a Public Information and Participation Program (PIPP) that includes, but is not limited to, the requirements listed in this section.  The Principal Permittee shall be responsible for developing and

December 13, 2001 (As amended on September 14, 2006 by Order R4-2006-0074 and on August 9, 2007 by Order R4-2007-0042)


EXHIBIT ___2___
PAGE _32_ OF _80_

implementing the Public Education Program, as described in the SQMP, and shall coordinate with Permittees to implement specific requirements.

The objectives of the PIPP are as follows:

- To measurably increase the knowledge of the target audiences regarding the MS4, the impacts of storm water pollution on receiving waters, and potential solutions to mitigate the problems caused;

- To measurably change the waste disposal and runoff pollution generation behavior of target audiences by encouraging implementation of appropriate solutions; and

- To involve and engage socio-economic groups and ethnic communities in Los Angeles County to participate in mitigating the impacts of storm water pollution.

The Principal Permittee shall convene an advisory committee to provide input and assistance in meeting the goals and objectives of the public education campaign.  The advisory committee shall be consulted during the process of developing the PIPP campaign, and shall provide comments and advice during the process of preparing a Request For Proposals for a storm water public education contractor.  The committee may participate as a part of a working group that evaluates contractor proposals and other tasks as appropriate.  The committee shall be comprised of representatives of the environmental community, Permittee cities, Regional Board staff, and experts in the fields of public education and marketing.  The Principal Permittee shall ensure that the committee meets at least once a year.

1.   Residential Program

    a)   "No Dumping" Message

        Each Permittee shall mark all storm drain inlets that they own with a legible "no dumping" message. In addition, signs with prohibitive language discouraging illegal dumping must be posted at designated public access points to creeks, other relevant water bodies, and channels no later than February 2, 2004.  Signage and storm drain messages shall be legible and maintained as necessary during the term of the permit.

    b)   Countywide Hotline

        The 888-CLEAN-LA hotline will serve as the general public reporting contact for reporting clogged catch basin inlets and illicit discharges/dumping, faded or lack of catch basin stencils, and general storm water management information.  Each Permittee may establish its own hotline if preferred.  Permittees shall include this information, updated when necessary, in public information, and the government pages of the telephone book, as they are developed or published.  The Principal Permittee shall compile a list of the general public reporting contacts from all Permittees and make this information available on the web site (888CleanLA.com) and upon request.  Permittees shall provide the Principal Permittee with their reporting contacts no later than

December 13, 2001 (As amended on September 14, 2006 by Order R4-2006-0074 and on August 9, 2007 by Order R4-2007-0042)

**EXHIBIT** *2*

**PAGE** *33* **OF** *80*

March 1, 2002.  Permittees are responsible for providing current, updated information to the Principal Permittee.

c)   Outreach and Education

(1)   The Principal Permittee shall continue to implement the following activities that were components of the first five-year PIPP:

(i)   Advertising;

(ii)   Media relations;

(iii)   Public service announcements;

(iv)   "How To" instructional material distributed in a targeted and activity-related manner;

(v)   Corporate, community association, environmental organization and entertainment industry tie-ins; and

(vi)   Events targeted to specific activities and population subgroups.

(2)   The Principal Permittee shall develop a strategy to educate ethnic communities and businesses through culturally effective methods.  Details of this strategy should be incorporated into the Public Education Program, and implemented, no later than February 3, 2003.

(3)   The Principal Permittee shall enhance the existing outreach efforts to residents and businesses related to the proper disposal of cigarette butts.

(4)   Each Permittee shall conduct educational activities within its jurisdiction and participate in countywide events.

(5)   The Principal Permittee shall organize Public Outreach Strategy meetings for Permittees on a quarterly basis, beginning no later than May 1, 2002.  The Principal Permittee shall provide guidance for Permittees to augment the countywide outreach and education program. Permittees shall coordinate regional and local outreach and education to reduce duplication of efforts.  Permittees are encouraged to include other interested parties in the outreach strategy to strengthen and coordinate educational efforts.

(6)   The Principal Permittee shall ensure that a minimum of 35 million impressions per year are made on the general public about storm water quality via print, local TV access, local radio, or other appropriate media.

(7)   The Principal Permittee, in cooperation with the Permittees, shall provide schools within each School

December 13, 2001 (As amended on September 14, 2006 by Order R4-2006-0074 and on August 9, 2007 by Order R4-2007-0042)

**EXHIBIT** _2_

**PAGE** _34_ **OF** _80_

District in the County with materials, including, but not limited to, videos, live presentations, and other information necessary to educate a minimum of 50 percent of all school children (K-12) every 2 years on storm water pollution.

(8)   Permittees shall provide the contact information for their appropriate staff responsible for storm water public education activities to the Principal Permittee no later than April 1, 2002, and changes to contact information no later than 30 days after a change occurs.

(9)   The Principal Permittee shall develop a strategy to measure the effectiveness of in-school educational programs.  The protocol shall include assessment of students' knowledge of storm water pollution problems and solutions before and after educational efforts are conducted.  The protocol shall be developed and submitted to the Regional Board Executive Officer for approval no later than May 1, 2002.  It shall be implemented upon approval.

(10)  In order to ensure that the PIPP is demonstrably effective in changing the behavior of the public, the Principal Permittee shall develop a behavioral change assessment strategy no later than May 1, 2002.  The strategy shall be developed based on sociological data and studies (such as the County Segmentation Study).  The Principal Permittee shall submit the assessment strategy to the Regional Board Executive Office for approval. It shall be implemented on approval.

d)   Pollutant-Specific Outreach

The Principal Permittee, in cooperation with Permittees, shall coordinate to develop outreach programs that focus on the watershed-specific pollutants listed in Table 1 no later than February 3, 2003.  Metals may be appropriately addressed through the Industrial/Commercial Facilities Program  (e.g. distribute education materials on appropriate BMPs for metal waste management to facilities that have been identified as a potential source, such as metal fabricating facilities).  Region-wide pollutants may be included in the Principal Permittee's mass media outreach efforts.

| Table 1. | |
|---|---|
| **Watershed** | **Target Pollutants for Outreach** |
| Ballona Creek | Trash, Indicator Bacteria, Metals, PAHs |
| Malibu Creek | Trash, Nutrients (Nitrogen), Indicator Bacteria, Sediments |
| Los Angeles River | Trash, Nutrients (Nitrogen), Indicator |



EXHIBIT  2
PAGE 35 OF 80

|  | Bacteria, Metals, Pesticides, PAHs |
|---|---|
| San Gabriel River | Trash, Nutrients (Nitrogen), Indicator Bacteria, Metals |
| Santa Clara River | Nutrients (Nitrogen), Coliform |
| Dominguez Channel | Trash, Indicator Bacteria, PAHs |

Each Permittee shall make outreach materials available to the general public and target audiences, such as schools, community groups, contractors and developers, and at appropriate public counters and events.   Outreach material shall include information on pollutants, sources of concern, and source abatement measures.

2.      Businesses Program

     a)      Corporate Outreach

The Principal Permittee shall develop and implement a Corporate Outreach program to educate and inform corporate managers about storm water regulations.   The program shall target RGOs and restaurant chains.  At a minimum, this program shall include:

     (1)      Conferring with corporate management to explain storm water regulations;

     (2)      Distribution and discussion of educational material regarding storm water pollution and BMPs, and provide managers with suggestions to facilitate employee compliance with storm water regulations.

Corporate Outreach for all RGOs and restaurant chain corporations shall be conducted not less than twice during the permit term, with the first outreach contact to begin no later than February 3, 2003.

     b)      Business Assistance Program

The Principal Permittee and Permittees may implement a Business Assistance Program to provide technical resource assistance to small businesses to advise them on BMPs implementation to reduce the discharge of pollutants in storm water runoff. Programs may include:

     (1)      On-site technical assistance or consultation via telephone to identify and implement storm water pollution prevention methods and best management practices; and

     (2)      Making available, distributing, and discussing of applicable BMP and educational materials.

**C.      Industrial/Commercial Facilities Control Program**

December 13, 2001 (As amended on September 14, 2006 by Order R4-2006-0074 and on August 9, 2007 by Order R4-2007-0042)

**EXHIBIT** _2_

**PAGE** _36_ **OF** _80_

Each Permittee shall require implementation of pollutant reduction and control measures at industrial and commercial facilities, with the objective of reducing pollutants in storm water runoff. Except as specified in other sections of this Order, pollutant reduction and control measures can be used alone or in combination, and can include Structural and Source Control BMPs, and operation and maintenance procedures, which can be applied before, during, and/or after pollution generating activities. At a minimum, the Industrial/Commercial Facilities Control Program shall include requirements to: (1) track, (2) inspect, and (3) ensure compliance at industrial and commercial facilities that are critical sources of pollutants in storm water.

1.  **Track Critical Sources**

    a)  Each Permittee shall maintain a watershed-based inventory or database of all facilities within its jurisdiction that are critical sources of storm water pollution. Critical sources to be tracked are summarized below, and also specified in Attachment B:

        (1)  Commercial Facilities
            * restaurants;
            * automotive service facilities; and
            * RGOs and automotive dealerships.

        (2)  USEPA Phase I Facilities (Tier 1 and 2)

        (3)  Other Federally-mandated Facilities [as specified in 40 CFR 122.26(d)(2)(iv)(C)]
            * municipal landfills;
            * hazardous waste treatment, disposal, and recovery facilities; and
            * facilities subject to SARA Title III (also known as EPCRA).

    b)  Each Permittee shall include the following minimum fields of information for each industrial and commercial facility:
        * name of facility and name of owner/operator;
        * address;
        * coverage under the GIASP or other individual or general NPDES permits; and
        * a narrative description including SIC codes that best reflects the industrial activities at and principal products of each facility.

        The Regional Board encourages Permittees to add other fields of information, such as material usage and/or industrial output, and discrepancies between SIC Code designations (as reported by facility operators) and the actual type of industrial activity has the potential to pollute storm water. In addition, the Regional Board recommends use of an automated database system, such as a Geographical Information System (GIS) or Internet-based system; however, this is not required.

December 13, 2001 (As amended on September 14, 2006 by Order R4-2006-0074 and on August 9, 2007 by Order R4-2007-0042)

EXHIBIT 2
PAGE 37 OF 80

c) Each Permittee shall update its inventory of critical sources at least annually.  The update may be accomplished through collection of new information obtained through field activities or through other readily available intra-agency informational databases (e.g. business licenses, pretreatment permits, sanitary sewer hook-up permits).

**2.      Inspect Critical Sources**

Each Permittee shall inspect all facilities in the categories and at a level and frequency as specified in the following subsections.

a)      Commercial Facilities

(1)      Restaurants

Frequency of Inspections:  Twice during the 5-year term of the Order, provided that the first inspection occurs no later than August 1, 2004, and that there is a minimum interval of one year in between the first compliance inspection and the second compliance inspection.

Level of inspections:  Each Permittee, in cooperation with its appropriate department (such as health or public works), shall inspect all restaurants within its jurisdiction to confirm that storm water BMPs are being effectively implemented in compliance with State law, County and municipal ordinances, Regional Board Resolution 98-08, and the SQMP.  At each restaurant, inspectors shall verify that the restaurant operator:

- has received educational materials on storm water pollution prevention practices;
- does not pour oil and grease or oil and grease residue onto a parking lot, street or adjacent catch basin;
- keeps the trash bin area clean and trash bin lids closed, and does not fill trash bins with washout water or any other liquid;
- does not allow illicit discharges, such as discharge of washwater from floormats, floors, porches, parking lots, alleys, sidewalks and street areas (in the immediate vicinity of the establishment), filters or garbage/trash containers;
- removes food waste, rubbish or other materials from parking lot areas in a sanitary manner that does not create a nuisance or discharge to the storm drain.

(2)      Automotive Service Facilities

December 13, 2001 (As amended on September 14, 2006 by Order R4-2006-0074 and on August 9, 2007 by Order R4-2007-0042)



EXHIBIT ___2___
PAGE _38_ OF _80_

Frequency of Inspections:  Twice during the 5-year term of the Order, provided that the first inspection occurs no later than August 1, 2004, and that there is a minimum interval of one year in between the first compliance inspection and the second compliance inspection.

Level of inspections:  Each Permittee shall inspect all automotive service facilities within its jurisdiction to confirm that storm water BMPs are effectively implemented in compliance with County and municipal ordinances, Regional Board Resolution 98-08, and the SQMP.  At each automotive service facility, inspectors shall verify that each operator:

- maintains the facility area so that it is clean and dry and without evidence of excessive staining;
- implements housekeeping BMPs to prevent spills and leaks;
- properly discharges wastewaters to a sanitary sewer and/or contains wastewaters for transfer to a legal point of disposal;
- is aware of the prohibition on discharge of non-storm water to the storm drain;
- properly manages raw and waste materials including proper disposal of hazardous waste;
- protects outdoor work and storage areas to prevent contact of pollutants with rainfall and runoff;
- labels, inspects, and routinely cleans storm drain inlets that are located on the facility's property; and
- trains employees to implement storm water pollution prevention practices.

(3)    Retail Gasoline Outlets and Automotive Dealerships

Frequency of Inspection:  Twice during the 5-year term of the Order, provided that the first inspection occurs no later than August 1, 2004, and that there is a minimum interval of one year in between the first compliance inspection and the second compliance inspection.

Level of Inspection:  Each Permittee shall confirm that BMPs are being effectively implemented at each RGO and automotive dealership within its jurisdiction, in compliance with the SQMP, Regional Board Resolution 98-08, and the Stormwater Quality Task Force Best Management Practice Guide for RGOs.  At each RGO and automotive dealership, inspectors shall verify that each operator:

December 13, 2001 (As amended on September 14, 2006 by Order R4-2006-0074 and on August 9, 2007 by Order R4-2007-0042)



EXHIBIT _2_
PAGE _39_ OF _80_

- routinely sweeps fuel-dispensing areas for removal of litter and debris, and keeps rags and absorbents ready for use in case of leaks and spills;
- is aware that washdown of facility area to the storm drain is prohibited;
- is aware of design flaws (such as grading that doesn't prevent run-on, or inadequate roof covers and berms), and that equivalent BMPs are implemented;
- inspects and cleans storm drain inlets and catch basins within each facility's boundaries no later than October 1st of each year;
- posts signs close to fuel dispensers, which warn vehicle owners/operators against "topping off" of vehicle fuel tanks and installation of automatic shutoff fuel dispensing nozzles;
- routinely checks outdoor waste receptacle and air/water supply areas, cleans leaks and drips, and ensures that only watertight waste receptacles are used and that lids are closed; and
- trains employees to properly manage hazardous materials and wastes as well as to implement other storm water pollution prevention practices.

b)   Phase I Facilities

Permittees need not inspect facilities that have been inspected by the Regional Board within the past 24 months.  For the remaining Phase I facilities that the Regional Board has not inspected, each Permittee shall conduct compliance inspections as specified below.

**Frequency of Inspection**

**Facilities in Tier 1 Categories:**  Twice during the 5-year term of the Order, provided that the first inspection occurs no later than August 1, 2004, and that there is a minimum interval of one year in between the first compliance inspection and the second compliance inspection.

**Facilities in Tier 2 Categories:**  Twice during the 5-year term of the permit, provided that the first inspection occurs no later than August 1, 2004.  Permittees need not perform additional inspections at those facilities determined to have no risk of exposure of industrial activity to storm water.  For those facilities that do have exposure of industrial activities to storm water, a Permittee may reduce the frequency of additional compliance inspections to once every 5 years, provided that the Permittee inspects at least 20% of the facilities in Tier 2 each year.



EXHIBIT    2
PAGE 40 OF 80

**Level of Inspection:** Each Permittee shall confirm that each operator:

- has a current Waste Discharge Identification (WDID) number for facilities discharging storm water associated with industrial activity, and that a Storm Water Pollution Prevention Plan is available on-site, and
- is effectively implementing BMPs in compliance with County and municipal ordinances, Regional Board Resolution 98-08, and the SQMP.

c)   Other Federally-mandated Facilities

**Frequency of Inspection:** Twice during the 5-year term of the Order, provided that the first inspection occurs no later than August 1, 2004, and that there is a minimum interval of one year in between the first compliance inspection and the second compliance inspection.

**Level of Inspection:** Each Permittee shall confirm that each operator:

- has a current Waste Discharge Identification (WDID) number for facilities discharging storm water associated with industrial activity, and that a Storm Water Pollution Prevention Plan is available on-site, and
- is effectively implementing BMPs in compliance with County and municipal ordinances, Regional Board Resolution 98-08, and the SQMP.

3.   Ensure Compliance of Critical Sources

a)   **BMP Implementation:** In the event that a Permittee determines that a BMP specified by the SQMP or Regional Board Resolution 98-08 is infeasible at any site, that Permittee shall require implementation of other BMPs that will achieve the equivalent reduction of pollutants in the storm water discharges. Likewise, for those BMPs that are not adequate to achieve water quality objectives, Permittees may require additional site-specific controls, such as Treatment Control BMPs.

December 13, 2001 (As amended on September 14, 2006 by Order R4-2006-0074 and on August 9, 2007 by Order R4-2007-0042)

EXHIBIT ___2___
PAGE _41_ OF _80_

b)  **Environmentally Sensitive Areas and Impaired Waters:**  For critical sources that are in ESAs or that are tributary to CWA § 303(d) impaired water bodies, Permittees shall consider requiring operators to implement additional controls to reduce pollutants in storm water runoff that are causing or contributing to the exceedences of Water Quality Objectives.

c)  **Progressive Enforcement:**  Each Permittee shall implement a progressive enforcement policy to ensure that facilities are brought into compliance with all storm water requirements within a reasonable time period as specified below.

   (1)  In the event that a Permittee determines, based on an inspection conducted above, that an operator has failed to adequately implement all necessary BMPs, that Permittee shall take progressive enforcement action which, at a minimum, shall include a follow-up inspection within 4 weeks from the date of the initial inspection.

   (2)  In the event that a Permittee determines that an operator has failed to adequately implement BMPs after a follow-up inspection, that Permittee shall take further enforcement action as established through authority in its municipal code and ordinances or through the judicial system.

   (3)  Each Permittee shall maintain records, including inspection reports, warning letters, notices of violations, and other enforcement records, demonstrating a good faith effort to bring facilities into compliance.

d)  Interagency Coordination

   (1)  **Referral of Violations of the SQMP, Regional Board Resolution 98-08, and Municipal Storm Water Ordinances:**  A Permittee may refer a violation(s) to the Regional Board provided that that Permittee has made a good faith effort of progressive enforcement.  At a minimum, a Permittee's good faith effort must include documentation of:
- Two follow-up inspections, and
- Two warning letters or notices of violation.

   (2)  **Referral of Violations of the GIASP, including Requirements to File a Notice of Intent:**  For those facilities in violation of the GIASP, Permittees may escalate referral of such violations to the Regional Board after one inspection and one written notice to the operator regarding the violation.  In making such referrals, Permittees shall include, at a minimum, the following documentation:

December 13, 2001 (As amended on September 14, 2006 by Order R4-2006-0074 and on August 9, 2007 by Order R4-2007-0042)

**EXHIBIT** 2
**PAGE 42 OF 80**

- Name of the facility;
- Operator of the facility;
- Owner of the facility;
- Industrial activity being conducted at the facility that is subject to the GIASP; and
- Records of communication with the facility operator regarding the violation, which shall include at least an inspection report and one written notice of the violation.

Permittees shall, at a minimum, make such referrals on a quarterly basis.

(3) **Investigation of Complaints Regarding Facilities – Transmitted by the Regional Board Staff:** Each Permittee shall initiate, within one business day, investigation of complaints (other than non-storm water discharges) regarding facilities within its jurisdiction. The initial investigation shall include, at a minimum, a limited inspection of the facility to confirm the complaint to determine if the facility is effectively complying with the SQMP and municipal storm water/urban runoff ordinances, and to oversee corrective action.

(4) **Support of Regional Board Enforcement Actions:** As directed by the Regional Board Executive Officer, Permittees shall support Regional Board enforcement actions by: assisting in identification of current owners, operators, and lessees of facilities; providing staff, when available, for joint inspections with Regional Board inspectors; appearing as witnesses in Regional Board enforcement hearings; and providing copies of inspection reports and other progressive enforcement documentation.

(5) **Participation in a Task Force:** The Permittees, Regional Board, and other stakeholders may form a Storm Water Task Force, the purpose of which is to communicate concerns regarding special cases of storm water violations by industrial and commercial facilities and to develop a coordinated approach to enforcement action.

D. **Development Planning Program**

The Permittees shall implement a development-planning program that will require all Planning Priority development and Redevelopment projects to:

- Minimize impacts from storm water and urban runoff on the biological integrity of Natural Drainage Systems and water bodies in accordance with requirements under CEQA (Cal. Pub. Resources Code § 21100), CWC §

EXHIBIT _2_
PAGE _43_ OF _80_

Case 2:09-cv-04045-DMG-PLA   Document 23   Filed 09/03/09   Page 45 of 81   Page ID #:294

13369, CWA § 319, CWA § 402(p), CWA § 404, CZARA § 6217(g), ESA § 7, and local government ordinances ;

- Maximize the percentage of pervious surfaces to allow  percolation of storm water into the ground;

- Minimize the quantity of storm water directed to impervious surfaces and the MS4;

- Minimize pollution emanating from parking lots through the use of appropriate Treatment Control BMPs and good housekeeping practices;

- Properly design and maintain Treatment Control BMPs in a manner that does not promote the breeding of vectors; and

- Provide for appropriate permanent measures to reduce storm water pollutant loads in storm water from the development site.

1.      Peak Flow Control

The Permittees shall control post-development peak storm water runoff discharge rates, velocities, and duration (peak flow control) in Natural Drainage Systems (i.e., mimic pre-development hydrology) to prevent accelerated stream erosion and to protect stream habitat. Natural Drainage Systems are located in the following areas:

a)      Malibu Creek;

b)      Topanga Canyon Creek;

c)      Upper Los Angeles River;

d)      Upper San Gabriel River;

e)      Santa Clara River; and

f)      Los Angeles County Coastal streams (see Basin Plan Table 2-1).

The Principal Permittee in consultation with Permittees shall develop numerical criteria for peak flow control, based on the results of the Peak Discharge Impact Study (see Monitoring Program Section II.I).

Each Permittee shall, no later than February 1, 2005, implement numerical criteria for peak flow control.

A Permittee or group of Permittees may substitute for the countywide peak flow control criteria with a Hydromodification Control Plan (HCP), on approval by the Regional Board, in the following circumstances:

(1)      Stream or watershed-specific conditions indicate the need for a different peak flow control criteria, and the alternative numerical criteria is developed through the application of hydrologic modeling and supporting field observations; or

December 13, 2001 (As amended on September 14, 2006 by Order R4-2006-0074 and on August 9, 2007 by Order R4-2007-0042)

EXHIBIT  2

PAGE 44 OF 80

(2)    A watershed-wide plan has been developed for implementation of control measures to reduce erosion and stabilize drainage systems on a watershed basis.

2.    Standard Urban Storm Water Mitigation Plans (SUSMPs)

a)    Each Permittee shall amend codes and ordinances not later than August 1, 2002 to give legal effect to SUSMP changes contained in this Order.  Changes to SUSMP requirements shall take effect not later than September 2, 2002.

b)    Each Permittee shall require that a single-family hillside home:

    (1)    Conserve natural areas;

    (2)    Protect slopes and channels;

    (3)    Provide storm drain system stenciling and signage;

    (4)    Divert roof runoff to vegetated areas before discharge unless the diversion would result in slope instability; and

    (5)    Direct surface flow to vegetated areas before discharge unless the diversion would result in slope instability.

c)    Each Permittee shall require that a SUSMP as approved by the Regional Board in Board Resolution No. R 00-02 be implemented for the following categories of developments:

    (1)    Ten or more unit homes (includes single family homes, multifamily homes, condominiums, and apartments);

    (2)    A 100,000 or more square feet of impervious surface area industrial/ commercial development;

    (3)    Automotive service facilities (SIC 5013, 5014, 5541, 7532-7534, and 7536-7539);

    (4)    Retail gasoline outlets;

    (5)    Restaurants (SIC 5812);

    (6)    Parking lots 5,000 square feet or more of surface area or with 25 or more parking spaces; and

    (7)    Redevelopment projects in subject categories that meet Redevelopment thresholds.



EXHIBIT 2
PAGE 45 OF 80

d) Each Permittee shall submit an ESA Delineation Map for its jurisdictional boundary, based on the Regional Board's ESA Definition, no later than June 3, 2002, for approval by the Regional Board Executive Officer in consultation with the California Department of Fish and Game, and the California Coastal Commission.

e) Each Permittee shall require the implementation of SUSMP provisions no later than September 2, 2002, for all projects located in or directly adjacent to or discharging directly to an ESA, where the development will:

(1) Discharge storm water and urban runoff that is likely to impact a sensitive biological species or habitat; and

(2) Create 2,500 square feet or more of impervious surface area.

3. Numerical Design Criteria

The Permittees shall require that post-construction Treatment Control BMPs incorporate, at a minimum, either a volumetric or flow based treatment control design standard, or both, as identified below to mitigate (infiltrate, filter or treat) storm water runoff:

a) Volumetric Treatment Control BMP

(1) The 85th percentile 24-hour runoff event determined as the maximized capture storm water volume for the area, from the formula recommended in *Urban Runoff Quality Management, WEF Manual of Practice No. 23/ ASCE Manual of Practice No. 87, (1998*); or

(2) The volume of annual runoff based on unit basin storage water quality volume, to achieve 80 percent or more volume treatment by the method recommended in *California Stormwater Best Management Practices Handbook – Industrial/ Commercial,* (1993); or

(3) The volume of runoff produced from a 0.75 inch storm event, prior to its discharge to a storm water conveyance system; or

(4) The volume of runoff produced from a historical-record based reference 24-hour rainfall criterion for "treatment" (0.75 inch average for the Los Angeles County area) that achieves approximately the same reduction in pollutant loads achieved by the 85th percentile 24-hour runoff event.

b) Flow Based Treatment Control BMP

(1) The flow of runoff produced from a rain event equal to at least 0.2 inches per hour intensity; or

December 13, 2001 (As amended on September 14, 2006 by Order R4-2006-0074 and on August 9, 2007 by Order R4-2007-0042)

EXHIBIT 2
PAGE 46 OF 80

(2)   The flow of runoff produced from a rain event equal to at least two times the 85th percentile hourly rainfall intensity for Los Angeles County; or

(3)   The flow of runoff produced from a rain event that will result in treatment of the same portion of runoff as treated using volumetric standards above.

4.   Applicability of Numerical Design Criteria

The Permittees shall require the following categories of Planning Priority Projects to design and implement post-construction treatment controls to mitigate storm water pollution:

a)   Single-family hillside residential developments of one acre or more of surface area;

b)   Housing developments (includes single family homes, multifamily homes, condominiums, and apartments) of ten units or more;

c)   A 100,000 square feet or more impervious surface area industrial/commercial development;

d)   Automotive service facilities (SIC 5013, 5014, 5541, 7532-7534 and 7536-7539) [5,000 square feet or more of surface area];

e)   Retail gasoline outlets [5,000 square feet or more of impervious surface area and with projected Average Daily Traffic (ADT) of 100 or more vehicles].  Subsurface Treatment Control BMPs which may endanger public safety (i.e., create an explosive environment) are considered not appropriate;

f)   Restaurants (SIC 5812) [5,000 square feet or more of surface area];

g)   Parking lots 5,000 square feet or more of surface area or with 25 or more parking spaces;

h)   Projects located in, adjacent to or discharging directly to an ESA that meet threshold conditions identified above in 2.e; and

i)   Redevelopment projects in subject categories that meet Redevelopment thresholds.

5.   Not later than March 10, 2003, each Permittee shall require the implementation of SUSMP and post-construction control requirements for the industrial/commercial development category to projects that disturb one acre or more of surface area.

6.   Site Specific Mitigation

Each Permittee shall, no later than September 2, 2002, require the implementation of a site-specific plan to mitigate post-development storm water for new development and redevelopment not requiring a SUSMP

December 13, 2001 (As amended on September 14, 2006 by Order R4-2006-0074 and on August 9, 2007 by Order R4-2007-0042)



EXHIBIT   2
PAGE 47 OF 80

but which may potentially have adverse impacts on post-development storm water quality, where one or more of the following project characteristics exist:

a)   Vehicle or equipment fueling areas;

b)   Vehicle or equipment maintenance areas, including washing and repair;

c)   Commercial or industrial waste handling or storage;

d)   Outdoor handling or storage of hazardous materials;

e)   Outdoor manufacturing areas;

f)   Outdoor food handling or processing;

g)   Outdoor animal care, confinement, or slaughter; or

h)   Outdoor horticulture activities.

7.   Redevelopment Projects

The Permittees shall apply the SUSMP, or site specific requirements including post-construction storm water mitigation to all Planning Priority Projects that undergo significant Redevelopment in their respective categories.

a)   Significant Redevelopment means land-disturbing activity that results in the creation or addition or replacement of 5,000 square feet or more of impervious surface area on an already developed site.

Where Redevelopment results in an alteration to more than fifty percent of impervious surfaces of a previously existing development, and the existing development was not subject to post development storm water quality control requirements, the entire project must be mitigated.  Where Redevelopment results in an alteration to less than fifty percent of impervious surfaces of a previously existing development, and the existing development was not subject to post development storm water quality control requirements, only the alteration must be mitigated, and not the entire development.

b)   Redevelopment does not include routine maintenance activities that are conducted to maintain original line and grade, hydraulic capacity, original purpose of facility or emergency redevelopment activity required to protect public health and safety.

c)   Existing single family structures are exempt from the Redevelopment requirements.

8.   Maintenance Agreement and Transfer

December 13, 2001 (As amended on September 14, 2006 by Order R4-2006-0074 and on August 9, 2007 by Order R4-2007-0042)



EXHIBIT  2
PAGE 48 OF 80

Each Permittee shall require that all developments subject to SUSMP and site specific plan requirements provide verification of maintenance provisions for Structural and Treatment Control BMPs, including but not limited to legal agreements, covenants, CEQA mitigation requirements, and or conditional use permits.  Verification at a minimum shall include:

a)  The developer's signed statement accepting responsibility for maintenance until the responsibility is legally transferred; and either

b)  A signed statement from the public entity assuming responsibility for Structural or Treatment Control BMP maintenance and that it meets all local agency design standards; or

c)  Written conditions in the sales or lease agreement, which requires the recipient to assume responsibility for maintenance and conduct a maintenance inspection at least once a year; or

d)  Written text in project conditions, covenants and restrictions (CCRs) for residential properties assigning maintenance responsibilities to the Home Owners Association for maintenance of the Structural and Treatment Control BMPs; or

e)  Any other legally enforceable agreement that assigns responsibility for the maintenance of post-construction Structural or Treatment Control BMPs.

9.   Regional Storm Water Mitigation Program

A Permittee or Permittee group may apply to the Regional Board for approval of a regional or sub-regional storm water mitigation program to substitute in part or wholly SUSMP requirements.  Upon review and a determination by the Regional Board Executive Officer that the proposal is technically valid and appropriate, the Regional Board may consider for approval such a program if its implementation will:

a)  Result in equivalent or improved storm water quality;

b)  Protect stream habitat;

c)  Promote cooperative problem solving by diverse interests;

d)  Be fiscally sustainable and has secure funding; and

e)  Be completed in five years including the construction and start-up of treatment facilities.

Nothing in this provision shall be construed as to delay the implementation of SUSMP requirements, as approved in this Order.

10.   Mitigation Funding

The Permittees may propose a management framework, for endorsement by the Regional Board Executive Officer, to support regional or sub-

December 13, 2001 (As amended on September 14, 2006 by Order R4-2006-0074 and on August 9, 2007 by Order R4-2007-0042)

**EXHIBIT** 2
**PAGE** 49 OF 80

regional solutions to storm water pollution, where any of the following situations occur:

   a)   A waiver for impracticability is granted;

   b)   Legislative funds become available;

   c)   Off-site mitigation is required because of loss of environmental habitat; or

   d)   An approved watershed management plan or a regional storm water mitigation plan exists that incorporates an equivalent or improved strategy for storm water mitigation.

11.   California Environmental Quality Act (CEQA) Document Update

Each Permittee shall incorporate into its CEQA process, with immediate effect, procedures for considering potential storm water quality impacts and providing for appropriate mitigation when preparing and reviewing CEQA documents.   The procedures shall require consideration of the following:

   a)   Potential impact of project construction on storm water runoff;

   b)   Potential impact of project post-construction activity on storm water runoff;

   c)   Potential for discharge of storm water from areas from material storage, vehicle or equipment fueling, vehicle or equipment maintenance (including washing), waste handling, hazardous materials handling or storage, delivery areas or loading docks, or other outdoor work areas;

   d)   Potential for discharge of storm water to impair the beneficial uses of the receiving waters or areas that provide water quality benefit;

   e)   Potential for the discharge of storm water to cause significant harm on the biological integrity of the waterways and water bodies;

   f)   Potential for significant changes in the flow velocity or volume of storm water runoff that can cause environmental harm; and

   g)   Potential for significant increases in erosion of the project site or surrounding areas.

12.   General Plan Update

   a)   Each Permittee shall amend, revise or update its General Plan to include watershed and storm water quality and quantity management considerations and policies when any of the following General Plan elements are updated or amended: (i) Land Use, (ii) Housing, (iii) Conservation, and (iv) Open Space.

   b)   Each Permittee shall provide the Regional Board with the draft amendment or revision when a listed General Plan element or the

December 13, 2001 (As amended on September 14, 2006 by Order R4-2006-0074 and on August 9, 2007 by Order R4-2007-0042)



EXHIBIT 2
PAGE 50 OF 80

General Plan is noticed for comment in accordance with Cal. Govt. Code § 65350 *et seq.*

13. Targeted Employee Training

Each Permittee shall train its employees in targeted positions (whose jobs or activities are engaged in development planning) regarding the development planning requirements on an annual basis beginning no later than August 1, 2002, and more frequently if necessary. For Permittees with a population of 250,000 or more (2000 U.S. Census), training shall be completed no later than February 3, 2003.

14. Developer Technical Guidance and Information

a) Each Permittee shall develop and make available to the developer community SUSMP (development planning) guidelines immediately.

b) The Principal Permittee in partnership with Permittees shall issue no later than February 2, 2004, a technical manual for the siting and design of BMPs for the development community in Los Angeles County.  The technical manual may be adapted from the revised California Storm Water Quality Task Force Best Management Practices Handbooks scheduled for publication in September 2002.  The technical manual shall at a minimum include:

(1) Treatment Control BMPs based on flow-based and volumetric water quality design criteria for the purposes of countywide consistency;

(2) Peak Flow Control criteria to control  peak discharge rates, velocities and duration;

(3) Expected pollutant removal performance ranges obtained from national databases, technical reports and the scientific literature;

(4) Maintenance considerations; and

(5) Cost considerations.

E. **Development Construction Program**

1. Each Permittee shall implement a program to control runoff from construction activity at all construction sites within its jurisdiction. The program shall ensure the following minimum requirements are effectively implemented at all construction sites:

a) Sediments generated on the project site shall be retained using adequate Treatment Control or Structural BMPs;

b) Construction-related materials, wastes, spills, or residues shall be retained at the  project site to avoid discharge to streets, drainage



EXHIBIT     2
PAGE 51 OF 80

Case 2:09-cv-04045-DMG-PLA Document 23 Filed 09/03/09 Page 53 of 81 Page ID #:302

facilities, receiving waters, or adjacent properties by wind or runoff;

c) Non-storm water runoff from equipment and vehicle washing and any other activity shall be contained at the project site; and

d) Erosion from slopes and channels shall be controlled by implementing an effective combination of BMPs (as approved in Regional Board Resolution No. 99-03), such as the limiting of grading scheduled during the wet season; inspecting graded areas during rain events; planting and maintenance of vegetation on slopes; and covering erosion susceptible slopes.

2. For construction sites one acre and greater, each Permittee shall comply with all conditions in section E.1. above and shall:

a) Require the preparation and submittal of a Local Storm Water Pollution Prevention Plan (Local SWPPP), for approval prior to issuance of a grading permit for construction projects.

The Local SWPPP shall include appropriate construction site BMPs and maintenance schedules. (A Local SWPPP may substitute for the State SWPPP if the Local SWPPP is at least as inclusive in controls and BMPs as the State SWPPP). The Local SWPPP must include the rationale used for selecting or rejecting BMPs. The project architect, or engineer of record, or authorized qualified designee, must sign a statement on the Local SWPPP to the effect:

*"As the architect/engineer of record, I have selected appropriate BMPs to effectively minimize the negative impacts of this project's construction activities on storm water quality. The project owner and contractor are aware that the selected BMPs must be installed, monitored, and maintained to ensure their effectiveness. The BMPs not selected for implementation are redundant or deemed not applicable to the proposed construction activity."*

The landowner or the landowner's agent shall sign a statement to the effect:

*"I certify that this document and all attachments were prepared under my direction or supervision in accordance with a system designed to assure that qualified personnel properly gather and evaluate the information submitted. Based on my inquiry of the person or persons who manage the system or those persons directly responsible for gathering the information, to the best of my knowledge and belief, the information submitted is true, accurate, and complete. I am aware that submitting false and/or inaccurate information, failing to update the Local SWPPP to reflect current conditions, or failing to properly and/or adequately implement the Local SWPPP may result in revocation of grading and/or other permits or other sanctions provided by law."*

December 13, 2001 (As amended on September 14, 2006 by Order R4-2006-0074 and on August 9, 2007 by Order R4-2007-0042)


EXHIBIT 2
PAGE 52 OF 80

The Local SWPPP certification shall be signed by the landowner as follows, for a corporation: by a responsible corporate officer which means (a) a president, secretary, treasurer, or vice president of the corporation in charge of a principal business function, or any other person who performs similar policy or decision-making functions for the corporation, or (b) the manager of the construction activity if authority to sign documents has been assigned or delegated to the manager in accordance with corporate procedures; for a partnership or sole proprietorship: by a general partner or the proprietor; or for a municipality or other public agency: by an elected official, a ranking management official (e.g., County Administrative Officer, City Manager, Director of Public Works, City Engineer, District Manager), or the manager of the construction activity if authority to sign Local SWPPPs has been assigned or delegated to the manager in accordance with established agency policy.

b) Inspect all construction sites for storm water quality requirements during routine inspections a minimum of once during the wet season.  The Local SWPPP shall be reviewed for compliance with local codes, ordinances, and permits.  For inspected sites that have not adequately implemented their Local SWPPP, a follow-up inspection to ensure compliance will take place within 2 weeks.  If compliance has not been attained, the Permittee will take additional actions to achieve compliance (as specified in municipal codes). If compliance has not been achieved, and the site is also covered under a statewide general construction storm water permit, each Permittee shall enforce their local ordinance requirements, and if non-compliance continues the Regional Board shall be notified for further joint enforcement actions.

c) Require, no later than March 10, 2003, prior to issuing a grading permit for all projects less than five acres requiring coverage under a statewide general construction storm water permit, proof of a Waste Discharger Identification (WDID) Number for filing a Notice of Intent (NOI) for permit coverage and a certification that a SWPPP has been prepared by the project developer. A Local SWPPP may substitute for the State SWPPP if the Local SWPPP is at least as inclusive in controls and BMPs as the State SWPPP.

3. For sites five acres and greater, each Permittee shall comply with all conditions in Sections E.1. and E.2. and shall:

a) Require, prior to issuing a grading permit for all projects requiring coverage under the state general permit, proof of a Waste Discharger Identification (WDID) Number for filing a Notice of Intent (NOI) for coverage under the GCASP and a certification that a SWPPP has been prepared by the project developer. A Local SWPPP may substitute for the State SWPPP if the Local SWPPP is at least as inclusive in controls and BMPs as the State SWPPP.

December 13, 2001 (As amended on September 14, 2006 by Order R4-2006-0074 and on August 9, 2007 by Order R4-2007-0042)



EXHIBIT _2_
PAGE _53_ OF _80_

    b)     Require proof of an NOI and a copy of the SWPPP at any time a transfer of ownership takes place for the entire development or portions of the common plan of development where construction activities are still on-going.

    c)     Use an effective system to track grading permits issued by each Permittee. To satisfy this requirement, the use of a database or GIS system is encouraged, but not required.

4.     GCASP Violation Referrals

    a)     Referral of Violations of the SQMP, Regional Board Resolution 98-08, and municipal storm water ordinances:

         A Permittee may refer a violation(s) to the Regional Board provided that the Permittee has made a good faith effort of progressive enforcement. At a minimum, a Permittee's good faith effort must include documentation of:
- Two follow-up inspections within 3 months, and
- Two warning letters or notices of violation.

    b)     Referral of Violations of GCASP Filing Requirements:

         For those projects subject to the GCASP, Permittees shall refer non-filers (i.e., those projects which cannot demonstrate that they have a WDID number) to the Regional Board, within 15 days of making a determination. In making such referrals, Permittees shall include, at a minimum, the following documentation:
- Project location;
- Developer;
- Estimated project size; and
- Records of communication with the developer regarding filing requirements.

5.     Each Permittee shall train employees in targeted positions (whose jobs or activities are engaged in construction activities including construction inspection staff) regarding the requirements of the storm water management program no later than August 1, 2002, and annually thereafter. For Permittees with a population of 250,000 or more (2000 U.S. Census), initial training shall be completed no later than February 3, 2003. Each Permittee shall maintain a list of trained employees.

## F.     Public Agency Activities Program

Each Permittee shall implement a Public Agency program to minimize storm water pollution impacts from public agency activities. Public Agency requirements consist of:

- Sewage Systems Maintenance, Overflow, and Spill Prevention
- Public Construction Activities Management
- Vehicle Maintenance/Material Storage Facilities/Corporation Yards Management
- Landscape and Recreational Facilities Management

December 13, 2001 (As amended on September 14, 2006 by Order R4-2006-0074 and on August 9, 2007 by Order R4-2007-0042)



EXHIBIT _2_

PAGE _54_ OF _80_

- Storm Drain Operation and Management
- Streets and Roads Maintenance
- Parking Facilities Management
- Public Industrial Activities Management
- Emergency Procedures
- Treatment Feasibility Study

1.  Sewage System Maintenance, Overflow, and Spill Prevention

    a)  Each Permittee shall implement a response plan for overflows of the sanitary sewer system within their respective jurisdiction, which shall consist at a minimum of the following:

        (1)  Investigation of any complaints received;

        (2)  Upon notification, immediate response to overflows for containment; and

        (3)  Notification to appropriate sewer and public health agencies when a sewer overflows to the MS4.

    b)  In addition to 1.a.1, 1.a.2, and 1.a.3 above, for those Permittees, which own and/or operate a sanitary sewer system, the Permittee shall also implement the following requirements:

        (1)  Procedures to prevent sewage spills or leaks from sewage facilities from entering the MS4; and

        (2)  Identify, repair, and remediate sanitary sewer blockages, exfiltration, overflow, and wet weather overflows from sanitary sewers to the MS4.

2.  Public Construction Activities Management

    a)  Each Permittee shall implement the Development Planning Program requirements (Permit Part 4.D) at public construction projects.

    b)  Each Permittee shall implement the Development Construction Program requirements (Permit Part 4.E) at Permittee owned construction sites.

    c)  Each Permittee shall obtain coverage under the GCASP for public construction sites 5 acres or greater (or part of a larger area of development) except that a municipality under 100,000 in population (1990 U.S. Census) need not obtain coverage under a separate permit until March 10, 2003.

    d)  Each Permittee, no later than March 10, 2003, shall obtain coverage under a statewide general construction storm water permit for public construction sites for projects between one and five acres.

EXHIBIT ___2___

PAGE _55_ OF _80_

3.     Vehicle Maintenance/Material Storage Facilities/Corporation Yards Management

    a)     Each Permittee, consistent with the SQMP, shall implement SWPPPs for public vehicle maintenance facilities, material storage facilities, and corporation yards which have the potential to discharge pollutants into storm water.

    b)     Each Permittee shall implement BMPs to minimize pollutant discharges in storm water including but not be limited to:

       (1)     Good housekeeping practices;

       (2)     Material storage control;

       (3)     Vehicle leaks and spill control; and

       (4)     Illicit discharge control.

    c)     Each Permittee shall implement the following measures to prevent the discharge of pollutants to the MS4:

       (1)     For existing facilities, that are not already plumbed to the sanitary sewer, all vehicle and equipment wash areas (except for fire stations) shall either be:

          (i)     Self-contained;

          (ii)     Equipped with a clarifier;

          (iii)     Equipped with an alternative pre-treatment device; or

          (iv)     Plumbed to the sanitary sewer.

       (2)     For new facilities, or during redevelopment of existing facilities (including fire stations), all vehicle and equipment wash areas shall be plumbed to the sanitary sewer and be equipped with a pre-treatment device in accordance with requirements of the sewer agency.

4.     Landscape and Recreational Facilities Management

    Each Permittee shall implement the following requirements:

    a)     A standardized protocol for the routine and non-routine application of pesticides, herbicides (including pre-emergents), and fertilizers;

    b)     Consistency with State Board's guidelines and monitoring requirements for application of aquatic pesticides to surface waters (WQ Order No. 2001-12 DWQ);

    c)     Ensure no application of pesticides or fertilizers immediately before, during, or immediately after a rain event or when water is flowing off the area to be applied;

December 13, 2001 (As amended on September 14, 2006 by Order R4-2006-0074 and on August 9, 2007 by Order R4-2007-0042)



EXHIBIT 2
PAGE 56 OF 80

d)    Ensure that no banned or unregistered pesticides are stored or applied;

e)    Ensure that staff applying pesticides are certified by the California Department of Food and Agriculture, or are under the direct supervision of a certified pesticide applicator;

f)    Implement procedures to encourage retention and planting of native vegetation and to reduce water, fertilizer, and pesticide needs;

g)    Store fertilizers and pesticides indoors or under cover on paved surfaces or use secondary containment;

h)    Reduce the use, storage, and handling of hazardous materials to reduce the potential for spills; and

i)    Regularly inspect storage areas.

5.    **Storm Drain Operation and Management**

a)    Each Permittee shall designate catch basin inlets within its jurisdiction as one of the following:

Priority A:    Catch basins that are designated as consistently generating the highest volumes of trash and/or debris.

Priority B:    Catch basins that are designated as consistently generating moderate volumes of trash and/or debris.

Priority C:    Catch basins that are designated as generating low volumes of trash and/or debris.

b)    Permittees subject to a trash TMDL (Los Angeles River and Ballona Creek WMAs) shall continue to implement the requirements listed below until trash TMDL implementation measures are adopted.  Thereafter, the subject Permittees shall implement programs in conformance with the TMDL implementation schedule, which shall include an effective combination of measures such as street sweeping, catch basin cleaning, installation of treatment devices and trash receptacles, or other BMPs.  Default requirements include:

(1)    Inspection and cleaning of catch basins between May 1 and September 30 of each year;

(2)    Additional cleaning of any catch basin that is at least 40% full of trash and/or debris;

(3)    Record keeping of catch basins cleaned; and

December 13, 2001 (As amended on September 14, 2006 by Order R4-2006-0074 and on August 9, 2007 by Order R4-2007-0042)



EXHIBIT _2_
PAGE _57_ OF _80_

(4)      Recording of the overall quantity of catch basin waste collected.

If the implementation phase for the Los Angeles River and Ballona Creek Trash TMDLs has not begun by October 2003, subject Permittees shall implement the requirements described below in subsection 5(c), until such time programs in conformance with the subject Trash TMDLs are being implemented.

c)      Permittees not subject to a trash TMDL shall:

     (1)      Clean catch basins according to the following schedule:

| | |
|---|---|
| Priority A: | A minimum of three times during the wet season and once during the dry season every year. |
| Priority B: | A minimum of once during the wet season and once during the dry season every year. |
| Priority C: | A minimum of once per year. |

In addition to the schedule above, between February 1, 2002 and July 1, 2003, Permittees shall ensure that any catch basin that is at least 40% full of trash and/or debris shall be cleaned out.  After July 1, 2003, Permittees shall ensure that any catch basin that is at least 25% full of trash and debris shall be cleaned out.

     (2)      For any special event that can be reasonably expected to generate substantial quantities of trash and litter, include provisions that require for the proper management of trash and litter generated, as a condition of the special use permit issued for that event.  At a minimum, the municipality who issues the permit for the special event shall arrange for either temporary screens to be placed on catch basins or for catch basins in that area to be cleaned out subsequent to the event and prior to any rain event.

     (3)      Place trash receptacles at all transit stops within its jurisdiction that have shelters no later than August 1, 2002, and at all other transit stops within its jurisdiction no later than February 3, 2003.  All trash receptacles shall be maintained as necessary.

d)      Each Permittee shall inspect the legibility of the catch basin stencil or label nearest the inlet.  Catch basins with illegible stencils shall be recorded and re-stenciled or re-labeled within 180 days of inspection.

e)      Each Permittee shall implement BMPs for Storm Drain Maintenance that include:

December 13, 2001 (As amended on September 14, 2006 by Order R4-2006-0074 and on August 9, 2007 by Order R4-2007-0042)



EXHIBIT _2_

PAGE_58_OF _80_

(1)     A program to visually monitor Permittee-owned open channels and other drainage structures for debris at least annually and identify and prioritize problem areas of illicit discharge for regular inspection;

(2)     A review of current maintenance activities to assure that appropriate storm water BMPs are being utilized to protect water quality;

(3)     Removal of trash and debris from open channel storm drains shall occur a minimum of once per year before the storm season;

(4)     Minimize the discharge of contaminants during MS4 maintenance and clean outs; and

(5)     Proper disposal of material removed.

6.     Streets and Roads Maintenance

a)     Each Permittee shall designate streets and/or street segments within its jurisdiction as one of the following:

Priority A:     Streets and/or street segments that are designated as consistently generating the highest volumes of trash and/or debris.

Priority B:     Streets and/or street segments that are designated as consistently generating moderate volumes of trash and/or debris.

Priority C:     Streets and/or street segments that are designated as generating low volumes of trash and/or debris.

b)     Each Permittee shall perform street sweeping of curbed streets according to the following schedule:

Priority A:     These streets and/or street segments shall be swept at least two times per month.

Priority B:     Each Permittee shall ensure that each street and/or street segments is swept at least once per month.

Priority C:     These streets and/or street segments shall be swept as necessary but in no case less than once per year.

c)     Each Permittee shall require that:

(1)     Sawcutting wastes be recovered and disposed of properly and that in no case shall waste be left on a roadway or allowed to enter the storm drain;

December 13, 2001 (As amended on September 14, 2006 by Order R4-2006-0074 and on August 9, 2007 by Order R4-2007-0042)



EXHIBIT     2
PAGE 59 OF 80

(2) Concrete and other street and road maintenance materials and wastes shall be managed to prevent discharge to the MS4; and

(3) The washout of concrete trucks and chutes shall only occur in designated areas and never discharged to storm drains, open ditches, streets, or catch basins.

d) Each Permittee shall, no later than August 1, 2002, train their employees in targeted positions (whose interactions, jobs, and activities affect storm water quality) regarding the requirements of the storm water management program to:

(1) Promote a clear understanding of the potential for maintenance activities to pollute storm water; and

(2) Identify and select appropriate BMPs.

For Permittees with a population of 250,000 or more (2000 U.S. Census) training shall be completed no later than February 1, 2003.

7.  Parking Facilities Management

Permittee-owned parking lots exposed to storm water shall be kept clear of debris and excessive oil buildup and cleaned no less than 2 times per month and/or inspected no less than 2 times per month to determine if cleaning is necessary. In no case shall a Permittee-owned parking lot be cleaned less than once a month.

8.  Public Industrial Activities Management

Each Permittee shall, for any municipal activity considered a discharge of storm water associated with industrial activity, obtain separate coverage under the GIASP except that a municipality under 100,000 in population (1990 U.S. Census) need not file the Notice Of Intent to be covered by said permit until March 10, 2003 (with the exception of power plants, airports, and uncontrolled sanitary landfills).

9.  Emergency Procedures

Each Permittee shall repair essential public services and infrastructure in a manner to minimize environmental damage in emergency situations such as: earthquakes; fires; floods; landslides; or windstorms. BMPs shall be implemented to the extent that measures do not compromise public health and safety. After initial emergency response or emergency repair activities have been completed, each Permittee shall implement BMPs and programs as required under this Order.

December 13, 2001 (As amended on September 14, 2006 by Order R4-2006-0074 and on August 9, 2007 by Order R4-2007-0042)



EXHIBIT 2
PAGE 60 OF 80

Case 2:09-cv-04045-DMG-PLA   Document 23   Filed 09/03/09   Page 62 of 81   Page ID #:311

10.     Treatment Feasibility Study

The Permittees in cooperation with the County Sanitation Districts of Los Angeles County shall conduct a study to investigate the possible diversion of dry weather discharges or the use of alternative Treatment Control BMPs to treat flows from their jurisdiction which may impact public health and safety and/or the environment.  The Permittees shall collectively review their individual prioritized lists and create a watershed based priority list of drains for potential diversion or treatment and submit the priority listing  to the Regional Board Executive Officer, no later than July 1, 2003.

G.     **Illicit Connections and Illicit Discharges Elimination Program**

Permittees shall eliminate all illicit connections and illicit discharges to the storm drain system, and shall document, track, and report all such cases in accordance with the elements and performance measures specified in the following subsections.

1.     General

a)     Implementation:  Each Permittee must develop an Implementation Program which specifies how each Permittee is implementing revisions to the IC/ID Program of the SQMP.  This Implementation Program must be documented, and available for review and approval by the Regional Board Executive Officer, upon request.

b)     Tracking:  All Permittees shall, no later than February 3, 2003, develop and maintain a  listing of all permitted connections to their storm drain system. All Permittees shall map at a scale and in a format specified by the Principal Permittee all illicit connections and discharges on their baseline maps, and shall transmit this information to the Principal Permittee. No later than February 3, 2003, the Principal Permittee shall use this information as well as results of baseline and priority screening for illicit connections (as set forth in subsection 2 below) to start an annual evaluation of patterns and trends of illicit connections and illicit discharges, with the objectives of identifying priority areas for elimination of illicit connections and illicit discharges.

c)     Training:  All Permittees shall train all targeted employees who are responsible for identification, investigation, termination, cleanup, and reporting of illicit connections and discharges.  For Permittees with a population of less than 250,000 (2000 U.S. Census), training shall be completed no later than August 1, 2002.  For Permittees with a population of 250,000 or more (2000 U.S. Census), training shall be completed no later than February 3, 2003.  Furthermore, all Permittees shall conduct refresher training on an annual basis thereafter.

**EXHIBIT** _2_
**PAGE** _61_ **OF** _80_

Case 2:09-cv-04045-DMG-PLA   Document 23   Filed 09/03/09   Page 63 of 81   Page ID #:312

2.     Illicit Connections

   a)     Screening for Illicit Connections

      (1)     Field Screening:  All Permittees shall field Screen the storm drain system for illicit connections in accordance with the following schedule:

         (i)     Open channels: No later than February 3, 2003;

         (ii)     Underground pipes in priority areas:  No later than February 1, 2005; and

         (iii)     Underground pipes with a diameter of 36 inches or greater:  No later than December 12, 2006.

         Permittees shall report, to the Principal Permittee, on the location and length of open channels or underground pipes that have been Screened *vis a vis* the entire storm drain network, and on the status of suspected, confirmed, and terminated illicit connections. Permittees shall maintain a list containing all permitted connections and the status of connections under investigation for possible illicit connection.

      (2)     Permit Screening: No later than December 12, 2006, Permittees shall complete a review of all permitted connections to the storm drain system, to confirm compliance with Part 1 (Discharge Prohibition).

   b)     Response to Illicit Connections

      (1)     Investigation:  Upon discovery or upon receiving a report of a suspected illicit connection, Permittees shall initiate an investigation within 21 days, to determine the source of the connection, the nature and volume of discharge through the connection, and the responsible party for the connection.

      (2)     Termination:  Upon confirmation of the illicit nature of a storm drain connection, Permittees shall ensure termination of the connection within 180 days, using enforcement authority as needed.

3.     Illicit Discharges

EXHIBIT    2
PAGE 62 OF 80

a)     Abatement and Cleanup: Permittees shall respond, within one business day of discovery or a report of a suspected illicit discharge, with activities to abate, contain, and clean up all illicit discharges, including hazardous substances.

b)     Investigation:  Permittees shall investigate illicit discharges as soon as practicable (during or immediately following containment and cleanup activities), and shall take enforcement action as appropriate.

## Part 5. DEFINITIONS

The following are definitions for terms applicable to this Order:

**"Adverse Impact"** means a detrimental effect upon water quality or beneficial uses caused by a discharge or loading of a pollutant or pollutants.

**"Anti-degradation policies"** means the *Statement of Policy with Respect to Maintaining High Quality Water in California* (State Board Resolution No. 68-16) which protects surface and ground waters from degradation.  In particular, this policy protects waterbodies where existing quality is higher than that necessary for the protection of beneficial uses including the protection of fish and wildlife propagation and recreation on and in the water.

**"Applicable Standards and Limitations"**  means all State, interstate, and federal standards and limitations to which a "discharge" or a related activity is subject under the CWA, including "effluent limitations, "water quality standards, standards of performance, toxic effluent standards or prohibitions,  "best management practices," and pretreatment standards under sections 301, 302, 303, 304, 306, 307, 308, 403 and 404 of CWA.

**"Areas of Special Biological Significance (ASBS)"** means all those areas of this state as ASBS, listed specifically within the California Ocean Plan or so designated by the State Board which, among other areas, includes the area from Mugu Lagoon to Latigo Point: Oceanwater within a line originating from Laguna Point at 34° 5' 40" north, 119° 6'30" west, thence southeasterly following  the mean high tideline to a point at Latigo Point defined by the intersection of the meanhigh tide line and a line extending due south of Benchmark 24; thence due south to a distance of 1000 feet offshore or to the 100 foot isobath, whichever distance is greater; thence northwesterly following the 100 foot isobath or maintaining a 1,000-foot distance from shore, whichever maintains the greater distance from shore, to a point lying due south of Laguna Point, thence due north to Laguna Point.

**"Authorized Discharge"** means any discharge that is authorized pursuant to an NPDES permit or meets the conditions set forth in this Order.

**"Automotive Service Facilities"** means a facility that is categorized in any one of the following Standard Industrial Classification (SIC) codes: 5013, 5014, 5541, 5511, 7532-7534, or 7536-7539.  For inspection purposes, Permittees need not inspect facilities with SIC codes 5013, 5014, 5541, 5511, provided that these facilities have no outside activities or materials that may be exposed to storm water.

December 13, 2001 (As amended on September 14, 2006 by Order R4-2006-0074 and on August 9, 2007 by Order R4-2007-0042)



EXHIBIT _2_
PAGE _63_ OF _80_

**"Basin Plan"** means the Water Quality Control Plan, Los Angeles Region, Basin Plan for the Coastal Watersheds of Los Angeles and Ventura Counties, adopted by the Regional Board on June 13, 1994 and subsequent amendments.

**"Beneficial Uses"** means the existing or potential uses of receiving waters in the permit area as designated by the Regional Board in the Basin Plan.

**"Best Management Practices (BMPs)"** means methods, measures, or practices designed and selected to reduce or eliminate the discharge of pollutants to surface waters from point and nonpoint source discharges including storm water.  BMPs include structural and nonstructural controls, and operation and maintenance procedures, which can be applied before, during, and/or after pollution producing activities.

**"Commercial Development"** means any development on private land that is not heavy industrial or residential.  The category includes, but is not limited to: hospitals, laboratories and other medical facilities, educational institutions, recreational facilities, plant nurseries, car wash facilities, mini-malls and other business complexes, shopping malls, hotels, office buildings, public warehouses and other light industrial complexes.

**"Construction"** means constructing, clearing, grading, or excavation that results in soil disturbance. Construction includes structure teardown.  It does not include routine maintenance to maintain original line and grade, hydraulic capacity, or original purpose of facility; emergency construction activities required to immediately protect public health and safety; interior remodeling with no outside exposure of construction material or construction waste to storm water; mechanical permit work; or sign permit work.

**"Control"** means to minimize, reduce, eliminate, or prohibit by technological, legal, contractual or other means, the discharge of pollutants from an activity or activities.

**"Dechlorinated/Debrominated Swimming Pool Discharge"** means swimming pool discharges which have no measurable chlorine or bromine and do not contain any detergents, wastes, or additional chemicals not typically found in swimming pool water.  The term does not include swimming pool filter backwash.

**"Development"** means any construction, rehabilitation, redevelopment or reconstruction of any public or private residential project (whether single-family, multi-unit or planned unit development); industrial, commercial, retail and other non-residential projects, including public agency projects; or mass grading for future construction.  It does not include routine maintenance to maintain original line and grade, hydraulic capacity, or original purpose of facility, nor does it include emergency construction activities required to immediately protect public health and safety.

**"Directly Adjacent"** means situated within 200 feet of the contiguous zone required for the continued maintenance, function, and structural stability of the environmentally sensitive area.

**"Director"** means the Director of a municipality and Person(s) designated by and under the Director's instruction and supervision.

**"Discharge"** means when used without qualification the "discharge of a pollutant."

December 13, 2001 (As amended on September 14, 2006 by Order R4-2006-0074 and on August 9, 2007 by Order R4-2007-0042)


EXHIBIT 2
PAGE 64 OF 80

**"Discharging Directly"** means outflow from a drainage conveyance system that is composed entirely or predominantly of flows from the subject, property, development, subdivision, or industrial facility, and not commingled with the flows from adjacent lands.

**"Discharge of a Pollutant"** means: any addition of any "pollutant" or combination of pollutants to "waters of the United States" from any "point source" or, any addition of any pollutant or combination of pollutants to the waters of the "contiguous zone" or the ocean from any point source other than a vessel or other floating craft which is being used as a means of transportation. The term discharge includes additions of pollutants into waters of the United States from: surface runoff which is collected or channeled by man; discharges through pipes, sewers, or other conveyances owned by a State, municipality, or other person which do not lead to a treatment works; and discharges through pipes, sewers, or other conveyances, leading into privately owned treatment works.

**"Disturbed Area"** means an area that is altered as a result of clearing, grading, and/or excavation.

**"Dry Weather"** means those days with less than 0.1 inch of rainfall, and occurring more than three days after a Rain Day.

**"Environmentally Sensitive Areas (ESAs)"** means an area in which plant or animal life or their habitats are either rare or especially valuable because of their special nature or role in an ecosystem and which would be easily disturbed or degraded by human activities and developments (California Public Resources Code § 30107.5). Areas subject to storm water mitigation requirements are: areas designated as Significant Ecological Areas by the County of Los Angeles (*Los Angeles County Significant Areas Study, Los Angeles County Department of Regional Planning (1976)* and amendments); an area designated as a Significant Natural Area by the California Department of Fish and Game's Significant Natural Areas Program, provided that area has been field verified by the Department of Fish and Game; an area listed in the Basin Plan as supporting the "Rare, Threatened, or Endangered Species (RARE)" beneficial use; and an area identified by a Permittee as environmentally sensitive.

**"General Construction Activities Storm Water Permit (GCASP)"** means the general NPDES permit adopted by the State Board which authorizes the discharge of storm water from construction activities under certain conditions.

**"General Industrial Activities Storm Water Permit (GIASP)"** means the general NPDES permit adopted by the State Board which authorizes the discharge of storm water from certain industrial activities under certain conditions.

**"Hillside"** means property located in an area with known erosive soil conditions, where the development contemplates grading on any natural slope that is 25% or greater and where grading contemplates cut or fill slopes.

**"Illicit Connection"** means any man-made conveyance that is connected to the storm drain system without a permit, excluding roof drains and other similar type connections. Examples include channels, pipelines, conduits, inlets, or outlets that are connected directly to the storm drain system.

December 13, 2001 (As amended on September 14, 2006 by Order R4-2006-0074 and on August 9, 2007 by Order R4-2007-0042)



EXHIBIT _2_

PAGE _65_ OF _80_

"**Illicit Discharge**" means any discharge to the storm drain system that is prohibited under local, state, or federal statutes, ordinances, codes, or regulations. The term illicit discharge includes all non storm-water discharges except discharges pursuant to an NPDES permit, discharges that are identified in Part 1, "Discharge Prohibitions" of this order, and discharges authorized by the Regional Board Executive Officer.

"**Illicit Disposal**" means any disposal, either intentionally or unintentionally, of material(s) or waste(s) that can pollute storm water.

"**Industrial/Commercial Facility**" means any facility involved and/or used in the production, manufacture, storage, transportation, distribution, exchange or sale of goods and/or commodities, and any facility involved and/or used in providing professional and non-professional services. This category of facilities includes, but is not limited to, any facility defined by the Standard Industrial Classifications (SIC). Facility ownership (federal, state, municipal, private) and profit motive of the facility are not factors in this definition.

"**Infiltration**" means the downward entry of water into the surface of the soil.

"**Inspection**" means entry and the conduct of an on-site review of a facility and its operations, at reasonable times, to determine compliance with specific municipal or other legal requirements. The steps involved in performing an inspection, include, but are not limited to:

1. Pre-inspection documentation research.;
2. Request for entry;
3. Interview of facility personnel;
4. Facility walk-through.
5. Visual observation of the condition of facility premises;
6. Examination and copying of records as required;
7. Sample collection (if necessary or required);
8. Exit conference (to discuss preliminary evaluation); and,
9. Report preparation, and if appropriate, recommendations for coming into compliance.

In the case of restaurants, a Permittee may conduct an inspection from the curbside, provided that such "curbside" inspection provides the Permittee with adequate information to determine an operator's compliance with BMPs that must be implemented per requirements of this Order, Regional Board Resolution 98-08, County and municipal ordinances, and the SQMP.

"**Large Municipal Separate Storm Sewer System (MS4)**" means all MS4s that serve a population greater than 250,000 (1990 Census) as defined in 40 CFR 122.26 (b)(4). The Regional Board designated Los Angeles County as a large MS4 in 1990, based on: (i) the U.S. Census Bureau 1990 population count of 8.9 million, and (ii) the interconnectivity of the MS4s in the incorporated and unincorporated areas within the County.

"**Local SWPPP**" means the Storm Water Pollution Prevention Plan required by the local agency for a project that disturbs one or more acres of land.

"**Maximum Extent Practicable (MEP)**" means the standard for implementation of storm water management programs to reduce pollutants in storm water. CWA § 402(p)(3)(B)(iii) requires

December 13, 2001 (As amended on September 14, 2006 by Order R4-2006-0074 and on August 9, 2007 by Order R4-2007-0042)



EXHIBIT ___2___
PAGE _66_ OF _80_

that municipal permits "shall require controls to reduce the discharge of pollutants to the maximum extent practicable, including management practices, control techniques and system, design and engineering methods, and such other provisions as the Administrator or the State determines appropriate for the control of such pollutants.  See also State Board Order WQ 2000-11 at page 20.

**"Method Detection Limit (MDL)"** means the minimum concentration of a substance that can be measured and reported with 99 percent confidence that the analyte concentration is greater than zero, as defined in 40 CFR 136, Appendix B.

**"Minimum Level (ML)"** means the concentration at which the entire analytical system must give a recognizable signal and acceptable calibration point.  The ML is the concentration in a sample that is equivalent to the concentration of the lowest calibration standard analyzed by a specific analytical procedure, assuming that all the method specified sample weights, volumes, and processing steps have been followed.

**"Municipal Separate Storm Sewer System (MS4)"** means a conveyance or system of conveyances (including roads with drainage systems, municipal streets, alleys, catch basins, curbs, gutters, ditches, manmade channels, or storm drains) owned by a State, city, county, town or other public body, that is designed or used for collecting or conveying storm water, which is not a combined sewer, and which is not part of a publicly owned treatment works, and which discharges to Waters of the United States.

**"National Pollutant Discharge Elimination System (NPDES)"** means the national program for issuing, modifying, revoking and reissuing, terminating, monitoring and enforcing permits, and imposing and enforcing pretreatment requirements, under CWA §307, 402, 318, and 405. The term includes an "approved program."

**"Natural Drainage Systems"** means unlined or unimproved (not engineered) creeks, streams, rivers or similar waterways.

**"New Development"** means land disturbing activities; structural development, including construction or installation of a building or structure, creation of impervious surfaces; and land subdivision.

**"Non-Storm Water Discharge"** means any discharge to a storm drain that is not composed entirely of storm water.

**"Nuisance"** means anything that meets all of the following requirements: (1) is injurious to health, or is indecent or offensive to the senses, or an obstruction to the free use of property, so as to interfere with the comfortable enjoyment of life or property; (2) affects at the same time an entire community or neighborhood, or any considerable number of persons, although the extent of the annoyance or damage inflicted upon individuals may be unequal.; (3) occurs during, or as a result of, the treatment or disposal of wastes.

**"Parking Lot"** means land area or facility for the parking or storage of motor vehicles used for businesses, commerce, industry, or personal use, with a lot size of 5,000 square feet or more of surface area, or with 25 or more parking spaces.

December 13, 2001 (As amended on September 14, 2006 by Order R4-2006-0074 and on August 9, 2007 by Order R4-2007-0042)



EXHIBIT ___
PAGE _67_ OF _80_

**"Permittee(s)"** means Co-Permittees and any agency named in this Order as being responsible for permit conditions within its jurisdiction.  Permittees to this Order include the Los Angeles County Flood Control District, Los Angeles County, and the cities of Agoura Hills, Alhambra, Arcadia, Artesia, Azusa, Baldwin Park, Bellflower, Bell Gardens, Beverly Hills, Bradbury, Burbank, Calabasas, Carson, Cerritos, Claremont, Commerce, Compton, Covina, Cudahy, Culver City, Diamond Bar, Downey, Duarte, El Monte, El Segundo, Gardena, Glendale, Glendora, Hawaiian Gardens, Hawthorne, Hermosa Beach, Hidden Hills, Huntington Park, Industry, Inglewood, Irwindale, La Canada Flintridge, La Habra Heights, Lakewood, La Mirada, La Puente, La Verne, Lawndale, Lomita, Los Angeles, Lynwood, Malibu, Manhattan Beach, Maywood, Monrovia, Montebello, Monterey Park, Norwalk, Palos Verdes Estates, Paramount, Pasadena, Pico Rivera, Pomona, Rancho Palos Verdes, Redondo Beach, Rolling Hills, Rolling Hills Estates, Rosemead, San Dimas, San Fernando, San Gabriel, San Marino, Santa Clarita, Santa Fe Springs, Santa Monica, Sierra Madre, Signal Hill, South El Monte, South Gate, South Pasadena, Temple City, Torrance, Vernon, Walnut, West Covina, West Hollywood, Westlake Village, and Whittier.

**"Planning Priority Projects"** means those projects that are required to incorporate appropriate storm water mitigation measures into the design plan for their respective project.  These types of projects include:

1. Ten or more unit homes (includes single family homes, multifamily homes, condominiums, and apartments)

2. A 100,000 or more square feet of impervious surface area industrial/ commercial development (1 ac starting March 2003)

3. Automotive service facilities (SIC 5013, 5014, 5541, 7532-7534, and 7536-7539)

4. Retail gasoline outlets

5. Restaurants (SIC 5812)

6. Parking lots 5,000 square feet or more of surface area or with 25 or more parking spaces

7. Redevelopment projects in subject categories that meet Redevelopment thresholds

8. Projects located in or directly adjacent to or discharging directly to an ESA, which meet thresholds; and

9. Those projects that require the implementation of a site-specific plan to mitigate post-development storm water for new development not requiring a SUSMP but which may potentially have adverse impacts on post-development storm water quality, where the following project characteristics exist:

EXHIBIT ___2___

PAGE _68_ OF _80_

a)    Vehicle or equipment fueling areas;
b)    Vehicle or equipment maintenance areas, including washing and repair;
c)    Commercial or industrial waste handling or storage;
d)    Outdoor handling or storage of hazardous materials;
e)    Outdoor manufacturing areas;
f)    Outdoor food handling or processing;
g)    Outdoor animal care, confinement, or slaughter; or
h)    Outdoor horticulture activities.

**"Pollutants"** means those "pollutants" defined in CWA §502(6) (33.U.S.C.§1362(6)), and incorporated by reference into California Water Code §13373.

**"Potable Water Distribution Systems Releases"** means sources of flows from drinking water storage, supply and distribution systems including flows from system failures, pressure releases, system maintenance, distribution line testing, fire hydrant flow testing; and flushing and dewatering of pipes, reservoirs, vaults, and minor non-invasive well maintenance activities not involving chemical addition(s).  It does not include wastewater discharges from activities that occur at wellheads, such as well construction, well development (i.e., aquifer pumping tests, well purging, etc.), or major well maintenance.

**"Project"** means all development, redevelopment, and land disturbing activities.  The term is not limited to "Project" as defined under CEQA (Pub. Resources Code §21065).

**"Rain Days"** are those days with greater than or equal to 0.1 inch of rainfall.

**"Rain Event"** means any rain event greater than 0.1 inch in 24 hours except where specifically stated otherwise.

**"Rare, Threatened, or Endangered Species (RARE)"** means a beneficial use for waterbodies in the Los Angeles Region, as designated in the Basin Plan (Table 2-1), that supports habitats necessary, at least in part, for the survival and successful maintenance of plant or animal species established under state or federal law as rare, threatened, or endangered.

**"Receiving Waters"** means all surface water bodies in the Los Angeles Region  that are identified in the Basin Plan.

**"Redevelopment"** means land-disturbing activity that results in the creation, addition, or replacement of 5,000 square feet or more of impervious surface area on an already developed site.  Redevelopment includes, but is not limited to: the expansion of a building footprint; addition or replacement of a structure; replacement of impervious surface area that is not part of a routine maintenance activity; and land disturbing activities related to structural or impervious surfaces.  It does not include routine maintenance to maintain original line and grade, hydraulic capacity, or original purpose of facility, nor does it include emergency construction activities required to immediately protect public health and safety.

**"Regional Administrator"** means the Regional Administrator of the Regional Office of the USEPA  or the authorized representative of the Regional Administrator.

December 13, 2001 (As amended on September 14, 2006 by Order R4-2006-0074 and on August 9, 2007 by Order R4-2007-0042)



EXHIBIT ___2___
PAGE 69 OF 80

Case 2:09-cv-04045-DMG-PLA   Document 23   Filed 09/03/09   Page 71 of 81   Page ID #:320

**"Restaurant"** means a facility that sells prepared foods and drinks for consumption, including stationary lunch counters and refreshment stands selling prepared foods and drinks for immediate consumption (SIC Code 5812).

**"Retail Gasoline Outlet"** means any facility engaged in selling gasoline and lubricating oils.

**"Runoff"** means any runoff including storm water and dry weather flows from a drainage area that reaches a receiving water body or subsurface.  During dry weather it is typically comprised of base flow either contaminated with pollutants or uncontaminated, and nuisance flows.

**"Screening"** means using proactive methods to identify illicit connections through a continuously narrowing process.  The methods may include: performing baseline monitoring of open channels, conducting special investigations using a prioritization approach, analyzing maintenance records for catch basin and storm drain cleaning and operation, and verifying all permitted connections into the storm drains.  Special investigation techniques may include: dye testing, visual inspection, smoke testing, flow monitoring, infrared, aerial and thermal photography, and remote control camera operation.

**"Sidewalk Rinsing"** means pressure washing of paved pedestrian walkways with average water usage of 0.006 gallons per square foot, with no cleaning agents, and properly disposing of all debris collected, as authorized under Regional Board Resolution No. 98-08.

**"Significant Ecological Area (SEA)"** means an area that is determined to possess an example of biotic resources that cumulatively represent biological diversity, for the purposes of protecting biotic diversity, as part of the Los Angeles County General Plan.[6]
Areas are designated as SEAs, if they possess one or more of the following criteria:

1. The habitat of rare, endangered, and threatened plant and animal species.
2. Biotic communities, vegetative associations, and habitat of plant and animal species that are either one of a kind, or are restricted in distribution on a regional basis.
3. Biotic communities, vegetative associations, and habitat of plant and animal species that are either one of a kind or are restricted in distribution in Los Angeles County.
4. Habitat that at some point in the life cycle of a species or group of species, serves as a concentrated breeding, feeding, resting, migrating grounds and is limited in availability either regionally or within Los Angeles County.
5. Biotic resources that are of scientific interest because they are either an extreme in physical/geographical limitations, or represent an unusual variation in a population or community.
6. Areas important as game species habitat or as fisheries.

---

[6] The 61 existing SEAs represent the findings of a study that was completed in 1976 by England and Nelson, Environmental Consultants, as amended through the adoption of a revised Los Angeles County General Plan in 1980.  The results of an update study to evaluate existing SEAs within unincorporated Los Angeles County is currently being proposed to the Los Angeles County Planning Commission (*Los Angeles County Significant Ecological Area Update Study 2000, Background Report*, PCR Services Corporation).  The *Update Study 2000*, which contains existing and proposed SEA boundaries, can be downloaded from the Los Angeles County Department of Planning website at http://planning.co.la.ca.us/drp_revw.html#SEA

December 13, 2001 (As amended on September 14, 2006 by Order R4-2006-0074 and on August 9, 2007 by Order R4-2007-0042)



EXHIBIT ___2___
PAGE _70_ OF _80_

7.  Areas that would provide for the preservation of relatively undisturbed examples of natural biotic communities in Los Angeles County.
8.  Special areas.[7]

**"Significant Natural Area (SNA)"** means an area defined by the California Department of Fish and Game (DFG), Significant Natural Areas Program, as an area that contains an important example of California's biological diversity. The most current SNA maps, reports, and descriptions can be downloaded from the DFG website at ftp://maphost.dfg.ca.gov/outgoing/whdab/sna/. These areas are identified using the following biological criteria only, irrespective of any administrative or jurisdictional considerations:

1.  Areas supporting extremely rare species or habitats.
2.  Areas supporting associations or concentrations of rare species or habitats.
3.  Areas exhibiting the best examples of rare species and habitats in the state.

**"Site"** means the land or water area where any "facility or activity" is physically located or conducted, including adjacent land used in connection with the facility or activity.

**"Source Control BMP"** means any schedules of activities, prohibitions of practices, maintenance procedures, managerial practices or operational practices that aim to prevent storm water pollution by reducing the potential for contamination at the source of pollution.

**"SQMP"** means the Los Angeles Countywide Stormwater Quality Management Program.

**"State Storm Water Pollution Prevention Plan (State SWPPP)"** means a plan, as required by a State General Permit, identifying potential pollutant sources and describing the design, placement and implementation of BMPs, to effectively prevent non-stormwater Discharges and reduce Pollutants in Stormwater Discharges during activities covered by the General Permit.

**"Storm Water"** means storm water runoff, snow melt runoff, and surface runoff and drainage.

**"Storm Water Discharge Associated with Industrial Activity"** means industrial discharge as defined in 40 CFR 122.26(b)(14)

**"Stormwater Quality Management Program"** means the Los Angeles Countywide Stormwater Quality Management Program, which includes descriptions of programs, collectively developed by the Permittees in accordance with provisions of the NPDES Permit, to comply with applicable federal and state law, as the same is amended from time to time.

**"Structural BMP"** means any structural facility designed and constructed to mitigate the adverse impacts of storm water and urban runoff pollution (e.g. canopy, structural enclosure). The category may include both Treatment Control BMPs and Source Control BMPs.

**"Summer Dry Weather"** means Dry Weather days occurring from April 1 through October 31 of each year.

---

[7] These criteria from the 1976 study have been modified in the *Update Study 2000*.

December 13, 2001 (As amended on September 14, 2006 by Order R4-2006-0074 and on August 9, 2007 by Order R4-2007-0042)



EXHIBIT 2
PAGE 71 OF 80

Case 2:09-cv-04045-DMG-PLA   Document 23   Filed 09/03/09   Page 73 of 81   Page ID #:322

**"SUSMP"** means the Los Angeles Countywide Standard Urban Stormwater Mitigation Plan. The SUSMP shall address conditions and requirements of new development.

**"Total Maximum Daily Load (TMDL)"** means the sum of the individual waste load allocations for point sources and load allocations for nonpoint sources and natural background.

**"Toxicity Identification Evaluation (TIE)"** means a set of procedures to identify the specific chemical(s) responsible for toxicity. These procedures are performed in three phases (characterization, identification, and confirmation) using aquatic organism toxicity tests.

**"Toxicity Reduction Evaluation (TRE)"** means a study conducted in a step-wise process to identify the causative agents of effluent or ambient toxicity, isolate the sources of toxicity, evaluate the effectiveness of toxicity control options, and then confirm the reduction in toxicity.

**"Treatment"** means the application of engineered systems that use physical, chemical, or biological processes to remove pollutants. Such processes include, but are not limited to, filtration, gravity settling, media absorption, biodegradation, biological uptake, chemical oxidation and UV radiation.

**"Treatment Control BMP"** means any engineered system designed to remove pollutants by simple gravity settling of particulate pollutants, filtration, biological uptake, media absorption or any other physical, biological, or chemical process.

**"USEPA Phase I Facilities"** means facilities in specified industrial categories that are required to obtain an NPDES permit for storm water discharges, as required by 40 CFR 122.26(c). These categories include:

i.   facilities subject to storm water effluent limitation guidelines, new source performance standards, or toxic pollutant effluent standards (40 CFR N)
ii.  manufacturing facilities
iii. oil and gas/mining facilities
iv.  hazardous waste treatment, storage, or disposal facilities
v.   landfills, land application sites, and open dumps
vi.  recycling facilities
vii. steam electric power generating facilities
viii. transportation facilities
ix.  sewage of wastewater treatment works
x.   light manufacturing facilities

**"Vehicle Maintenance/Material Storage Facilities/Corporation Yards"** means any Permittee owned or operated facility or portion thereof that:

i.   Conducts industrial activity, operates equipment, handles materials, and provides services similar to Federal Phase I facilities;
ii.  Performs fleet vehicle service/maintenance on ten or more vehicles per day including repair, maintenance, washing, and fueling;
iii. Performs maintenance and/or repair of heavy industrial machinery/equipment ; and
iv.  Stores chemicals, raw materials, or waste materials in quantities that require a hazardous materials business plan or a Spill Prevention, Control , and Counter-measures (SPCC) plan.

December 13, 2001 (As amended on September 14, 2006 by Order R4-2006-0074 and on August 9, 2007 by Order R4-2007-0042)



EXHIBIT ___2___

PAGE _72_ OF _80_

**"Water Quality Standards and Water Quality Objectives"** means water quality criteria contained in the Basin Plan, the California Ocean Plan, the National Toxics Rule, the California Toxics Rule, and other state or federally approved surface water quality plans.  Such plans are used by the Regional Board to regulate all discharges, including storm water discharges.

**"Waters of the State"** means any surface water or groundwater, including saline waters, within boundaries of the state.

**"Waters of the United States" or "Waters of the U.S."** means:

    a.  All waters that are currently used, were used in the past, or may be susceptible to use in interstate or foreign commerce, including all waters which are subject to the ebb and flow of the tide;

    b.  All interstate waters, including interstate "wetlands";

    c.  All other waters such as intrastate lakes, rivers, streams (including intermittent streams), mudflats, sandflats, "wetlands," sloughs, prairie potholes, wet meadows, playa lakes, or natural ponds the use, degradation, or destruction of which would affect or could affect interstate or foreign commerce including any such waters:

        1.  Which are or could be used by interstate or foreign travelers for recreational or other purposes;

        2.  From which fish or shellfish are or could be taken and sold in interstate or foreign commerce; or

        3.  Which are used or could be used for industrial purposes by industries in interstate commerce;

    d.  All impoundments of waters otherwise defined as waters of the United States under this definition;

    e.  Tributaries of waters identified in paragraphs (a) through (d) of this definition;

    f.  The territorial sea; and

    g.  "Wetlands" adjacent to waters (other than waters that are themselves wetlands) identified in paragraph (a) through (f) of this definition.

Waste treatment systems, including treatment ponds or lagoons designed to meet the requirements of CWA (other than cooling ponds as defined in 40 CFR 423.22(m), which also meet the criteria of this definition) are not waters of the United States.  This exclusion applies only to man-made bodies of water, which neither were originally created in waters of the United States (such as disposal area in wetlands) nor resulted from the impoundment of waters of the United States.  Waters of the United States do not include prior converted cropland.  Notwithstanding the determination of an area's status as prior converted cropland by any other federal agency, for the purposes of the CWA, the final authority regarding CWA jurisdiction remains with USEPA.

**"Wave Wash"** means the point at which a storm drain or creek empties and the effluent from the storm drain initially mixes with the receiving ocean water.

**"Wet Season"** means the calendar period beginning October 1 through April 15.

December 13, 2001 (As amended on September 14, 2006 by Order R4-2006-0074 and on August 9, 2007 by Order R4-2007-0042)



EXHIBIT _2_

PAGE _73_ OF _80_

## Part 6. STANDARD PROVISIONS

**A.**     **Standard Requirements**

1.     Each Permittee shall comply with all provisions and requirements of this permit.

2.     Should a Permittee discover a failure to submit any relevant facts or that it submitted incorrect information in a report, it shall promptly submit the missing or correct information.

3.     Each Permittee shall report all instances of non-compliance not otherwise reported at the time monitoring reports are submitted.

4.     This Order includes the attached Monitoring and Reporting Program, and SUSMP(Regional Board Resolution No. R00-02), which are a part of the permit and must be complied with in the same manner as with the rest of the requirements in the permit.

**B.**     **Regional Board Review**

Any formal determination or approval made by the Regional Board Executive Officer pursuant to the provisions of this Order may be reviewed by the Regional Board. A Permittee(s) or a member of the public may request such review upon petition within 30 days of the effective date of the notification of such decision to the Permittee(s) and interested parties on file at the Regional Board.

**C.**     **Public Review**

1.     All documents submitted to the Regional Board in compliance with the terms and conditions of this Order shall be made available to members of the public pursuant to the Freedom of Information Act (5 U.S.C. § 552 (as amended) and the Public Records Act (Cal. Government Code § 6250 *et seq.*).

2.     All documents submitted to the Regional Board Executive Officer for approval shall be made available to the public for a 30-day period to allow for public comment.

**D.**     **Duty to Comply**

1.     Each Permittee must comply with all of the terms, requirements, and conditions of this Order. Any violation of this order constitutes a violation of the Clean Water Act, its regulations and the California Water Code, and is grounds for enforcement action, Order termination, Order revocation and reissuance, denial of an application for reissuance; or a combination thereof [40 CFR 122.41(a), CWC § 13261, 13263, 13265, 13268, 13300, 13301, 13304, 13340, 13350].

2.     A copy of these waste discharge specifications shall be maintained by each Permittee so as to be available during normal business hours to Permittee employees and members of the public.

December 13, 2001 (As amended on September 14, 2006 by Order R4-2006-0074 and on August 9, 2007 by Order R4-2007-0042)



**EXHIBIT** _2_
**PAGE** _74_ **OF** _80_

3.  Any discharge of wastes at any point(s) other than specifically described in this Order is prohibited, and constitutes a violation of the Order.

**E.    Duty to Mitigate [40 CFR 122.41 (d)]**

Each Permittee shall take all reasonable steps to minimize or prevent any discharge that has a reasonable likelihood of adversely affecting human health or the environment.

**F.    Inspection and Entry [40 CFR 122.41(i), CWC § 13267]**

The Regional Board, USEPA, and other authorized representatives shall be allowed:

1.  Entry upon premises where a regulated facility is located or conducted, or where records are kept under conditions of this Order;

2.  Access to copy any records, at reasonable times, that are kept under the conditions of this Order;

3.  To inspect at reasonable times any facility, equipment (including monitoring and control equipment), practices, or operations regulated or required under this Order; and,

4.  To photograph, sample, and monitor at reasonable times for the purpose of assuring compliance with this Order, or as otherwise authorized by the CWA and the CWC.

**G.    Proper Operation and Maintenance [40 CFR 122.41 (e), CWC § 13263(f)]**

The Permittees shall at all times properly operate and maintain all facilities and systems of treatment (and related appurtenances) that are installed or used by the Permittees to achieve compliance with this Order. Proper operation and maintenance includes adequate laboratory controls and appropriate quality assurance procedures. This provision requires the operation of backup or auxiliary facilities or similar system that are installed by a Permittee only when necessary to achieve compliance with the conditions of this Order.

**H.    Signatory Requirements [40 CFR 122.41(k) & 122.22]**

Except as otherwise provided in this Order, all applications, reports, or information submitted to the Regional Board shall be signed by the Director of Public Works, City Engineer, or authorized designee and certified as set forth in 40 CFR 122.22.

**I.    Reopener and Modification [40 CFR 122.41(f) & 122.62]**

1.  This Order may only be modified, revoked, or reissued, prior to the expiration date, by the Regional Board, in accordance with the procedural requirements of the CWC and CCR Title 23 for the issuance of waste

December 13, 2001 (As amended on September 14, 2006 by Order R4-2006-0074 and on August 9, 2007 by Order R4-2007-0042)



EXHIBIT     2
PAGE 75 OF 80

discharge requirements, 40 CFR 122.62, and upon prior notice and hearing, to:

a)   Address changed conditions identified in the required reports or other sources deemed significant by the Regional Board;

b)   Incorporate applicable requirements or statewide water quality control plans adopted by the State Board or amendments to the Basin Plan;

c)   Comply with any applicable requirements, guidelines, and/or regulations issued or approved pursuant to CWA Section 402(p); and/or,

d)   Consider any other federal, or state laws or regulations that became effective after adoption of this Order.

2.   After notice and opportunity for a hearing, this Order may be terminated or modified for cause, including, but not limited to:

a)   Violation of any term or condition contained in this Order;

b)   Obtaining this Order by misrepresentation, or failure to disclose all relevant facts; or,

c)   A change in any condition that requires either a temporary or permanent reduction or elimination of the authorized discharge.

3.   The filing of a request by the Principal Permittee or Permittees for a modification, revocation and re-issuance, or termination, or a notification of planned changes or anticipated noncompliance does not stay any condition of this Order.

4.   This Order may be modified to make corrections or allowances for changes in the permitted activity listed in this section, following the procedures at 40 CFR 122.63, if processed as a minor modification. Minor modifications may only:

a)   Correct typographical errors, or

b)   Require more frequent monitoring or reporting by the Permittee.

**J.   Severability**

The provisions of this permit are severable; and if any provision of this permit or the application of any provision of this permit to any circumstance is held invalid, the application of such provision to other circumstances and the remainder of this permit shall not be affected.

**K.   Duty to Provide Information [40 CFR 122.41(h)]**

The Permittees shall furnish, within a reasonable time, any information the Regional Board or USEPA may request to determine whether cause exists for

December 13, 2001 (As amended on September 14, 2006 by Order R4-2006-0074 and on August 9, 2007 by Order R4-2007-0042)



EXHIBIT ___2___
PAGE _76_ OF _80_

Case 2:09-cv-04045-DMG-PLA   Document 23   Filed 09/03/09   Page 78 of 81   Page ID #:327

modifying, revoking and reissuing, or terminating this Order. The Permittees shall also furnish to the Regional Board, upon request, copies of records required to be kept by this Order.

**L.    Twenty-four Hour Reporting [40 CFR 122.41(l)(6)][8]**

1.   The Permittees shall report to the Regional Board any noncompliance that may endanger health or the environment.  Any information shall be provided orally within 24 hours from the time any Permittee becomes aware of the circumstances. A written submission shall also be provided within five days of the time the Permittee becomes aware of the circumstances.  The written submission shall contain a description of the noncompliance and its cause; the period of noncompliance, including exact dates and times and, if the noncompliance has not been corrected, the anticipated time it is expected to continue; and steps taken or planned to reduce, eliminate, and prevent reoccurrence of the noncompliance.

2.   The Regional Board may waive the required written report on a case-by-case basis.

**M.    Bypass [40 CFR 122.41(m)][9]**

Bypass (the intentional diversion of waste streams from any portion of a treatment facility) is prohibited.  The Regional Board may take enforcement action against Permittees for bypass unless:

1.   Bypass was unavoidable to prevent loss of life, personal injury or severe property damage.  (Severe property damage means substantial physical damage to property, damage to the treatment facilities that causes them to become inoperable, or substantial and permanent loss of natural resources that can reasonably be expected to occur in the absence of a bypass.  Severe property damage does not mean economic loss caused by delays in production.);

2.   There were no feasible alternatives to bypass, such as the use of auxiliary treatment facilities, retention of untreated waste, or maintenance during normal periods of equipment down time.  This condition is not satisfied if adequate back-up equipment should have been installed in the exercise of reasonable engineering judgment to prevent a bypass that could occur during normal periods of equipment downtime or preventive maintenance;

3.   The Permittee submitted a notice at least ten days in advance of the need for a bypass to the Regional Board; or,

---

[8] This provision applies to incidents where effluent limitations (numerical or narrative) as provided in this Order or in the Los Angeles County SQMP are exceeded, and which endanger public health or the environment.

[9] This provision applies to the operation and maintenance of storm water controls and BMPs as provided in this Order or in the SQMP.

December 13, 2001 (As amended on September 14, 2006 by Order R4-2006-0074 and on August 9, 2007 by Order R4-2007-0042)



**EXHIBIT** _2_
**PAGE** _77_ **OF** _80_

4.   Permittees may allow a bypass to occur that does not cause effluent limitations to be exceeded, but only if it is for essential maintenance to assure efficient operation. In such a case, the above bypass conditions are not applicable. The Permittee shall submit notice of an unanticipated bypass as required.

**N.   Upset [40 CFR 122.41(n)][10]**

*Upset* means an exceptional incident in which there is unintentional and temporary noncompliance with technology based permit effluent limitations because of factors beyond the reasonable control of the permittee. An upset does not include noncompliance to the extent caused by operational error, improperly designed treatment facilities, inadequate treatment facilities, lack of preventive maintenance, or careless or improper operation.

1.   A Permittee that wishes to establish the affirmative defense of an upset in an action brought for non compliance shall demonstrate, through properly signed, contemporaneous operating logs, or other relevant evidence that:

a)   An upset occurred and that the Permittee can identify the cause(s) of the upset;

b)   The permitted facility was being properly operated by the time of the upset;

c)   The Permittee submitted notice of the upset as required; and,

d)   The Permittee complied with any remedial measures required.

2.   No determination made before an action for noncompliance, such as during administrative review of claims that non-compliance was caused by an upset, is final administrative action subject to judicial review.

3.   In any enforcement proceeding, the Permittee seeking to establish the occurrence of an upset has the burden of proof.

**O.   Property Rights [40 CFR 122.41(g)]**

This Order does not convey any property rights of any sort, or any exclusive privilege.

**P.   Enforcement**

1.   Violation of any of the provisions of the NPDES permit or any of the provisions of this Order may subject the violator to any of the penalties described herein, or any combination thereof, at the discretion of the

---

[10] *Supra.* See footnote number 3.

December 13, 2001 (As amended on September 14, 2006 by Order R4-2006-0074 and on August 9, 2007 by Order R4-2007-0042)



EXHIBIT ___2___
PAGE _78_ OF _80_

prosecuting authority; except that only one kind of penalties may be applied for each kind of violation. The CWA provides the following:

a) Criminal Penalties for:

    (1) Negligent Violations:

The CWA provides that any person who negligently violates permit conditions implementing § 301, 302, 306, 307, 308, 318, or 405 is subject to a fine of not less than $2,500 nor more than $25,000 per day for each violation, or by imprisonment for not more than 1 year, or both.

    (2) Knowing Violations:

The CWA provides that any person who knowingly violates permit conditions implementing § 301, 302, 306, 307, 308, 318, or 405 is subject to a fine of not less than $5,000 nor more than $50,000 per day of violation, or by imprisonment for not more than 3 years, or both.

    (3) Knowing Endangerment:

The CWA provides that any person who knowingly violates permit conditions implementing § 301, 302, 307, 308, 318, or 405 and who knows at that time that he is placing another person in imminent danger of death or serious bodily injury is subject to a fine of not more than $250,000, or by imprisonment for not more than 15 years, or both.

    (4) False Statement:

The CWA provides that any person who knowingly makes any false material statement, representation, or certification in any application, record, report, plan, or other document filed or required to be maintained under the Act or who knowingly falsifies, tampers with, or renders inaccurate, any monitoring device or method required to be maintained under the Act, shall upon conviction, be punished by a fine of not more than $10,000 or by imprisonment for not more than two years, or by both.  If a conviction is for a violation committed after a first conviction of such person under this paragraph, punishment shall be by a fine of not more than $20,000 per day of violation, or by imprisonment of not more than four years, or by both.  (See CWA § 309(c)(4))

b) Civil Penalties

The CWA provides that any person who violates a permit condition implementing § 301, 302, 306, 307, 308, 318, or 405 is subject to a civil penalty not to exceed $27,500 per day for each violation.

2. The CWC provides that any person who violates a waste discharge requirement provision of the CWC is subject to civil penalties of up to $5,000 per day, $10,000 per day, or $25,000 per day of violation; or when the violation involves the discharge of pollutants, is subject to civil penalties of up to $10 per gallon per day or $25 per gallon per day of

December 13, 2001 (As amended on September 14, 2006 by Order R4-2006-0074 and on August 9, 2007 by Order R4-2007-0042)



EXHIBIT ___2___

PAGE _79_OF_80_

Case 2:09-cv-04045-DMG-PLA   Document 23   Filed 09/03/09   Page 81 of 81   Page ID #:330

violation; or some combination thereof, depending on the violation or combination of violations.

**Q.     Need to Halt or Reduce Activity not a Defense [40 CFR 122.41(c)]**

It shall not be a defense for a Permittee in an enforcement action that it would have been necessary to halt or reduce the permitted activity in order to maintain compliance with the conditions of this Order.

**R.     Rescission**

Regional Board Order No. 96-054 is hereby rescinded.

**S.     Expiration**

This Order expires on December 12, 2006. The Permittees must submit a Report of Waste Discharges and a proposed Storm Water Quality Management Program in accordance with CCR Title 23 as application for reissuance of waste discharge requirements no later than June 12, 2006.

I, Dennis A. Dickerson, Regional Board Executive Officer, do hereby certify that the foregoing is a full, true, and correct copy of an order adopted by the California Regional Water Quality Control Board, Los Angeles Region, on December 13, 2001.

_____
Dennis A. Dickerson
Executive Officer

December 13, 2001 (As amended on September 14, 2006 by Order R4-2006-0074 and on August 9, 2007 by Order R4-2007-0042)



EXHIBIT  2
PAGE 80 OF 80