LATHAM & WATKINS LLP
   Kirk A. Wilkinson (Bar No. 128367)
    *kirk.wilkinson@lw.com*
355 South Grand Avenue
Los Angeles, California  90071-1560
Telephone:  (213) 485-1234
Facsimile:   (213) 891-8763

LATHAM & WATKINS LLP
    Charity M. Gilbreth (Bar No. 223504)
    *charity.gilbreth@lw.com*
    Garrett L. Jansma  (Bar No. 261825)
    *garrett.jansma@lw.com*
650 Town Center Drive, 20th Floor
Costa Mesa, California  92626-1925
Telephone:  (714) 540-1235
Facsimile:   (714) 755-8290

Attorneys for Defendants
THE WALT DISNEY COMPANY,
DISNEY ENTERPRISES, INC., and
DISNEY WORLDWIDE SERVICES, INC.

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| ENVIRONMENTAL WORLD WATCH, INC., DENNIS JACKSON, ROBERT HILL, ROBIN MCCALL, and WILLIAM MCCALL,<br><br>Plaintiffs,<br><br>v.<br><br>THE WALT DISNEY COMPANY, WALT DISNEY ENTERPRISES, INC., DISNEY WORLDWIDE SERVICES, INC., and DOES 1-30, Inclusive,<br><br>Defendants. | CASE NO. CV09-4045 DMG (PLAx)<br><br>**DEFENDANTS' NOTICE OF MOTION FOR SUMMARY JUDGMENT; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF**<br><br>**[PUBLIC VERSION OF DOCUMENT FILED UNDER SEAL]**<br><br>[Statement of Uncontroverted Facts and Conclusions of Law In Support of Defendants' Motion for Summary Judgment, Declarations of Eric Smalstig, P.E., Christine Lansen, and Garrett Jansma, Defendants' Compendium of Exhibits, and Proposed Order Filed Concurrently Herewith]<br><br>Hearing Date:    June 29, 2012<br>Time:               2:00 p.m.<br>Place:             Second Floor, Ctrm. 7<br>Before:           Hon. Dolly M. Gee<br><br>Action Filed:     June 5, 2009<br>Pre-Trial Conf.:  August 7, 2012<br>Trial Date:       September 4, 2012 |

**TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:**

**PLEASE TAKE NOTICE** that on June 29, 2012, at 2:00 p.m., or as soon thereafter as this matter may be heard in Courtroom 7 of the above-entitled Court, located at 312 N. Spring Street, Los Angeles, California, 90012, The Walt Disney Company, Disney Enterprises, Inc., and Disney Worldwide Services, Inc. ("Defendants") will and hereby do move, pursuant to Rule 56 of the Federal Rules of Civil Procedure, for summary judgment regarding each and every one of Plaintiffs' Clean Water Act ("CWA") claims on the grounds that Defendants' storm water and non-storm water discharges to the City of Burbank's municipal separate storm sewer system ("ms4") pursuant to a permit issued by the City of Burbank do not require a federal National Pollutant Discharge Elimination System ("NPDES") permit.  Defendants' Motion is made on the basis that there is no triable issue of material fact as to these issues and that Defendants are entitled to an order adjudicating that Plaintiffs cannot establish a CWA claim as a matter of law.

Defendants' Motion is based on this Notice of Motion and Motion, Defendants' supporting Memorandum of Points and Authorities, the supporting declarations of Garrett L. Jansma, Eric Smalstig and Christine Lansen, Defendants' Separate Statement of Undisputed Facts, all pleadings and papers on file with the Court in this action, and on such other matters as may be presented to the Court at or before the hearing of this Motion.

The motion is made following the telephone conference of counsel pursuant to Local Rule 7-3, which took place on April 30, 2012.

Dated:  May 11, 2012

LATHAM & WATKINS LLP

By:    s/ Garrett L. Jansma
Garrett L. Jansma
Attorneys for Defendants
THE WALT DISNEY COMPANY,
DISNEY ENTERPRISES, INC., and
DISNEY WORLDWIDE SERVICES,
INC.

# TABLE OF CONTENTS

**Page**

I.    INTRODUCTION ........................................................................................ 1

II.   FACTS ....................................................................................................... 2

III.  ARGUMENT .............................................................................................. 5

    A.   Summary Judgment Standard and Burden of Proof ........................... 5

    B.   Plaintiffs' CWA Claims are Legally Deficient ................................. 5

    C.   Defendants Do Not Need an NPDES Permit to Discharge *Storm Water* to Burbank's Municipal Separate Storm Sewer System ....................................................................................... 7

        1.   The Studio Lot is Not an Industrial Facility ......................... 11

        2.   Non-Industrial Commercial Facilities Are Regulated Through Municipal Control to Minimize Administrative Burden .......................................... 16

        3.   Local Agencies Regulate the Studio as a Commercial Facility ............................................................ 18

    D.   Defendants' *Non-Storm* Water Discharges are Authorized by EPA's Storm Water Regulations, the LA MS4 Permit, Burbank's Storm Water Ordinance, and Permit 1168 ...................... 19

    E.   Contrary to Plaintiffs' Allegations, the Presence of Pollutants in Storm Water or Non-Storm Water Runoff Does Not Trigger NPDES Permit Obligations .................................. 22

IV.   CONCLUSION ......................................................................................... 25

NOTICE OF MOTION FOR SUMMARY JUDGMENT AND MEMO
OF POINTS & AUTHORITIES ISO THEREOF

1

## TABLE OF AUTHORITIES

2

**Page**

3

### CASES

4

*Anderson v. Liberty Lobby, Inc.*,
5
    477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) ...................................... 5

6

*Celotex Corp. v. Catrett*,
7
    477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986) ...................................... 5

8

*Conservation Law Foundation v. Hannaford Bros. Co.*,
9
    327 F. Supp. 2d 325 (D. Vt. 2001) ........................................................ 8, 17, 24

10

*Envtl. Def. Ctr., Inc. v. EPA*,
    344 F.3d 832 (9th Cir. 2003) ..................................................................... 9, 23
11

12

*Envtl. Prot. Info. Ctr. v. Pac. Lumber Co.*,
    301 F. Supp. 2d 1102 (N.D. Cal. 2004) ......................................................... 24
13

14

*Gwaltney of Smithfield, Ltd. v. Chesapeake Bay Foundation*,
    484 U.S. 49 (1987) ........................................................................................ 8

15

*In re Stormwater NPDES Petition*,
16
    2006 VT 91 (Vt. 2006) ................................................................................. 10

17

*Munoz v. Mabus*,
18
    630 F.3d 856, 2010 WL 5263141 (9th Cir. 2010) ........................................... 5

19

*Norse v. City Of Santa Cruz*,
20
    629 F.3d 966, 2010 WL 5097749 (9th Cir. 2010) ........................................... 5

21

*Northwest Envtl. Def. Ctr. v. Brown*,
    640 F.3d 1063 (9th Cir. Or. 2011) ............................................................. 9, 16
22

23

*NRDC, Inc. v. County of Los Angeles*,
    2011 U.S. App. LEXIS 14443 (9th Cir. Cal. July 13, 2011) ......... 10, 16, 17, 23
24

25

*Rosemere Neighborhood Ass'n v. City of Vancouver*,
    2005 U.S. Dist. LEXIS 43011 (W.D. Wash. Oct. 18, 2005) ................. 8, 17, 24

26

*South Florida Management District v. Miccosukee Tribe*,
27
    541 U.S. 95 (2004) ........................................................................................ 8

28

**STATUTES**

33 U.S.C. § 1311(a) ........................................................................................ 7

33 U.S.C. § 1314(i)(2) .................................................................................. 10

33 U.S.C. § 1342(p) .................................................................................... 8, 9

33 U.S.C. § 1362(14) ..................................................................................... 7

33 U.S.C. § 1362(6) .................................................................................... 6, 7

CWA § 301(a) ........................................................................................ passim

CWA § 402 ............................................................................................... 7, 17

CWA § 402(p) ........................................................................................ passim

CWA § 402(p)(2)(A) ...................................................................................... 9

CWA § 402(p)(2)(E) ..................................................................................... 10

CWA § 402(p)(3)(B)(ii) ............................................................................... 19

**OTHER AUTHORITIES**

131 Cong. Rec. 15616 (Jun. 13, 1985) ....................................................... 16

131 Cong. Rec. 15657 (Jun. 13, 1985) ....................................................... 16

132 Cong. Rec. S16424 (Oct. 16, 1986) ..................................................... 23

133 Cong. Rec. 985 (1987) ............................................................................ 9

1987 U.S.C.C.A.N. 5 ................................................................................. 8, 22

64 Fed. Reg. 68734 ........................................................................................ 9

NPDES Storm Water Program, Question and Answer Document,
    Volume 2 (July 1993) ......................................................................... 13

Standard Industrial Classification Manual ("SIC Code Manual") 12
    (1987) ................................................................................................. 12

Urbanization, Water Quality, and the Regulated Landscape, 82 U.
    Colo. L. Rev. 431 ............................................................................... 10

## RULES

Fed. R. Civ. P. 56 .................................................................................i, 5

Fed. R. Civ. P. 56(a) ...............................................................................5

Fed. R. Civ. P. 56(c) ...............................................................................5

Fed. R. Civ. P. 56(e) ...............................................................................5

Local Rule 7-3 .........................................................................................i

## REGULATIONS

40 C.F.R. § 122.26(b)(14) ................................................................12, 14

40 C.F.R. § 122.26(b)(14)(i)...................................................................15

40 C.F.R. § 122.26(b)(14)(ii)..................................................................13, 15

40 C.F.R. § 122.26(b)(14)(iii) ................................................................13, 15

40 C.F.R. § 122.26(b)(14)(ix)..................................................................15

40 C.F.R. § 122.26(b)(14)(v)...................................................................15

40 C.F.R. § 122.26(b)(14)(vi)..................................................................13, 15

40 C.F.R. § 122.26(b)(14)(vii).................................................................15

40 C.F.R. § 122.26(b)(14)(viii)................................................................13, 15

40 C.F.R. § 122.26(b)(14)(xi)..................................................................13, 15

40 C.F.R. § 122.26(b)(8) .........................................................................3

40 C.F.R. § 122.26(d)(2)(iv)(B)(1) ..........................................................20

40 C.F.R. § 1222.26(f)(2) ........................................................................10

40 C.F.R. 122.2.......................................................................................3

40 C.F.R. Par 123 ...................................................................................10

40. C.F.R. § 122.26(a)(9)(i) ....................................................................11

55 Fed. Reg. 47995 ................................................................................19

55 Fed. Reg. 47997 ................................................................................................ 2

55 Fed. Reg. 47999 .............................................................................................. 12

55 Fed. Reg. 48007 .............................................................................................. 14

55 Fed. Reg. 48037 ........................................................................................ 19, 20

64 Fed. Reg. 68725 ........................................................................................ 22, 23

65 Fed. Reg. 64766-67 ........................................................................................ 24

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**MEMORANDUM OF POINTS AND AUTHORITIES**

**I.     INTRODUCTION**

███████████████████████████████████

███████████████████████████████████

███████████████████████████████████

███████████████████████████████████

████████       After nearly three years of discovery failed to produce a shred of evidence to support Plaintiffs' core allegation in this and eight other federal and state court actions,[3] the remaining Plaintiffs refuse to acknowledge their mistake and simply walk away.  Instead they have doubled down, pressing on with a flawed Clean Water Act ("CWA") case that seeks to upend the existing storm water regulatory framework by exponentially expanding the federal National Pollutant Discharge Elimination System ("NPDES") program.  Were this Court to accept Plaintiffs' novel CWA theory, every commercial facility that discharges storm water runoff or landscape irrigation runoff to a municipal storm sewer would require a federal NPDES permit – an administrative nightmare that Congress deliberately avoided when it established the storm water program. All urban runoff, including storm water or irrigation water flowing across roads or parking lots at commercial facilities, entrains pollutants.  Clawing at something to continue

_____

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

[3] A list of the eight additional actions is provided at Appendix A.

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
ORANGE COUNTY

1  to litigate over, Plaintiffs attempt to rewrite the entire storm water legislative and

2  regulatory scheme in an undreamt-of way to require a federal permit for discharges

3  from commercial facilities that are currently regulated by local governments, a

4  move that would open the floodgates to unlimited citizen suit litigation and create a

5  an attorneys' fees goldmine for those pursuing these "spit on the sidewalk" claims.

6  Fortunately, the CWA and its implementing regulations foreclose Plaintiffs' latest

7  misguided theory as a matter of law.

8  **II.    FACTS**

9        The material facts in this case are not in dispute.  Defendants' 51-acre

10  studio lot located at 500 South Buena Vista Street in Burbank, California ("Studio

11  Lot") consists primarily of office buildings and motion picture production

12  facilities.  (Defendants' Statement of Undisputed Facts ("SUF") #4-5.)  There,

13  Defendants produce and distribute animated and live-action motion pictures, as

14  well as original television content for network and syndication markets.  (SUF #4.)

15  In addition to production and post-production facilities (*e.g.*, sound stages, craft

16  shops, film sets, digital media rooms) that directly support this primary activity

17  (SUF #4), many buildings on the Studio Lot are used for corporate offices and

18  ancillary facilities such as parking lots, a commissary, and an automobile service

19  station, which provides motor vehicle fueling and washing services.  (SUF #6.)

20        Defendants' storm water management practices are like those at most

21  commercial facilities in California.  Runoff that is generated during precipitation

22  events (*i.e.*, "storm water")[4], and irrigation water which originates from the City's

23  potable water supplies and occasionally seeps beyond the facility's lawns and

24  gardens (*i.e.*, "non-storm water"), flow into the facility's storm sewer system, and

25  _____

26  [4] In the CWA, the term "storm water" is presented as a single word.  EPA, on
   the other hand, decided to use an approach consistent with the Government
27  Printing Office's approved form where storm water appears as two words.  55 Fed.
   Reg. 47997.  In this brief, Defendants employ the two-word spelling, except when
28  directly quoting from sources that have used one word.

1   ultimately discharge into the City of Burbank's municipal separate storm sewer

2   system ("ms4").[5]  (SUF #7.)  These storm sewer discharges are subject to the City

3   of Burbank's municipal storm water ordinance as well as a discharge permit issued

4   to Defendants by the City of Burbank (Permit 1168), which applies exclusively to

5   the Studio Lot and subjects Defendants to a host of storm water management

6   practices and prohibitions.  (SUF #8, 9.)  Permit 1168 authorizes Defendants to

7   "discharge runoff from the [Studio Lot] into the City of Burbank's storm water

8   conveyance system in accordance with the conditions set forth in Burbank

9   Municipal Code Title 8-1.") (SUF #10.)  Because there is a commissary on the site,

10  and because restaurants have been identified as one of three categories of

11  commercial facilities (along with automotive service facilities and retail gasoline

12  outlets) that present a potential risk for storm water pollution (SUF #11), the

13  Studio Lot is one of approximately 600 sites in Burbank that is regulated under the

14  City's Critical Source Program.[6]  (SUF #12-13.)  "Critical source" facilities are

15  subject to heightened storm water requirements and inspections.  (SUF #14.)

16           Burbank is one of 84 incorporated cities within the Los Angeles

17  County Flood Control District ("District") that has obtained coverage under the LA

18

19     [5] Under federal regulations (40 C.F.R. § 122.26(b)(8)), an ms4 is: "a
20  conveyance or system of conveyances (including roads with drainage systems,
    municipal streets, catch basins, curbs, gutters, ditches, man-made channels, or
    storm drains):

21     (i) Owned or operated by a State, city, town, borough, county, parish, district,
22        association, or other public body (created by or pursuant to State law)
           having jurisdiction over disposal of sewage, industrial wastes, storm
           water, or other wastes, including special districts under State law such as
23        a sewer district, flood control district or drainage district, or similar
           entity. . . that discharges to waters of the United States;
24     (ii)Designed or used for collecting or conveying storm water;
25     (iii)Which is not a combined sewer; and
26     (iv) Which is not part of a Publicly Owned Treatment Works (POTW) as
           defined at 40 C.F.R. 122.2."

27     [6] In contrast, there are only 27 facilities in Burbank that are currently subject to
28  the General Industrial Stormwater Permit ("GISP").  *See* discussion at p. 14, *infra.*

1   MS4 Permit issued by the Los Angeles Regional Water Quality Control Board

2   ("Regional Board") pursuant to EPA's federal storm water regulations and the

3   CWA's storm water provisions. [7] (SUF #15.)  Burbank's ms4 thus collects and

4   channels runoff in accordance with this municipal NPDES permit to the District's

5   extensive flood control and storm-sewer infrastructure.  *Id*.  The LA MS4 Permit

6   contains myriad prohibitions and conditions which require the MS4 Permittees

7   (including Burbank) to regulate those that discharge into their ms4s.  (SUF #16.)

8   Burbank's "stormwater and runoff pollution control ordinance" governs "the

9   discharge, deposit or disposal of any stormwater and/or non-storm water runoff to

10  the storm drain system and/or receiving waters within the City of Burbank" and

11  generally implements the City's obligations under the LA MS4 Permit.  (SUF

12  #17.)  Burbank's storm water ordinance authorizes the owner or operator of any

13  property to discharge "[r]unoff from landscape irrigation, air conditioning

14  condensate, water line flushing" and certain additional non-storm water sources as

15  long as such discharges are "conducted in a manner not in violation of other

16  provisions of this code." (SUF #18-19.)

17          In short, storm sewer discharges from the Studio Lot are authorized by

18  Permit 1168, the Burbank Municipal Code, and the LA MS4 Permit, and are well

19  within the established storm water regulatory framework.  Having developed this

20  storm water regulatory framework to implement congressional intent, it would be

21  anomalous to read the CWA as requiring a different result.

22

23

24  _____

25  [7] Los Angeles Municipal Separate Storm Sewer System ("LA MS4") Permit (Order No. 01-182; NPDES Permit No. CAS004001) ("Municipal Storm Water
26  and Urban Runoff Discharges Within the County of Los Angeles, and the Incorporated Cities Therein, Except the City of Long Beach"), last amended on
27  April 14, 2011.  Attached as Exhibit 8 to Compendium of Exhibits In Support of Defendants' Motion for Summary Judgment ("Defendants' Compendium of
28  Exhibits").

## III.   ARGUMENT

### A.   Summary Judgment Standard and Burden of Proof

Summary judgment should be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *accord Munoz v. Mabus*, 630 F.3d 856, 860 (9th Cir. 2010). Material facts are those that may affect the outcome of the case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). An issue is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id*.

The moving party bears the initial burden of establishing the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once the moving party has met its initial burden, Rule 56(c) shifts the burden to the nonmoving party who must "go beyond the pleadings and by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Id*. at 324 (*quoting* Fed. R. Civ. P. 56(c), (e)); *see also Norse v. City of Santa Cruz*, 629 F.3d 966 (9th Cir. 2010) (*en banc*) ("Rule 56 requires the parties to set out facts they will be able to prove at trial.").

### B.   Plaintiffs' CWA Claims are Legally Deficient

Defendants' Studio Lot operates as a commercial facility within the established regulatory framework. It is not an "industrial facility" under the applicable regulations. *See* Section III(C)(1), *infra*. Runoff from the Studio Lot that discharges to Burbank's ms4 is regulated by the City's storm water ordinance and is subject to Permit 1168, the waste discharge permit issued by the City to the Studio Lot. Defendants' compliance with Permit 1168 is enforced through regular inspections and reporting. In turn, both the ordinance and Permit 1168 fulfill Burbank's obligations under its own municipal NPDES permit (the LA MS4

1   Permit), which was issued by the Regional Board pursuant to the EPA's federal

2   storm water regulations and the CWA's storm water provisions.[8]

3            Plaintiffs seek to overhaul this system by insisting that Defendants are

4   required to obtain one or more federal NPDES permits to discharge runoff from the

5   Studio Lot: one permit for **storm** water runoff from precipitation events and/or

6   another for Defendants' **non-storm** water runoff from potable water sources (*e.g.*,

7   landscape irrigation runoff).  However, because the Studio Lot is neither a

8   municipality nor an industrial facility, and because the State Water Resources

9   Control Board has never exercised its residual designation authority to require

10   Defendants to obtain a NPDES permit, storm water discharges from the Studio Lot

11   are legally exempt from the federal permitting requirements.  Further, because

12   Defendants' non-storm water flows, which are primarily made up of landscape

13   irrigation water from a potable source, are on a short list of innocuous discharges

14   that are presumed not to present an environmental threat, they are authorized under

15   the CWA's implementing regulations, the LA MS4 Permit, the Burbank Municipal

16   Code, and Defendants' Permit 1168.

17            The term "pollutant" is broadly defined under the CWA.[9]  Defendants

18   acknowledge that storm water and landscape irrigation water can entrain pollutants

19   as they run across the Studio Lot, just as they do at virtually every park, parking lot

20   and road in southern California.  Defendants further acknowledge that this runoff

21   passes into the City's ms4 pursuant to Defendants' permit and eventually into the

---

[8] Throughout this brief, reference is made to both "ms4" and the "LA MS4 Permit."  The former is a generic reference to municipal separate storm sewer systems without regard to their particular location.  The latter specifically refers to the municipal NPDES permit that regulates storm sewer discharges from Burbank and the other co-permittees ("LA MS4 Permittees").

[9] 33 U.S.C. § 1362(6).  The statute defines "pollutant" to mean "dredged spoil, solid waste, incinerator residue, sewage, garbage, sewage sludge, munitions, chemical wastes, biological materials, radioactive materials, heat, wrecked or discarded equipment, rock, sand, cellar dirt and industrial, municipal, and agricultural waste discharged into water."

1   Los Angeles River pursuant to the LA MS4 Permit.  The Burbank Municipal Code,

2   Permit 1168, the LA MS4 Permit, and the CWA, however, authorize these

3   discharges.  While Plaintiffs are correct that Defendants have not obtained separate

4   NPDES permits to cover these discharges, **none of this gives rise to a violation of**

5   **the CWA**.  Defendants' storm and non-storm water discharges are in compliance

6   with CWA Sections 402(p) and 301(a) because: (i) the Studio Lot is a commercial

7   facility that is not subject to the General Industrial Storm Water Permit; and (ii) the

8   Studio Lot's non-storm water discharges are authorized under applicable laws.

9   Although Plaintiffs would prefer to stretch the federal NPDES permitting program

10  to allow CWA lawsuits against everyone, including homeowners and any

11  commercial facility whose excess lawn water may occasionally find its way into

12  the municipal storm sewer, Congress has decided that this runoff is best addressed

13  at the local level.  Consequently, there is no legal basis for Plaintiffs to rewrite the

14  regulatory system and Defendants are entitled to summary judgment as a matter of

15  law.

16      **C.      Defendants Do Not Need an NPDES Permit to Discharge _Storm_**

17  **_Water_ to Burbank's Municipal Separate Storm Sewer System**

18          The CWA prohibits the discharge of any "pollutant"[10] from a "point

19  source"[11] to "waters of the United States" unless the discharge complies with other

20  provisions of the Act, including Section 402 – the National Pollutant Discharge

21  Elimination System ("NPDES").  Under CWA Section 301(a), the discharge of a

22  pollutant from a point source to a navigable water is illegal "**except as in**

23  **compliance**" with Section 402, among others.  33 U.S.C. § 1311(a).  CWA

24  _____

25      [10] 33 U.S.C. § 1362(6).  _See_ footnote 8.

26      [11] 33 U.S.C. § 1362(14) ("A point source is "any discernible, confined and
    discrete conveyance, including but not limited to any pipe, ditch, channel, tunnel,
27  conduit, well, discrete fissure, container, rolling stock, concentrated animal feeding
    operation, or vessel or other floating craft, from which pollutants are or may be
28  discharged.").

1   Sections 301(a) and 402 do not require dischargers to obtain permits.  *Id.  See also*

2   *South Florida Mgmt. Dist. v. Miccosukee Tribe*, 541 U.S. 95, 102 (2004) (the

3   CWA "prohibits 'the discharge of any pollutant by any person' unless done in

4   compliance with some provision of the Act."); *see also Gwaltney of Smithfield,*

5   *Ltd. v. Chesapeake Bay Found.*, 484 U.S. 49, 52 (1987) (In order to achieve the

6   [fishable, swimmable] goals, § 301(a) of the Act makes unlawful the discharge of

7   any pollutant into navigable waters except as authorized by specified sections of

8   the Act.").  Section 402 establishes the federal NPDES program, and Section

9   402(p) contains the provisions that apply to storm water discharges – *i.e.*,

10  "discharges composed entirely of stormwater," which Congress defined to include

11  "pollutants that are incidental to stormwater runoff."[12]  33 U.S.C. § 1342(p); 1987

12  U.S.C.C.A.N. 5, 38.  A storm water discharge that complies with Section 402(p)

13  does not violate Section 301(a).  *Conservation Law Foundation v. Hannaford*

14  *Bros. Co.*, 327 F. Supp. 2d 325, 332 (D. Vt. 2004).

15          Under Section 402(p) and EPA's implementing Phase 1 and 2

16  regulations, storm water discharges are authorized by and thus comply with

17  Section 402(p), even in the absence of an NPDES permit, unless the dischargers

18  fall into one of **three categories**: (1) facilities that discharge "storm water

19  associated with industrial activities" (*i.e.*, "industrial facilities"); (2) certain

20  municipalities; and (3) those that have been individually designated by

21  environmental regulators as having particularly problematic discharges.  CWA §

22

23

24  _____

25  [12] In adopting the Water Quality Act of 1987 that added the storm water
    amendments to the CWA, Congress explained that "discharges composed entirely
26  of stormwater include pollutants that are incidental to stormwater runoff."  1987
    U.S.C.C.A.N. 5, 38; s*ee also Rosemere Neighborhood Ass'n v. City of Vancouver*,
27  2005 U.S. Dist. LEXIS 43011, at *13 (W.D. Wash. Oct. 18, 2005) (citing the
    "Section by Section Analysis" prepared by the Chairman of the House Public
28  Works and Transportation Committee).

402(p) ; 33 U.S.C. § 1342(p).[13]   Whereas dischargers within these three categories must obtain NPDES permits under Section 402(p), all other storm water dischargers comply with Section 402(p) even though they are exempt from the NPDES permitting requirements.   *See, e.g., Northwest Envtl. Def. Ctr. v. Brown*, 640 F.3d 1063, 1083 (9th Cir. 2011) ("It is within the discretion of EPA to promulgate Phase II regulations requiring, **or not requiring**, permits" for "[s]tormwater discharges from churches, schools and residential properties, through rain gutters or otherwise, and from other relatively de minimus sources . . . . In the 1987 amendments, Congress exempted many stormwater discharges from the NPDES permitting process.") (emphasis added); *see also* 133 Cong. Rec. 985 (1987) (statement of Rep. Hammerschmidt) ("We established a mechanism that will require permits only where necessary – rather than in every instance. Without these changes, local, State, and Federal officials would be inundated with an enormous permitting workload even though most of the discharges would not have significant environmental impacts."); 64 Fed. Reg. 68734 (The EPA Phase II rule excludes millions of storm water discharges from regulation under the NPDES program "either because EPA currently lacks information indicating a consistent potential for adverse water quality impact or because EPA believes that the likelihood of adverse impacts on water quality is low").   *See also Envtl. Def. Ctr., Inc. v. EPA*, 344 F.3d 832, 844 (9th Cir. Cal. 2003) (upholding EPA's authority to regulate less than all remaining point source storm water discharges under section 402(p)(6)).   While all remaining (*i.e.*, private, non-industrial) dischargers need not obtain federal NPDES permits, they are typically regulated locally through the enforcement of municipal storm water permits, ordinances or both.

---

[13] A fourth category includes a small set of dischargers that were already subject to an existing NPDES permit when the Water Quality Act was adopted in 1987.  CWA § 402(p)(2)(A); 33 U.S.C. § 1342(p).

1           For the millions of private, non-industrial facilities that discharge

2 storm water containing pollutants from point sources to jurisdictional waters,

3 compliance with Section 402(p) is achieved unless the EPA or state regulatory

4 agencies have affirmatively acted to include them pursuant to the agencies'

5 "residual designation authority." [14]   CWA § 402(p)(2)(E); 33 U.S.C. § 1342(p).

6 Section 402(p) includes a catch-all provision which authorizes the relevant

7 permitting authority (*e.g.*, the EPA or the California Water Board) to require

8 permits for any discharge that the agency "determines . . . contributes to a violation

9 of  a water quality standard or is a significant contributor of pollutants to waters of

10 the United States." *Id*.  EPA's corresponding regulations authorize "any person" to

11 petition the EPA or an NPDES-implementing state to exercise this residual

12 designation authority.  40 C.F.R. § 1222.26(f)(2).  "Once filed, a petition forces the

13 EPA or the state to make a determination, and if the EPA or the state determines

14 that the stormwater discharge contributes to water quality violations, permitting is

15 mandatory." Dave Owen, *Urbanization, Water Quality, and the Regulated*

16 *Landscape*, 82 U. Colo. L. Rev. 431, 465 (2011) (internal citations omitted); *see*

17 *also In re Stormwater NPDES Petition*, 180 Vt. 261, 264-65 (Vt. 2006) (requiring

18 the Vermont Agency of Natural Resources to conduct a fact specific analysis under

19 its residual designation authority to determine whether NPDES permits were

20 necessary for certain discharges identified in a citizen petition).

21

22

23

24

---

25     [14] 33 U.S.C. §§ 1314(i)(2), 1342(b); 40 C.F.R. Par 123.  Under the Porter-
26 Cologne Water Quality Control Act, California state law designates the State
Water Resources Control Board and nine regional boards as the principal state
27 agencies for enforcing federal and state water pollution law and for issuing
permits. *See NRDC, Inc. v. County of Los Angeles*, 2011 U.S. App. LEXIS 14443,
28 at *12 (9th Cir. Cal. July 13, 2011).

1.   ***The Studio Lot is Not an Industrial Facility***

The plaintiffs in this case claim that the Studio Lot is an industrial facility required to obtain coverage under a separate NPDES Permit.[15] *See, e.g.*, SUF # 20 (FAC at ¶ 33 (Defendants "have violated and continue to violate the CWA and the General [Industrial Storm Water] Permit as evidenced by Defendants' discharges of storm water containing pollutants.")).  Dr. Larry Russell, Plaintiffs' expert, tries to convert Defendants' motion picture studio into an "industrial facility" by grasping at whatever "ancillary" activity he can think of that sounds like it might be "industrial" in nature.  Specifically, he calls out: "food service, waste management, landscaping, light and heavy construction, transportation services,[16] set and furniture production, …digital processing…, painting, film processing, lithographic printing, clay modeling, sign, set, and furniture production…, and construction and demolition of sets for filming purposes."  (SUF #24.)  Plaintiffs' position is dependent on the ordinary use of the term "industrial facility," which is not controlling or relevant here.

As a matter of law, these ancillary activities do not transform the Defendants' motion picture studio, which is a commercial facility, into an "industrial facility."  As defined under the federal regulations, the industrial facilities category is very narrow, focuses on the **primary business activity** at the facility, and excludes a wide range of activities that an ordinary use of this term

---

[15] The other two discharge categories are not at issue in this case. Plaintiffs do not allege that the Studio Lot is a municipality.  (SUF #21.)  Nor do they claim that EPA or the California Water Board has exercised their residual designation authority to require the Studio Lot obtain an NPDES permit. (SUF #22.); *see* 40. C.F.R. § 122.26(a)(9)(i).  *See also* SUF #23 (Defendants are not engaging in any construction projects at the Studio Lot that disturb more than one acre and might require coverage under the California General Construction Storm Water Permit).

[16] According to Russell, "transportation services" includes "[t]he activities related to vehicle operation and on site use such as areas which are used for vehicle transportation, storage, fueling or parking, maintenance of vehicles including cleaning and detailing, and the vehicles and ancillary equipment which are used for commercial or industrial activities on the Site."  (SUF #24.)

1    might connote.  While most facilities discharge storm water containing

2    "pollutants," very few discharge storm water "associated with industrial activity" –

3    a narrowly defined legal term that triggers the obligation to apply for NPDES

4    permit coverage under the General Industrial Storm Water Permit ("GISP").  55

5    Fed. Reg. 47999 (to limit the NPDES permitting burden, EPA "significantly

6    narrowed the scope of the definition of 'associated with industrial activity' to focus

7    in on those facilities which are most commonly considered 'industrial' and thought

8    to have the potential for the highest levels of pollutants in their storm water

9    discharges.").  The regulations define the categories of facilities engaged in

10   "industrial activity" by those that either (i) fit into one of five specifically

11   enumerated Standard Industrial Classification ("SIC") Codes, or (ii) fit into one of

12   five narrowly-tailored narrative descriptions. 40 C.F.R. § 122.26(b)(14).

13                  a.    *The Studio Lot's SIC Code (7812) is Not Listed in the*

14                        *Federal Regulations or the GISP*

15                  To collect, tabulate, present, analyze, and compare statistical data

16   collected from businesses across the country, the Office of Management and

17   Budget developed and published the Standard Industrial Classification Manual.

18   The SIC Manual establishes a comprehensive system for assigning each business

19   "establishment" a SIC code according to its "**primary activity**, which is

20   determined by its principal product or group of products produced or distributed, or

21   services rendered." (SUF #25) (citing Office of Management and Budget,

22   Executive Office of the President, Standard Industrial Classification Manual ("SIC

23   Code Manual") 12 (1987) (emphasis added).[17]  The federal storm water regulations

24

25        [17] The SIC Code Manual defines "establishment" as "economic unit, generally
     at a single physical location, where business is conducted or where services are
26   performed."  The SIC system was replaced in 1997 by the North American
     Industry Classification System (NAICS), which is currently "the standard used by
27   Federal statistical agencies in classifying business establishments for the purpose
     of collecting, analyzing, and publishing statistical data related to the U.S. business
28

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
ORANGE COUNTY

NOTICE OF MOTION FOR SUMMARY JUDGMENT AND MEMO
     OF POINTS & AUTHORITIES ISO THEREOF

1   employ SIC codes as one of two methods by which to identify five of the

2   categories of facilities that "discharge storm water associated with industrial

3   activities."  40 C.F.R. § 122.26(b)(14)(ii), (iii), (vi), (viii), and (xi); *see* Appendix

4   A, Figure 1 (listing the five categories of SIC Code-identified industrial facilities).

5   In its guidance materials, EPA has endorsed the approach of categorizing a facility

6   on the basis of its "primary activity."[18]

7           The Studio Lot is identified by SIC Code "major group" number 78

8   which is defined to cover "establishments producing and distributing motion

9   pictures" and which encompasses SIC Code 7812 – "[e]stablishments primarily

10  engaged in the production of theatrical and nontheatrical motion pictures."  (SUF

11  #27-38, 41, 43.)  Over the years, and well before this lawsuit was filed, Defendants

12  and third parties have used these codes to identify the Studio Lot.  (SUF #33-34.)

13          Unable to establish that a motion picture studio falls within a SIC

14  code that is "industrial" as defined by the federal regulations, Plaintiffs suggest that

15  the Studio Lot could be categorized under some different SIC code because of the

16  ancillary activities that are conducted on site (*e.g.*, commissary, garbage collection,

17  landscaping, set construction, etc.).  (SUF #36, 39.)  Yet all of these activities

18  either directly or indirectly support the Studio Lot's primary activity – motion

19  picture production and post-production; not a single one is a separate establishment

20  that would require the facility to be categorized under a different SIC Code.  (SUF

21  #6, 36.)  Even Plaintiffs' experts acknowledge this point.  Mr. Hagemann noted

22

23  economy."  (http://www.census.gov/eos/www/naics/.)  Nevertheless, SIC codes are
    still widely used by many regulatory agencies.

24  [18] According to EPA, "a facility must determine its primary SIC code based on
    the primary activity occurring at the site.  To determine the primary industrial
25  activity, the SIC Manual recommends using the value of receipts or revenues.  If
    such information is not available for a particular facility, the number of employees
26  or production rate for each process may be compared.  The operation that generates
    the most revenue or employs the most personnel is the operation in which the
27  facility is primarily engaged."  (SUF #26) (NPDES Storm Water Program,
    Question and Answer Document, Volume 2 (July 1993)).

28

1  that the purported industrial activities he has identified (*e.g.*, "truck, transportation

2  activities, fueling activities, parking…set production, painting, upholstery work")

3  are **necessary for the physical production of what Disney makes**, movies and

4  TV shows." (SUF #36.)  And Dr. Russell concedes that the Studio Lot is a motion

5  picture studio as defined by its primary activity, and that its SIC Code "would not

6  have it in one of those categories traditionally called an industrial facility." (SUF

7  #37, 40.)[19]  Although Dr. Russell opined that "[s]torm water containing pollutants,

8  resulting from industrial activities occurring on site, is discharged from the Site,"

9  (SUF #39), he clarified at deposition that this does not mean that the Studio Lot is

10  an "industrial facility" as that concept is narrowly defined under the applicable

11  storm water regulations.  (SUF #37, 40, 41.)  For example, gas stations and car

12  washes are regulated as commercial facilities (SUF #42), and the presence of trash

13  bins and/or automobiles does not convert a commercial facility into an "industrial"

14  one.  There is no legal or factual basis for concluding that the Studio Lot should be

15  re-categorized under the SIC Manual as anything other than a motion picture

16  studio.

17            Moreover, the "industrial facilities" definition completely excludes

18  "facilities that are generally classified under the Office of Management and Budget

19  Standard Industrial Classification (SIC) as wholesale, retail, service, ***or***

20  ***commercial*** activities."  55 Fed. Reg. 48007 (emphasis added) (explicitly rejecting

21  two commenters' recommendation that all commercial enterprises should be

22  required to obtain a permit as part of the Phase I rulemaking).  As a commercial

23  facility identified by SIC Code 7812, the Studio Lot is not among those listed in

24  the code section identifying the facilities that discharge storm water "associated

25  with industrial activity." 40 C.F.R. § 122.26(b)(14); *see* Appendix A, Figure 1.  In

26

27  _____

   [19] Plaintiffs' rebuttal expert, Mr. Hagemann declined to opine as to whether the

28  Studio Lot is an industrial facility requiring coverage under the GISP.  (SUF #38.)

1    fact, in all of Burbank, there are only 27 industrial facilities that are covered under

2    the GISP.[20]  (SUF #43.)  These include Burbank Water & Power's Magnolia

3    Power Plant, Burbank's Bob Hope Airport, a number of metalworking (*e.g.*,

4    plating, anodizing) shops, and other heavy industrial/manufacturing facilities.  *Id.*

5    Note that this short list does not include Defendants' Studio Lot, Warner Bros.

6    Studios, Warner Bros. Studios Ranch, or any of the other 600-plus critical source

7    commercial facilities that are subject to heightened storm water runoff regulations

8    under the City's Industrial/Commercial Facilities Program.  *Id.*  Because the Studio

9    Lot's SIC code is not listed in the federal storm water regulations, it is not an

10   "industrial facility" by virtue of its SIC Code.

11               b.     *The Narrative Categories Do Not Cover the Studio Lot*

12          In addition to identifying "industrial" facilities by their SIC Code

13   classifications, the EPA's storm water regulations consider facilities to be engaging

14   in "industrial activity" if they conduct activities that are contemplated by five very

15   specific narrative categories.  40 C.F.R. § 122.26(b)(14)(i), (vi), (v), (vii), and (ix).

16   *See* Appendix A, Figure 2; *see also* GISP at Attachment 1 (incorporating the five

17   narrative categories).  The Studio Lot is not a hazardous waste treatment, storage

18   or disposal facility (TSDF), a landfill, a steam electric generating facility, a sewage

19   treatment plant or any of the other facilities that are covered by these narrative

20   categories.  SUF #44-48; *see* Appendix A, Figure 3 (flow chart based on "Clean

21   Water Act Industrial Stormwater Applicability Flowchart," July 2009).[21]

22

23

24

---

25      [20] Of the 27 facilities, 24 report that their SIC codes are among those listed at 40
    C.F.R. § 122.26(b)(14)(ii, iii, vi, viii, and xi).  The remaining three facilities (*i.e.*,

26   Burbank Water & Power's Magnolia Power Project, Burbank's Public Service
    Department, and Burbank's municipal landfill) each falls within at least one of the

27   narrative categories set forth at 40 C.F.R. § 122.26(b)(14)(i, vi, v, vii, and ix).

28   [21] Attached as Ex. 18 to Defendants' Compendium of Exhibits.

2.    ***Non-Industrial Commercial Facilities Are Regulated Through Municipal Control to Minimize Administrative Burden***

Rather than expanding the NPDES program exponentially to require every commercial facility or homeowner that discharges storm water containing pollutants to a municipal separate storm sewer system to obtain an NPDES permit, the CWA requires municipalities to exercise control over non-industrial discharges into ms4s.  Consistent with congressional intent and the CWA's plain language, the federal storm water program focuses on the most problematic discharges, thereby avoiding the "administrative nightmare" of requiring EPA and the states to issue permits to "every parking lot, gas station, store, business, industry or home in America."  *See NRDC, Inc. v. County of Los Angeles*, 2011 U.S. App. LEXIS 14443, at *36, n.6 (9th Cir. Cal. July 13, 2011) (citing 131 Cong. Rec. 15616, 15657 (Jun. 13, 1985) (Statement of Sen. Wallop) ("[The regulations] can be interpreted to require everyone who has a device to divert, gather, or collect stormwater runoff and snowmelt to get a permit from EPA as a point source. . . . Requiring a permit for these kinds of stormwater runoff conveyance systems would be an administrative nightmare."); 131 Cong. Rec. 15657.  Congress avoided creating this nightmare, in large part, by "put[ting] the NPDES permitting requirement at the municipal level to ease the burden of administering the program." *NRDC, Inc.*, 2011 U.S. App. LEXIS 14443, at *35-36 (citing *Northwest Envtl. Def. Ctr.*, 640 F.3d 1063, 1085-1086 (9th Cir. 2011).  In other words, Congress has already made the regulatory allocation Plaintiffs seek to reverse – industrial facilities and certain municipalities require federal NPDES permits, whereas commercial facilities are subject to local regulation.[22]

---

[22] During deposition, Plaintiffs' expert Dr. Russell explained that Defendants should be required to obtain a federal NPDES permit "[b]ecause there is more, for lack of a better word, power in having in my opinion a direct permit with the Regional Water Quality Control Board that **steps around a municipal issued permit.**") (SUF 49) (emphasis added).  Although Plaintiffs might like to "step

1    The LA MS4 Permit applies the concept of municipal control.

2  Burbank and other LA MS4 permittees must "possess adequate legal authority …

3  to [r]equire persons within their jurisdiction to comply with conditions in

4  Permittee's ordinances, permits, contracts, model program, or order (i.e. hold

5  dischargers to its MS4 accountable for their contributions of pollutants and

6  flows)[.]" *NRDC, Inc.*, 2011 U.S. App. LEXIS 14443, at *35-36) (citing the LA

7  MS4 Permit at Part 3.G.2).  Burbank accomplishes this via local ordinance,

8  conditions in discharge permits and inspections.

9    Courts have rebuffed attempts to stretch the NPDES permitting

10  requirements beyond these well-defined limits.  In *Conservation Law Found. v.*

11  *Hannaford Bros.*, for instance, an environmental organization sued the owner of a

12  commercial shopping plaza whose parking lot allegedly collected and discharged

13  runoff containing pollutants, including oil, grease, and metals, directly to a

14  jurisdictional water.  *Conservation Law Found. v. Hannaford Bros.*, 327 F. Supp.

15  2d 325, 330-35 (D. Vt. 2004).  In granting Hannaford's motion to dismiss, the

16  court found that even though Hannaford did not have an NPDES permit, the

17  discharges from its parking lot complied with Section 402(p) because the plaza

18  was neither an industrial facility nor a municipality and its storm water discharge

19  had not been individually designated.  *Hannaford Bros.*, 327 F. Supp. 2d at 330

20  ("Section 402 cannot be interpreted to require NPDES permits for all stormwater

21  discharges notwithstanding regulations or individual determinations issued (or not

22  issued) by EPA or authorized state agencies.").  By complying with Section

23  402(p), the court held the defendants did not violate Section 301(a).  *Id.* ("[T]he

24  discharge of a pollutant in compliance with § 402 does not violate § 301(a)."); *see*

25  *also Rosemere Neighborhood Ass'n v. City of Vancouver*, 2005 U.S. Dist. LEXIS

26  43011, at *15 (W.D. Wash. Oct. 18, 2005) (following *Hannaford*).

27  around" the existing legal framework, which largely relies on delegation to local

28  authorities, there is no legal basis for doing so.

### 3. *Local Agencies Regulate the Studio as a Commercial Facility*

Over the years, a number of regulatory agencies have acknowledged that the Studio Lot does not require a separate federal storm water permit. During at least two routine inspections of the Studio Lot, staff from the County of Los Angeles's Department of Public Works Environmental Programs Division explicitly noted that the Studio Lot "**[d]oes not need coverage**" under a general or individual storm water permit. (SUF #50) (emphasis added). City of Burbank and Regional Board inspectors have also endorsed this finding. Even though Burbank regularly inspects and evaluates Defendants' storm water management practices in connection with its enforcement of the City's stormwater ordinance and Permit 1168 (SUF #51), it has not instructed Defendants to seek coverage under the GISP. (SUF #52.) Nor did the Regional Board when it inspected and tested Defendants' storm sewer discharges on three separate occasions in 2009 in response to Plaintiffs' allegations. (SUF #53-55.)

Much like the parking lot in *Hannaford*, the Studio Lot is not an industrial facility, a municipality, or an individually designated discharger. Instead, the Studio Lot is one of millions of commercial facilities in this country regulated by municipal control, in accordance with an MS4 Permit, subject to its own local permit and municipal code, and within the NPDES permitting framework. *See* Defendants' Compendium of Exhibits, Ex. 3 (Smalstig's Expert Report at 11-17 (Opinion No. 2)). The undisputed facts establish that Defendants have no legal obligation to obtain an NPDES permit to discharge storm water runoff to Burbank's storm sewer system and that Defendants are therefore entitled to summary judgment as a matter of law.

**D.** **Defendants' *Non-Storm* Water Discharges are Authorized by EPA's Storm Water Regulations, the LA MS4 Permit, Burbank's Storm Water Ordinance, and Permit 1168**

Plaintiffs contend that Defendants discharge non-storm water runoff to the City's storm sewer system.  FAC (Ex. 14), Third Claim for Relief (¶¶ 35-38).  Although the FAC makes no attempt to identify these non-storm water discharges, Plaintiffs' experts have focused on landscape irrigation runoff originating from Burbank's potable water supply.  (SUF #57-58.)  Plaintiffs contend that because this runoff entrains "pollutants," Defendants must obtain an individual NPDES permit to discharge it to the City sewer.  Without an NPDES permit for the landscape irrigation runoff, Plaintiffs contend that Defendants are in violation of CWA Section 301(a).  Ex. 6 (FAC) at 35-38.  Given the incredibly broad scope of this theory, which would apparently require anyone whose excess lawn water ends up in a storm drain to obtain a federal NPDES permit, Plaintiffs should be able to point to dozens of instances when such permits have been required.  The fact that Plaintiffs experts cannot cite to a single such instance, however, demonstrates that this theory is completely frivolous.  (SUF #59-60).

The CWA provides that all MS4 permits must include a requirement to "effectively prohibit non-storm water discharges into the storm sewers."  CWA § 402(p)(3)(B)(ii); 33 U.S.C. § 1342(p).  However, EPA interprets the "effective prohibition" requirement to include some important exceptions because Congress never intended to prohibit all non-storm water discharges.  Non-storm water flows that are "commonly occurring," "characteristic of human existence in urban environment," and which do not typically pose significant environmental problems" are generally exempt from the effective prohibition requirement.  55 Fed. Reg. 47995; 48037.  EPA developed a short list of non-storm water discharges that are generally innocuous and thus conditionally authorized.  In relevant part, this list includes "water line flushing, landscape irrigation, …

1   discharges from potable water sources, … air conditioning condensation, …[and]

2   lawn watering." 40 C.F.R. § 122.26(d)(2)(iv)(B)(1). Whereas most non-storm

3   water discharges are "illicit" and must be "effectively prohibited," these particular

4   flows are not illicit; they are authorized or exempt unless and until they have been

5   "identified by the municipality as sources of pollutants." *Id.*; 55 Fed. Reg. 48037;

6   *see also* Appendix A, Figure 4 (identifying three categories of storm sewer

7   discharges – storm water, illicit non-storm water, and authorized non-storm water).

8           The LA MS4 Permit incorporates the "effective prohibition"

9   requirement and the conditional exemption for these generally innocuous non-

10  storm water flows.  (SUF #61-62.)  It provides that "[t]he Permittees shall

11  effectively prohibit non-storm water discharges into the MS4 and watercourses,

12  **except** where such discharges…[a]re covered by a separate individual or general

13  NPDES permit for non-storm water discharges; or [f]all within one of the

14  categories below." (SUF #63) (emphasis added).  The third enumerated category –

15  "flows incidental to urban activities" – covers the non-storm water discharges that

16  are at issue in this case, namely: "reclaimed and potable landscape irrigation

17  runoff," "potable drinking water supply and distribution system releases," and "air

18  conditioning condensate."  (SUF #64-65.)  These common non-storm water flows

19  are conditionally exempt and authorized by the LA MS4 Permit, unless and until

20  the Regional Board Executive Officer ("EO") or municipality determines that they

21  are not.  (SUF #66).

22          Plaintiffs' contention that Defendants' landscape irrigation runoff

23  contains "pollutants" does not affect the outcome of this analysis.  If Burbank or

24  the Regional Board were to determine that landscape irrigation water from the

25  Studio Lot flows through and picks up pollutants as it runs across the Studio Lot,

26  these entities would have the authority to issue a determination formally

27  identifying Defendants' non-storm water flows as "sources of pollutants."  40

28  C.F.R. § 122.26(d)(2)(iv)(B)(1).  In such instance, Defendants could theoretically

be required to obtain a separate NPDES permit or the City could control Defendants' discharge through its storm water management program. *See* Defendants' Compendium of Exhibits, Ex. 22 (EPA Guidance Manual for the Preparation of Part 2 of the NPDES Permit Application for Discharges from MS4s (November 1992) at 6-33). But this has never happened, even though Plaintiffs have repeatedly attempted to focus regulatory attention on Defendants' storm sewer discharges. [23] (SUF #67). Since the LA MS4 Permit was first issued, the Regional Board and Burbank have never identified landscape irrigation runoff or any of the other conditionally authorized non-storm water discharges as "sources of pollutants." (SUF #67.) Accordingly, landscape irrigation and other "[c]ategories of non-stormwater discharges…are ALLOWED" under Burbank's Illicit Stormwater Program, its storm water ordinance and Permit 1168. (SUF #68) (capitalization in original).

Even now, as the Los Angeles Regional Board Staff considers whether to impose additional limitations on landscape irrigation runoff as part of its reissuance of the LA MS4 Permit, there is no proposal to eliminate these exemptions. (SUF #69.) Instead, the draft LA MS4 Permit (applicable to the City of Burbank) seeks to "**minimize** the discharge of landscape irrigation water into the MS4" by requiring each LA MS4 Permittee to "[e]nact a municipal ordinance that specifies landscape irrigation standards to minimize irrigation runoff and eliminate irrigation overspray." *Id* (Ex. 29.) Because Defendants' non-storm

---

[23] In 2009, after receiving a complaint from Environmental World Watch, Inc. alleging that Defendants dumped hexavalent chromium from air conditioning operations into a storm drain that discharges into the LA River, the Regional Board inspected the Studio Lot and its storm sewer discharges on three separate occasions, collecting water samples each time. (SUF #54.) After detecting zinc at levels above the California Toxic Rule ("CTR") requirements at Disney's storm drain and downstream of Disney's storm drain, the Regional Board forwarded a copy of these inspection results to the City of Burbank "for follow-up under MS4 Permit." (SUF # 55.) No additional action was taken by the Regional Board or the City. *Id*.

water flows are specifically authorized by the LA MS4 Permit and they fully comply with the City of Burbank's stormwater ordinance and Permit 1168, Plaintiffs' non-storm water-based claims fail as a matter of law.

**E.     Contrary to Plaintiffs' Allegations, the Presence of Pollutants in Storm Water or Non-Storm Water Runoff Does Not Trigger NPDES Permit Obligations**

Plaintiffs allege that Defendants' storm water and non-storm water discharges violate CWA Sections 301(a) and 402(p) because they contain "pollutants." FAC (Ex. 14), Claims for Relief Nos. 1-3. In his Amended Report, Dr. Russell claims that as "storm water" runoff "flows overland or impervious surfaces, failing to percolate into the ground…[and] accumulates debris, chemicals, sediment or other pollutants,… [t]he entrainment of pollutants convert storm water to storm water containing non-storm containing pollutants, sometimes referred to as non-storm water." (SUF #70.)[24] Dr. Hagemann similarly argues that Defendants' landscape irrigation runoff is not authorized under the LA MS4 Permit because the water entrains pollutants as it flows from the sprinkler heads into the storm drain. (SUF #72.)

That Defendants' runoff may entrain "pollutants" does not change the outcome of the permit analysis. When Congress enacted the statutory scheme to regulate storm water, it did so in order to regulate urban runoff, not pristine water. 1987 U.S.C.C.A.N. 5, 38 (the term "discharges composed entirely of stormwater" includes pollutants that are incidental to stormwater runoff); 64 Fed. Reg. 68725. Congress defined the term "storm water" to include "storm water runoff" and "surface runoff and drainage." Because "pollutants" is so broadly defined to include any solid waste, sand -- even heat -- "pollutants" will necessarily be

---

[24] In his original report, Dr. Russell more boldly claimed that storm water plus non-storm water is "*often simply referred to* as non-storm water." (Emphasis added). He revised this claim in his amended report. (SUF #71).

1  entrained in storm water **runoff** as it flows across impervious surfaces in an

2  urbanized environment.  *See, e.g.*, *NRDC Inc. v. County of Los Angeles,* 2011 U.S.

3  App. LEXIS 14443,at *4-5 (9th Cir. Cal. July 13, 2011) ("When stormwater flows

4  over urban environs, it collects 'suspended metals, sediments, algae-promoting

5  nutrients (nitrogen and phosphorous), floatable trash, used motor oil, raw sewage,

6  pesticides, and other toxic contaminants.'").[25]  *See also* SUF #73 (Mr. Hagemann

7  explained that urban runoff "is a mix of different sources of contamination" such

8  as "everything from animal feces to runoff…across streets, parking lots"); SUF

9  #74 (Dr. Russell noted that sediment, dirt, metals, oil, and grease are found in most

10  parking lots in southern California, and remarking how, after the first rain event,

11  "[i]t's kind of like being on ice as the oils and greases wash off of the

12  roadways.").)

13         To the extent Defendants' discharges contain pollutants such as zinc

14  from tires or copper from brake pads, these pollutants are incidental to storm water

15  and non-storm water runoff and unremarkable.[26]  (SUF #75-80).  Dr. Russell notes

16  that the pollutants might even have travelled from the heavily trafficked 134

17  Freeway, which is a stone's throw away from the facility's Buena Vista parking

18  lot.  (SUF #77.)  Accordingly, Defendants' storm water discharges are "composed

19

20      [25] *Citing Envtl. Def. Ctr., Inc. v. EPA*, 344 F.3d 832, 840 (9th Cir. 2003); *see
      also* 64 Fed. Reg. 68725 ("Storm water and snow-melt runoff wash over . . .

21  impervious areas, picking up pollutants along the way while gaining speed and
    volume because of their inability to disperse and filter into the ground.  What

22  results are **storm water** flows that are higher in volume, pollutants, and
    temperature than the flows in less impervious areas, which have more natural

23  vegetation and soil to filter the runoff.") (emphasis added).

24      [26] One would expect to find zinc and copper in a parking lot storm drain in
    southern California.  The first conclusion of EPA's comprehensive Nationwide

25  Urban Runoff Program ("NURP") study of urban storm water pollution across the
    United States was that "[h]eavy meatals (especially copper, lead and zinc) are by

26  far the most prevalent priority pollutant constituents found in urban runoff.").
    (SUF #80.)  *See also* 132 Cong. Rec. S16424, October 16, 1986 ("EPA's National

27  Urban Runoff study found 63 toxic pollutants, including all 13 toxic metals in the
    discharge from municipal separate storm sewers.  Of these, lead, copper, and zinc

28  were the most pervasive; EPA found these in at least 91 percent of its samples.").

1   entirely of stormwater" and are thus in compliance with the CWA's storm water

2   provisions in Section 402(p).  *Rosemere Neighborhood Ass'n v. City of Vancouver*,

3   2005 U.S. Dist. LEXIS 43011, at *12 (W.D. Wash. Oct. 18, 2005); *see also*

4   *Conservation Law Found. v. Hannaford Bros. Co.*, 327 F. Supp. 2d 325, 331 (D.

5   Vt. 2004) (*criticizing Envtl. Prot. Info. Ctr. v. Pac. Lumber Co.*, 301 F. Supp. 2d

6   1102 (N.D. Cal. 2004)).

7            Similarly, the presence of pollutants in concentrations exceeding

8   certain regulatory levels, specifically the California Toxic Rule ("CTR") and/or

9   EPA's federal benchmark levels, does not require a different outcome.  A

10  "benchmark" is "viewed by EPA as a level that, if below, a facility presents little

11  potential for water quality concern."  (SUF #81).  But benchmarks are expressly

12  "not effluent limitations and should not be interpreted or adopted as such."  *Id.*

13  (emphasis added).  Storm water flows are widely variable and intermittent and thus

14  difficult to monitor.[27]  For instance, the LA MS4 Permit and the GISP do not

15  require municipal or industrial permit holders to abide by numeric effluent limits

16  for any of the pollutants that are at issue in this case (*e.g.*, zinc, copper), a fact that

17  Plaintiffs' experts acknowledge.  (SUF #82-84).  Given that even industrial and

18  municipal NPDES permit holders are not subject to numeric standards, it is

19  inexplicable that Plaintiffs suggest these standards somehow apply to or change the

20  status of commercial facilities like the Studio Lot, which are exempt from the

21  NPDES permitting requirements.  The Act contains no standalone limits that apply

22  to non-permit holders.  65 Fed. Reg. 64766-67.

23

24

_____

25  [27] *See, e.g.*, Storm Water Panel Recommendations to the California State Water
    Resources Control Board, "The Feasibility of Numeric Effluent Limits Applicable
26  to Discharges of Storm Water Associated with Municipal, Industrial and
    Construction Activities" (June 19, 2006) at 1 (noting that "Regional water Boards
27  have typically not included numeric limits in storm water permits"), attached as
    Ex. 34 to Defendants' Compendium of Exhibits.
28

1  **IV.   CONCLUSION**

2        There is nothing remarkable about Defendants' storm or non-storm

3  water discharges.  Defendants operate their motion picture studio just like many

4  other commercial facilities in Burbank that discharge storm water and non-storm

5  water runoff to the municipal storm sewer system pursuant to local regulations, a

6  local permit, and local enforcement.  Defendants do not have a federal NPDES

7  permit because none is required.  For all of the reasons stated above, Defendants

8  are entitled to summary judgment as a matter of law.

9  Dated:  May 11, 2012                  Respectfully submitted,

10                            LATHAM & WATKINS LLP

11

12                            By:   s/ Garrett L. Jansma

13                              Garrett L. Jansma
                            Attorneys for Defendants

14                              THE WALT DISNEY COMPANY,
                            DISNEY ENTERPRISES, INC., and

15                              DISNEY WORLDWIDE SERVICES,
                            INC.

16

17

18

19

20

21

22

23

24

25

26

27

28

NOTICE OF MOTION FOR SUMMARY JUDGMENT AND MEMO
OF POINTS & AUTHORITIES ISO THEREOF

# APPENDIX A

## Eight Additional State and Federal Cases

In addition to the instant case, plaintiffs have filed:

1. *United States ex rel. Exhibits in Support of Defendants' Motion for Summary Judgment (collectively, "Defendants' Under Seal Papers") Environmental World Watch, Inc. v. The Walt Disney Company.*, No. CV08-04733-JVS (VBKx) (C.D. Cal. filed July 18, 2008) (dismissed without prejudice on May 13, 2009);

2. *Environmental World Watch, Inc. v. The Walt Disney Company*, No. BC414964 (L.A. Super. Ct. filed June 3, 2009) (dismissed with prejudice on April 24, 2012);

3. *Environmental World Watch, Inc. v. The Walt Disney Company*, No. NC039846 (L.A. Super. Ct. filed June 1, 2007) (dismissed for lack of prosecution on Aug. 15, 2007);

4. *Environmental World Watch, Inc. v. The Walt Disney Company,* No. NC050458 (L.A. Super. Ct. filed Oct. 27, 2007) (dismissed without prejudice on Nov. 7, 2008; judgment for Defendants and award of costs entered on Feb. 5, 2009);

5. *State of California, ex rel Environmental World Watch, Inc. v. The Walt Disney Company.*, No. BC408096 (L.A. Super. Ct. filed Feb. 19, 2009) (dismissed with prejudice on Nov. 5, 2010; judgments for Defendants entered on Jan. 6, 2011 and Feb. 9, 2011);

6. *Jackson v. The Walt Disney Company*, No. BC410175 (L.A. Super. Ct. filed Mar. 20, 2009);

7. *Hill v. The Walt Disney Company*, No. BC415444 (L.A. Super. Ct. filed June 9, 2009);

8. *Baptist v. The Walt Disney Company*, No. BC429489 (L.A. Super. Ct. filed Jan. 8, 2010) (dismissed with prejudice on January 31, 2012).

# Figure 1 – Industrial Facilities Identified by SIC Code

| SIC Code NOs. | Description | Code Section |
|---|---|---|
| 24 (except 2434), 26 (except 265 and 267), 28 (except 283 and 285), 29, 311, 32 (except 323), 33, 3441, 373 | Heavy manufacturing facilities (e.g., paper mills, chemical plants, petroleum refineries, steel mills/foundries); | 40 C.F.R 122.26(b)(14)(ii) |
| 10-14 | Mining/oil and gas facilities | 40 C.F.R 122.26(b)(14)(iii) |
| 5015, 5093 | Recycling facilities (e.g., metal scrapyards, battery reclaimers, salvage yards, automobile junkyards) | 40 C.F.R 122.26(b)(14)(vi) |
| 40, 41, 42 (except 4221–25), 43, 44, 45, 5171 | Transportation facilities | 40 C.F.R 122.26(b)(14)(viii) |
| 20, 21, 22, 23, 2434, 25, 265, 267, 27, 283, 285, 30, 31 (except 311), 323, 34 (except 3441), 35, 36, 37 (except 373), 38, 39, and 4221–25 | "Light industry" manufacturing facilities where industrial materials are exposed to storm water | 40 C.F.R 122.26(b)(14)(xi) |

# Figure 2 – Industrial Facilities Identified by Narrative Description

| Narrative Categories | Description | Code Section |
|---|---|---|
| Facilities subject to storm water effluent limitations guidelines, new source performance standards, or toxic pollutant effluent standards under 40 CFR subchapter N | Cement manufacturing, feedlots, fertilizer manufacturing, petroleum refining, phosphate manufacturing, steal electric, coal mining, mineral mining and processing, ore mining and dressing, asphalt emulsion | 40 C.F.R 122.26(b)(14)(i) |
| Hazardous waste treatment, storage, or disposal facilities, including those that are operating under interim status or permit under subtitle C of RCRA | Hazardous waste treatment, storage or disposal facilities | 40 C.F.R 122.26(b)(14)(iv) |
| Landfills, land application sites, and open dumps that receive or have received any industrial wastes | Landfills | 40 C.F.R 122.26(b)(14)(v) |
| Steam electric power generating facilities, including coal handling sites | Steam electric generating facilities | 40 C.F.R 122.26(b)(14)(vii) |
| Treatment works treating domestic sewage or any other sewage sludge or wastewater treatment device or system, used in the storage treatment, recycling, and reclamation of municipal or domestic sewage | Sewage treatment plants | 40 C.F.R 122.26(b)(14)(ix) |

1

### Figure 3 – Flow Chart Depicting "Industrial Facility" Analysis



13

### Figure 4 – Storm Sewer Discharge Categories



LA\2649646

LATHAM&WATKINSLLP

ATTORNEYS AT LAW
ORANGE COUNTY