1  Brooks Cutter, Esq. SB# 121407
2  E-mail: bcutter@kcrlegal.com
   John R. Parker, Jr., Esq., SB# 261771
3  E-mail: jparker@kcrlegal.com
   Kershaw Cutter & Ratinoff, LLP
4  401 Watt Avenue
5  Sacramento, CA 95864
   Tel. 916-448-9800
6  Fax 916-669-4499

7
   Jack Silver, Esq. SB# 160575
8  E-mail: lhm28843@sbcglobal.net
9  Law Office of Jack Silver
   Post Office Box 5469
10 Santa Rosa, CA 95402-5469
   Tel.  (707) 528-8175
11 Fax (707) 528-8675

12
   Attorneys for Plaintiffs
13 DENNIS JACKSON, WILLIAM MCCALL,
14 ROBIN MCCALL

15
16              UNITED STATES DISTRICT COURT

17             CENTRAL DISTRICT OF CALIFORNIA

18 ENVIRONMENTAL WORLD          )  CASE NO. CV09-4045 DMG (PLAx)
19 WATCH, INC., DENNIS JACKSON, )
   ROBERT HILL, ROBIN MCCALL,   )  **MEMORANDUM OF POINTS AND**
20 and WILLIAM MCCALL,          )  **AUTHORITIES IN SUPPORT OF**
                                )  **PLAINTIFFS' MOTION FOR**
21         Plaintiffs,          )  **SUMMARY JUDGMENT**
22 v.                           )
                                )
23                              )  Date:         June 29, 2012
24 THE WALT DISNEY COMPANY,     )  Time:         2:00 p.m.
   WALT DISNEY ENTERPRISES,     )  Courtroom:    7
25 INC., DISNEY WORLDWIDE       )  Judge:        Hon. Dolly M. Gee
26 SERVICES, INC., and DOES 1-30,)
   Inclusive,                   )
27                              )
28         Defendants.          )
   _____ )

P&As Re Pltfs' Notice of Motion for SJ                    2:09-cv-04045-DMG-PLA

TABLE OF CONTENTS

I.      STATEMENT OF THE CASE.................................... 1

II.     ISSUES TO BE DECIDED...................................... 2

III.    FACTS OF THE CASE. .......................................... 2

IV.     PRIOR PROCEEDINGS......................................... 7

V.      SUMMARY OF ARGUMENT.................................. 8

VI.     STANDARD OF REVIEW...................................... 9

VII.    ARGUMENT. .................................................. 10

        A.      Disney is Violating CWA§ 301(a) by Discharging Pollutants
                From a Point Source to a Water of the United States Without
                Being a Permittee on Any NPDES Permit For Such Discharges...... 11

                1.      Copper, Zinc and TOC Are Pollutants.  Copper and Zinc
                        are Listed as Toxic Pollutants. ......................... 11

                2.      Disney's Storm Water System is a Point Source............. 12

                3.      Disney Discharges Pollutants to the Los Angeles River
                        Via the Burbank MS4.................................. 13

                4.      All Discharges of Pollutants From the Site Require
                        Permitting Including Those Occurring During Rain Events.... 14

                5.      Disney is Not a Named Permittee on Any NPDES Permit
                        Authorizing the Discharge of Pollutants to ta Water of
                        the United States..................................... 17

        B.      Disney's Storm Water Discharges Require a NPDES Permit
                and Must Comply With Storm Water Regulations Promulgated
                Under CWA§ 402(p)................................... 18

*i*

1         1.     CWA § 402(p) Establishes a Framework for Regulating Storm
2               Water Discharges Under the NPDES Permitting Program. . . . . 18

3         2.     As of October 1, 1984, All Storm Water Discharges
4               Must be Permitted Under CWA § 402(p). . . . . . . . . . . . . . . . . . 19

5         3.     Disney Engages in Multiple "Industrial" Activities on
6               the 45-Acre Commercial Site Which Require Permitting
7               Under CWA § 402(p). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

8    C.    Plaintiffs McCall and Jackson Have Standing and Can Meet the
9        Requirements of  Article III. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

10   VIII.  CONCLUSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

*ii*

1

2

**TABLE OF AUTHORITIES**

**CASES**

3

4

*American Mining Congress v. United States EPA*
  965 F.2d 759 (9th Cir. 1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18,21

5

6

*Anderson v. Liberty Lobby, Inc.*
477 U.S. 242 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  10

7

8

*Beard v. Banks*
548 U.S. 521  (2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  10

9

10

*Committee to Save the Mokelumne River v. East Bay Municipal Utility District*
  13 F.3d 305 (9th Cir. 1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10,13

11

12

*Ecological Rights Foundation v. Pacific Lumber Company*
  230 F. 3d 1141 (9th Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  23

13

14

*Environmental Defense Center v. U.S. EPA*
  344 F.3d 832 (9th Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  13

15

16

*Environmental Protection Information Center v. Pacific Lumber Co., et al.,*
  301 F. Supp. 2d 1102 (N.D. CA 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15, 19

17

18

*Friends of the Earth v. Laidlaw*
528 U.S. 167, 120 S. Ct. 693 (2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  23

19

20

*Headwaters v. Talent Irrigation District*
243 F.3d 526 (9th Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  14

21

22

*Lujan v. Defenders of Wildlife*
504 U.S. 555 (1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  23

23

24

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*
  475 U.S. 574 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  9

25

26

*N. Plains Res. Council v. Fid. Exploration & Dev. Co.*
325 F.3d 1155 (9th Cir.2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10,11

27

28

*iii*

*Northern California River Watch v. City of Healdsburg*
496 F. 3d 993 (9th Cir. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*Northwest Envt'l Defense Center v. Brown*
 640 F 3d 1063 (9th Cir. 2011). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9, 10, 12, 14, 16,21

*Natural Resources Defense Council, Inc. v. EPA*
966 F.2d 1292 (9th Cir.1992). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*Oregon Natural Desert Ass'n v. Dombeck*
172 F.3d 1092 (9th Cir.1998). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

*Rapanos v. United States*
547 U.S. 715 (2006). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*San Francisco Baykeeper v. West Bay Sanitation District*
 791 F. Supp. 2d 719 (N.D. CA 2011). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*Sierra Club v. Cedar Point Oil Company Inc.*
73 F. 3d 546 (5th Cir. 1996). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*Sierra Club v. El Paso Gold Mines, Inc.*
421 F. 3d. 1133 (10th Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*Sierra Club v. Morton*
 405 U.S. 727 (1972). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

*United States v. Velsicol Chemical Corp.*
438 F. Supp. 945 (W.D. Tenn. 1976) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

**FEDERAL STATUTES**

33 U.S.C. § 1251(a). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10, 18
33 U.S.C. § 1311(a). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*
33 U.S.C. § 1342. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10
33 U.S.C. § 1342(p). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2
33 U.S.C. § 1342(p)(1). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15, 20
33 U.S.C. § 1342(p)(2)(B). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19, 20
33 U.S.C. § 1342(p)(4)(A). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*iv*

33 U.S.C. § 1362(6). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   11
33 U.S.C. § 1362(13). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   11
33 U.S.C. § 1362(14). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   12
33 U.S.C. § 1362(19). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   12
33 U.S.C. § 1365(f). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   11

Fed. Rule of Civ. P. 56(c). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   9
Fed. Rule of Civ. P. 56(d) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   10
Fed. Rule of Civ. P. 56(e). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   9

**FEDERAL REGULATIONS**

40 C.F.R. § 122.26(b)(8). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   3
40 C.F.R. § 122.26(b)(14) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   22
40 C.F R. § 131. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   6
40 C.F.R. § 401.15. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   8,11
40 C.F.R. § 423. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   11

**LEGISLATIVE HISTORY**

H.R. Rep. No. 99-189 (July 2, 1985). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   21
H.R. Conf. Rep. No. 1004 (Oct. 15, 1987). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   21

133 Cong. Rec. H. 991 (Jan. 8, 1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   21
133 Cong. Rec. S 1280 (Jan. 14, 1987). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   20

*v*

## I.   STATEMENT OF THE CASE

The Walt Disney Company, Walt Disney Enterprises, Inc. and Disney Worldwide Services, Inc., ("Disney") owns and operates a 45-acre film production studio in Burbank, California (the "Site").  The Site contains a storm water system that collects and channelizes both storm and non-storm water runoff.  Disney's storm water system discharges to the Los Angeles River, a water of the United States.  Three types of discharges violate the Clean Water Act's requirement that such discharges be permitted under the National Pollution Discharge Elimination System ("NPDES"): non-storm water, discharges not entirely composed of storm water, and storm water discharges associated with on-site commercial and industrial activity.

In all three discharges the pollutants zinc, copper and total organic carbon ("TOC") are being discharged at concentrations above EPA benchmarks and California Toxics Rule ("CTR") limits.  Zinc and copper are listed by the EPA as toxic pollutants and are among 126 priority pollutants for which the EPA has developed standardized analytical test protocols (EPA methods).  Disney has no NPDES permit, therefore its discharges are prohibited under the Clean Water Act.  The Los Angeles River is Clean Water Act § 303(d) listed as impaired for both zinc and copper.  Additional unpermitted loading such as those from Disney's 45-acre commercial/industrial operations, makes it difficult to improve water quality to levels sufficient to alleviate the impairment.  Plaintiffs request Disney either cease its illegal discharges or acquire a NPDES permit which properly and lawfully regulate them.

//

## II.    ISSUES TO BE DECIDED

A.    Is Disney violating CWA § 301(a), 33 U.S.C. § 1311(a), for discharging pollutants from a point source (its storm water system) to a water of the United States (the Los Angeles River) without a NPDES permit?

B.    Is Disney violating CWA § 402(p), 33 U.S.C. § 1342(p), for discharging storm water to the Los Angeles River without being in compliance with all applicable provisions of § 402(p)?

## III.    FACTS OF THE CASE

Disney's 45-acre studio lot Site located on South Buena Vista Street in Burbank has served as the primary production and manufacturing center for Disney's animated and live action films since 1939.    Site operations consist of office buildings, sound stages, open areas and sets for filming, as well as the auxiliary operations of food service, waste management, landscaping, light and heavy construction, transportation services[1], set and furniture production, and digital processing.  Other Site-related support activities include painting, film processing, lithographic printing, clay modeling, sign, set, and furniture production.  The construction of office and production buildings continues on the Site to the present date, as does the construction and demolition of sets for filming purposes. [Russell Decl.¶ 4].

Additionally, there are two commissaries, which in 2009 were serving between 2400-5000 meals per day. There is a ancillary full service fueling, auto cleaning and detailing facility for Disney's fleet, a multistory parking garage, parking lots and a Starbucks. [Russell Decl. ¶5] The Site is a sizable industrial/commercial operation.

---

[1]The activities related to vehicle operation and on site use such as areas used for vehicle transportation, storage, fueling or parking, maintenance of vehicles including cleaning and detailing, and the vehicles and ancillary equipment which are used for commercial or industrial activities on the Site.

Elevation at the Site ranges from approximately 518 to 521 feet mean sea level (msl) with a general slope to the south and southeast toward the Los Angeles River just beyond Keystone Street and Riverside Drive.  Consistent with Site topography, surface water runoff drains to the south/southeast toward the Los Angeles River approximately 500 feet from the southwest tip of the Site. [Hagemann Decl. ¶7].

Disney collects and channelizes storm water and non-storm water through its storm water system[2], which consists of discrete conveyances including drop inlets and underground pipes. [Russell Decl.  ¶7;Silver Decl. ¶8a].   Disney's storm water system is a contained system connected to the Burbank municipal storm water system (Burbank MS4 or MS4[3]) only, with no storm water system connections receiving inputs from off-site sources. [Silver Decl. ¶6,8b; Russell Decl.¶7]. The only outfall of the Burbank MS4 system that receives discharges from the Disney storm water system is the Los Angeles River. [Hagemann Decl. ¶3; Russell Decl. ¶7].

The elevation of Disney's storm water system outfall to the Burbank MS4 is approximately 518 feet msl. The elevation of the outfall from the Burbank MS4 to the Los Angeles River is approximately 479 feet msl. [Hagemann Decl. ¶ 9]. The Burbank MS4 system from the Site to the Los Angeles River is designed gravity flow. (Russell Decl. ¶9).   The majority of Disney's storm water system is gravity flow. In some instances Disney uses pumps to move water from below grade to the storm water system.

---

[2] Storm water systems are also referred to by the EPA as storm sewer systems although they are separate and apart from the sewer collection system.

[3] Under Federal Regulations, an MS4 is "a conveyance or system of conveyances (including roads with drainage systems, municipal streets, catch basins, curbs, gutters, ditches, man-made channels, or storm drains): (i) Owned or operated by a State, city, town, borough, county, parish, district, association, or other public body . . . having jurisdiction over disposal of sewage, industrial wastes, storm water, or other wastes, including special districts under State law such as a sewer district, flood control district or drainage district, or similar entity . . . (ii) Designed or used for collecting or conveying storm water; (iii) Which is not a combined sewer; and (iv) Which is not part of a Publicly Owned Treatment Works (POTW). . . ." 40 C.F.R. § 122.26(b)(8).

[Silver Decl. ¶8d; Russell Decl. ¶9].  Storm water systems are designed to drain and not flood during storms. [Russell Decl. ¶9]. There are no reports of either Disney's storm water system or the Burbank MS4 flooding in the past 6 years. [Hagemann Decl. ¶ 17]. Discharges from Disney's storm water system are discharges to the Los Angeles River. Given the 40-foot drop in elevation, once discharges leave Disney's storm water system they have nowhere to go other than the Los Angeles River. [Russell Decl.  ¶9].

Three types of discharges from Disney's storm water system are subject to CWA § 301(a) permitting requirements:   1) dry weather discharges (non-storm water) containing pollutants caused by landscape irrigation, hydrant flushing and other non-storm related discharges; 2) discharges during rain events which are not entirely composed of storm water; and, 3) storm water discharges.  The last category also requires compliance with CWA § 402(p).

During dry weather periods, such as in the summertime, Disney waters its landscaping three days a week. [Silver Decl. ¶3b]. From April 2005 to June 2011 there have been only been140 days of precipitation of 0.1 inches or more out of a total of 2,282 days.  During that same period there were 58 months out of 74 in which the mean temperature was greater that 75°F and landscape irrigation likely to occur. [Decl. Hagemann ¶9] .  Approximately 800-1000 sprinkler heads are used which run on various timing cycles. Watering generally starts at 8:00 P.M. and continues until at least 4:00 A.M. the following day. [Silver Decl. ¶3].  Inspections of the Site taking place in the afternoon following a watering day demonstrated ongoing discharges. [Russell Decl. ¶12, 13].  Each time Disney waters its landscaping, it is estimated that 20,000 gallons of

runoff go into Disney's storm water system carrying with it pollutants such as zinc, copper and TOC. [Russell Decl. ¶14] .

In addition to non-storm water landscaping discharges, Disney also flushes its hydrants to its storm water system. [Silver Decl. ¶4].    On June 30, 2009 the Regional Water Quality Control Board ("RWQCB") inspected the Disney Site. The weather was clear and there had been no rains during the previous week.  Disney was flushing its hydrants, and RWQCB observed discharges from the Disney storm water system to the MS4 attributed to the hydrant flushing. [Russell Decl. ¶13].  Disney's discharges due to landscape watering are far greater than those attributed to hydrant flushing. [Russell Decl. ¶14].  Discharges from Disney's storm water system to the MS4 due to landscape watering have been observed by Disney's staff as well as Plaintiffs' expert. [Silver Decl. ¶4b;  Russell Decl. ¶14].

Non-storm water discharges have also been observed which could not be attributed to either of the aforementioned sources. [Russell Decl. ¶13].  Both the RWQCB and Plaintiffs have documented discharges from the Site to the MS4, and discharges from the MS4 to the Los Angeles River. [Russell Decl. ¶10,13].  In addition to non-storm water discharges from landscape irrigation and hydrant flushing, Disney has admitted to other unpermitted non-storm water discharges. [Russell Decl. ¶13]. A significant portion of these discharges carry zinc, copper and TOC in excess of water quality objectives. [Hagemann Decl.¶11] .

In addition to non-storm water, Disney's storm water system collects, channelizes and discharges rain (storm water runoff) and pollutants which become entrapped with

the rain water.[4]  These pollutants include waste products generated from transportation services, i.e., zinc from tires, copper from brake linings, as well as TOC from refuse areas. [Russell Decl. ¶17, 20]. Due to the entrainment of commercial and industrial pollutants, these discharges are not composed entirely of storm water. [Hagemann Decl. ¶18].

In 2009 the RWQCB conducted 3 investigations of the discharges to and from Disney's storm water system.  In 2010 and 2011 Plaintiffs conducted sampling on 5 separate days.  Disney's consultant took duplicate samples during 2 of the 3 RWQCB investigations and for all of the on-site sampling by Plaintiffs. [Russell Decl. ¶15] .

The data sets from the RWQCB, Disney and Plaintiffs are in agreement that Disney is discharging zinc, copper and TOC from its storm water system to the Los Angeles River via the Burbank MS4.  [Hagemann Decl. ¶11; Russell Decl. ¶15]. Disney's discharges contain significant levels of zinc, copper and TOC which were often found to be above water quality standards including EPA's benchmark limitations and the CTR (40 C.F R. § 131). [Hagemann Decl. ¶11].  The discharge of zinc and copper are of particular concern due to the CWA § 303(d) listing of the Los Angeles River as impaired for zinc and copper. [Hagemann Decl. ¶15].  ]  For waters not yet meeting water quality standards, the addition of unpermitted loads "cause or contribute" to a violation of the standards since any additional discharge contributes to the impairment and makes it quantitatively more difficult to improve water quality to levels sufficient to eliminate the impairment. [Hagemann Decl. ¶16].

---

[4]According to EPA: "Stormwater runoff is generated when precipitation from rain and snow melt events flows over land or impervious surfaces and does not percolate into the ground. *As the [stormwater] runoff flows over the land or impervious surfaces (paved streets, parking lots, and building rooftops), it accumulates debris, chemicals, sediment or other pollutants that could adversely affect water quality if the runoff is discharged untreated.*" [http://cfpub.epa.gov/npdes/home.cfm?program_id=6]. [emphasis added]

Disney admits it is not a named permittee or identified discharger in any current NPDES permit for non-storm water discharges. [Silver Decl. ¶5b].

Disney admits it is also not currently covered by any storm water permit including the California General Industrial Storm Water Permit ("General Permit").  According to the City of Burbank, Disney "is a critical source, qualifying as an 'automotive service facility.'" [Russell Decl. ¶16]. This designation is due to the fact the Site contains a full service gas fueling station and vehicle cleaning/detailing operational unit for its vehicle fleet.  In 2009, the City of Burbank estimated that this vehicle maintenance operation washes and details approximately 75 cars per day. [Russell Decl. ¶16]. During the time of Plaintiffs' inspections to the Site, numerous Disney fleet vehicles were fueled, cleaned and detailed in the ancillary transportation facility. [Russell ¶6] .

## IV.   PRIOR PROCEEDINGS

On September 3, 2009, Disney filed a Fed. R. Civ. P. 12(b) motion to dismiss which was denied in its entirety.  Disney contended it did not need a NPDES permit "because the operative municipal storm water and urban runoff permit – the Los Angeles County MS4 Permit (which includes the City of Burbank) – grants Burbank 'adequate legal authority' to 'prohibit non-storm water discharges to the storm drain system . . . .'" [Ct. Doc. 37 pg. 11-12, Order Denying Defendants' Motion to Dismiss].

In denying Disney's motion Judge Pregerson stated, "Disney offers no support for its contention that Burbank's legal authority to prohibit non-storm water discharges, under the terms of the MS4 Permit, forecloses Plaintiffs' claim under the CWA. Further, the MS4 permit states that '[u]nauthorized non-storm water discharges (even when

commingled with storm water) shall be eliminated or covered by a separate NPDES permit.'"  [Ct. Doc. 37 pg. 11-12].

## V.    SUMMARY OF ARGUMENT

Subject to limited exceptions which do not apply to Disney, CWA § 301(a), 33 U.S.C. § 1311(a) makes the discharge of a pollutant from a point source to a water of the United States without a NPDES permit illegal.  Disney's storm water system is a point source, a system of conveyances, that channelizes zinc, copper and TOC and discharges these pollutants to the Los Angeles River, a water of the United States.  Disney is not a permittee on any current NPDES permit nor has it filed a Notice of Intent ("NOI") to be covered by the General Permit.

Testing performed during investigations conducted by the RWQCB, Disney and Plaintiffs evidenced zinc, copper and TOC being discharged in significant quantities from the Site through Disney's storm water system.  Zinc and copper are among 126 priority pollutants EPA regulates, and for which the EPA has developed standardized analytical methods. Zinc and copper are also listed as toxic pollutants under 40 C.F.R. § 401.15.

The Los Angeles River is CWA § 303(d) listed as impaired for copper and zinc. Additional unpermitted and unallocated loads such as those from the Disney 45-acre site make it quantitatively more difficult to improve water quality to levels that satisfy water quality standards.

The General Permit covers "storm water associated with industrial activity" whether the activity is primary or auxiliary to the facility's function. General descriptions

of these activities include "transportation facilities" that "conduct any type of vehicle maintenance such as fueling, cleaning, repairing, etc.".  Disney's auxiliary activities associated with its transportation facilities and refuse storage are the source of the regulated and toxic pollutants zinc, copper and TOC and require the entire Site be covered under a CWA § 402(p) storm water permit.

Whether or not Disney qualifies as having storm water discharges "associated with industrial activity," CWA § 301(a) "prohibits the discharge of any pollutant from a point source into navigable waters of the United States without an NPDES permit." *Northwest Envt'l Defense Ctr. v. Brown,* 640 F 3d 1063, 1070 (9th Cir. 2011).  Under the Ninth Circuit, polluted discharges are not exempt from section 301(a) simply because they contain storm water.  The moratorium on requiring compliance with CWA § 402(p) ended October 1, 1994.  Therefore, in addition to acquiring a NPDES permit under section 301(a) Disney must also comply with the storm water regulations under section 402(p).

## VI.   STANDARD OF REVIEW

Pursuant to Fed. R. Civ. P. 56(c), a motion for summary judgment is appropriate where "there is no genuine issue as to any material fact and those relevant facts, taken as a whole, indicate that a reasonable fact-finder could not find for the nonmoving party." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-587 (1986). The nonmoving party must present evidence of "specific facts showing that there is *a genuine issue for trial.*" *Matsushita*, 475 U.S. at 587 [quoting Fed. R Civ. P. 56(e)] (emphasis original). "Only disputes over facts that might affect the outcome of the suit

under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). If a non-moving party is unable to make a showing of specific facts to support its claim of a genuine issue requiring a trial, the law requires entry of a judgment in favor of the moving party. *Beard v. Banks*, 548 U.S. 521, 529 (2006). Rule 56(d) allows for partial summary judgment to adjudicate some of the issues in the case, and authorizes an order specifying the facts that are deemed established for trial.

## VII.   ARGUMENT

Congress enacted the Clean Water Act to "restore and maintain the chemical, physical, and biological integrity of the Nation's waters". CWA § 101(a), 33 U.S.C. § 1251(a); *Oregon Natural Desert Ass'n v. Dombeck*, 172 F.3d 1092, 1096 (9th Cir.1998). CWA § 301(a), 33 U.S. § 1311(a) provides that, subject to certain exceptions[5], "the discharge of any pollutant by any person shall be unlawful." 33 U.S.C. § 1311(a). One of these exceptions is if the discharger is a permittee under a NPDES permit authorized by CWA § 402, 33 U.S.C. § 1342. *Northwest Envt'l Defense Center v. Brown*, 640 F 3d at 1070 ["The combined effect of §§ 301(a) and 402 is that 'the CWA prohibits the discharge of any pollutant from a point source into navigable waters of the United States without an NPDES permit.' *N. Plains Res. Council v. Fid. Exploration & Dev. Co.,* 325 F.3d 1155, 1160 (9th Cir.2003)"]; *see also Committee to Save the Mokelumne v. East Bay Municipal Utility District*, 13 F.3d 305, 308 (9th Cir. 1993).

---

[5] The exceptions include discharges composed entirely of agricultural irrigation return flows, certain natural discharges from mines and discharges to a sewage collection system connected to a treatment plant. [CWA § 301(a)] None apply to Disney.

Private parties may bring citizens' suits pursuant to 33 U.S.C. § 1365 to enforce effluent standards or limitations, which are defined as including violations of 33 U.S.C. § 1311(a) and 33 U.S.C. § 1365(f).

**A.     Disney Is Violating CWA § 301(a) by Discharging Pollutants from a Point Source to a Water of the United States Without Being a Permittee on Any NPDES Permit for Such Discharges**

**1.     Copper, Zinc and TOC Are Pollutants.  Copper and Zinc Are Listed as Toxic Pollutants**

The Clean Water Act's definition of "pollutant" is extremely broad. 33 U.S.C. § 1362(6); *see also N. Plains Res. Council v. Fid. Exploration & Dev. Co.* 325 F.3d at 1162-1163.  Zinc and copper are among 126 priority pollutants EPA regulates, and for which EPA has developed analytical test methods (EPA Methods).  See Appendix A to 40 C.F.R. Part 423.  Zinc and copper are listed as toxic pollutants under 40 C.F.R. § 401.15.[6]

Total organic carbon ("TOC") is a pollutant for which EPA has set benchmarks. TOC reflects the amount of carbon bound in an organic compound, and is often used as a non-specific indicator of water quality.  TOC in water can come from decaying natural organic matter as well as from synthetic and natural sources such as those introduced by Disney on the Site.  TOC was found in concentrations above EPA benchmarks in the storm water basin which drains the refuse area on the Site. [Russell Decl. ¶17].

---

[6]   The term "toxic pollutant" means those pollutants, or combinations of pollutants, including disease-causing agents, which after discharge and upon exposure, ingestion, inhalation or assimilation into any organism, either directly from the environment or indirectly by ingestion through food chains, will, on the basis of information available to the Administrator (EPA), cause death, disease, behavioral abnormalities, cancer, genetic mutations, physiological malfunctions (including malfunctions in reproduction) or physical deformations, in such organisms or their offspring. CWA § 502(13), 33 U.S.C. § 1362(13)

Sampling at the Site conducted by RWQCB, Disney and Plaintiffs detected high concentrations of copper, zinc and TOC, among other pollutants, in the storm drains that discharge to the Los Angeles River.  The Los Angeles River is CWA § 303(d) listed as impaired for zinc and copper. [Hagemann Decl. ¶11,15].  Zinc and copper are aquatic toxins that bioaccumulate thus causing pollution. [Russell Decl. ¶22; Hagemann Decl. ¶15].

It cannot be disputed that the copper, zinc and TOC in the discharges from Disney's storm water system are pollutants as defined under the Clean Water Act. See also *Sierra Club v. Cedar Point Oil Company Inc.* 73 F. 3d 546, 566 (5th Cir. 1996) [That the definition of "pollutant" is meant to leave out very little is confirmed by the statutory definition of "pollution," which means nothing less than the "man-made or man-induced alteration of the chemical, physical, biological, and radiological integrity of water." 33 U.S.C. § 1362(19).]

### 2.    Disney's Storm Water System Is a Point Source

There is no genuine issue of material fact that Disney's storm water system is a point source.  Under the Clean Water Act "the term 'point source' means any discernible, confined and discrete conveyance, including but not limited to any pipe, ditch, channel, tunnel, conduit, well, discrete fissure, container, rolling stock, concentrated animal feeding operation, or vessel or other floating craft, from which pollutants are or may be discharged." CWA § 502(14), 33 U.S.C. § 1362(14).  As discussed above, Disney's storm water system meets this definition.  See also *Northwest Envt'l Defense Center v. Brown,* 640 F.3d at 1071 ["Storm sewers are established point sources subject to NPDES

permitting requirements. . .” quoting *Environmental Defense Center v. U.S. EPA,* 344 F.3d 832, 841-842 n. 8 (9th Cir. 2003)].

### 3. Disney Discharges Pollutants to the Los Angeles River via the Burbank MS4

The Ninth Circuit has ruled that the collection, channelization and release to a water of the United States is a “discharge” under the Clean Water Act. *Committee to Save the Mokelumne*, 13 F.3d at 308.  As noted in the Facts of the Case section above, Disney’s storm water system has no inlet storm water system connections from off-site sources, and only discharges to the Burbank MS4. MS4. [Russell Decl. ¶7; Silver Decl. ¶6,8b].  The Disney storm water system is designed gravity flow. In certain circumstances, pumps are used to transfer polluted water from a lower elevation to a higher one such as sumps in the basement of the Zorro Parking structure. [Russell Decl. ¶9; Silver Decl. ¶8d].  None of the collected water is treated prior to being discharged to the Burbank MS4.  [Russell Decl. ¶18; Silver Decl. ¶4e].  From the Burbank MS4 there is a 40-foot drop to the Los Angeles River.  [Hagemann ¶8; Russell Decl. ¶9]. Storm water systems are designed to drain, otherwise they would flood during rain events.  [Russell ¶9].  There has been no report of flooding at the Site from Disney’s storm water system, nor any reports of flooding from the Burbank MS4 leading from the Site to the Los Angeles River in the past six years. [Hagemann Decl. ¶17]. The schematics of both storm water systems indicate a designed gravity flow, and experience indicates that the system is working as designed.  Therefore, water, including the pollutants carried with it, which enter Disney’s storm water system end up in the Los

Angeles River.[7] They simply have no where else to go. [Russell Decl. ¶9].

In *Rapanos v. United States,* 547 U.S. 715 (2006), the Supreme Court noted that the "discharge into intermittent channels of any pollutant *that naturally washes downstream* likely violates § 1311(a), even if the pollutants discharged from a point source do not emit  'directly into' covered waters, but pass 'through conveyances' in between." (emphasis original) *Rapanos id* at 743–744. The Ninth Circuit has consistently held that a discharge to a conveyance, such as a canal connected to a water of the United States, is a discharge to water of the United States, "[t]he Clean Water Act is concerned with the pollution of tributaries as well as with the pollution of navigable streams, and 'it is incontestable that substantial pollution of one not only may but very probably will affect the other.'"  *Headwaters v. Talent Irrigation District*, 243 F.3d 526, 534 (9th Cir. 2001). See also *United States v. Velsicol Chemical Corp.,* 438 F. Supp. 945, 946-947 (W.D. Tenn. 1976) [a municipal sewer system MS4] separated the initial discharge and jurisdictional waters]; and, *Sierra Club v. El Paso Gold Mines, Inc.,* 421 F. 3d. 1133, 1137, 1141 (10th Cir. 2005) (2.5 miles of tunnel separated the initial discharge and jurisdictional waters).

### 4.    All Discharges of Pollutants from the Site Require Permitting Including Those Occurring During Rain Events

Section 301(a) of the Clean Water Act "prohibits the discharge of any pollutant from a point source into navigable waters of the United States without an NPDES permit." *Northwest Envt'l Defense Ctr. v. Brown,* 640 F 3d at 1070.  Under Ninth Circuit

---

[7] There should be no issue that the Los Angles River is a "water of the United States". In 2010, EPA made a formal finding that the "Los Angeles River is a 'Traditional Navigable Water' from its origins at the confluence of Arroyo Calabasas and Bell Creek to San Pedro Bay at the Pacific Ocean, a distance of approximately 51 miles." [Silver Decl. ¶9]

law this prohibition applies to both dry wether (i.e. non-storm water) and storm water discharges containing pollutants.

On-site and off-site sampling taken during investigations of the Site by RWQCB, Disney and Plaintiffs show zinc, copper and TOC above EPA benchmark and CTR levels. Dry weather testing of Disney's storm water system was conducted by RWQCB and Disney's consultants on June 30, 2009 and by Plaintiffs and Disney's consultants on October 12, 2011, October 20, 2011 and October 25, 2011. Sampling events conducted by RWQCB, Disney and Plaintiffs showed zinc and copper in excess of EPA benchmark and CTR levels. Sampling events conducted by Disney and Plaintiffs showed TOC in excess of EPA benchmark.[8] [Hagemann Decl. ¶11].

Wet weather testing of Disney's storm water system was conducted by RWQCB and Disney's consultants on October 14, 2009, and by Plaintiffs and Disney's consultants on October 19, 2010 and October 20, 2010. Sampling events conducted by RWQCB, Disney and Plaintiffs showed zinc and copper in excess of EPA benchmark and CTR levels. Sampling events conducted by Disney and Plaintiffs showed TOC in excess of EPA benchmark.[Russell Dec ¶ 15; Hagemann Decl. ¶11].

Discharges that are not "composed entirely of storm water" are not exempt under CWA § 402(p). *See* 33 U.S.C. § 1342(p)(1).[9] Disney's polluted discharges do not fall within this exception as they are "composed entirely of storm water". [Hagemann Decl. ¶18]. See *Environmental Protection Information Center v. Pacific Lumber Co., et al.,*

---

[8] There is no CTR for TOC.

[9] CWA § 402(p)(1) states: "Prior to October 1, 1994, the Administrator or the State (in the case of a permit program approved under section 402 of this Act [this section] shall not require a permit under this section for discharges composed entirely of stormwater."

301 F. Supp. 2d 1102, 1110-1111 (N.D. CA 2004).[10]   Judge Patel, in rejecting defendant's illogical interpretation that any toxic pollutant is exempt from the Clean Water Act if it mixes with any amount of rainfall, held that "neither of 402(p)'s threshold requirements are satisfied" because the point source discharge at issue was not exempt from regulation as it was polluted and thus not composed entirely of storm water. Here, irrefutable evidence demonstrates that Disney's polluted discharges are composed of not only storm water, but also pollution added by Disney due to commercial and industrial activities on its 45-acre Site. [Russell Decl. ¶17, 20].

The Ninth Circuit has repeatedly stressed that the prohibition under section 301(a) says what it means: the Clean Water Act "prohibits the discharge of *any* pollutant from a point source into navigable waters of the United States without an NPDES permit." (emphasis added). *Northwest Envt'l Defense Ctr. v. Brown,* 640 F 3d at 1070.   Whether discharges of pollutants are mediated by landscape irrigation, hydrant flushing, accidental releases or rain, such discharges must be permitted under the NPDES permitting scheme.

This conclusion both supports the plain reading of the statute as well as its underlying purpose. When discharges to Disney's storm water system occur, not all of the pollutants washed into the system are necessarily discharged to the Burbank MS4 or the Los Angeles River immediately. [Russell Decl. ¶19].   Just as off-site, dry weather discharges might contain pollutants washed into a storm water system during rain events, off-site wet weather discharges may contain pollutants deposited due to non-storm water discharges. [Russell Decl. ¶19].   Because the intent of the Clean Water Act is to "restore

---

[10] Also see footnote 4 above - EPA defines storm water as rain or snow melt runoff prior to accumulating surface pollutants.

and maintain the chemical, physical, and biological integrity of the Nation's waters" it makes no sense to regulate a discharge that is clearly illegal while not regulating another simply because the discharge of toxic pollutants is merely delayed until a storm event.

### 5.   Disney Is Not a Named Permittee on Any NPDES Permit Authorizing the Discharge of Pollutants to a Water of the United States

In order to legally discharge pollutants to the Los Angeles River from its storm water system Disney must be a permitted discharger (i.e. permittee) on a NPDES permit issued by the EPA or the State of California, and must be in compliance with that NPDES permit.[11]

In *San Francisco Baykeeper v. West Bay Sanitation District*, 791 F. Supp. 2d 719, 772 (N.D. CA 2011), Judge Chen rejected the defendant's argument that its discharges were covered under the county's MS4 permit due to the fact the defendant was not a permittee. The court held that there "is no authority to support Defendant's position. Indeed, the case law strongly suggests that Plaintiff's position is the correct one—that a permit covers only permittees." *ibid*. Disney is not a permittee on any NPDES permit that authorizes discharges of zinc, copper and TOC from its storm water system to the Los Angeles River, nor has it filed a NOI to be covered by the General Permit. [Silver Decl. ¶5b].  Thus, Disney has been and continues to be in violation of the Clean Water Act for discharging pollutants from point sources to waters of the United States without an NPDES permit.

Disney's requirement to comply with a NPDES permit would further the Clean Water Act's goal to, "restore and maintain the chemical, physical, and biological

---

[11] Due to the nature of Disney's discharges, it could also file a NOI to be covered under the General Permit and qualify its non-storm water dischargers under that permit.

integrity of the Nation's waters". CWA § 101(a), 33 U.S.C. § 1251(a).  The obligations Disney may have due to local ordinances and municipal permits do not meet NPDES permitting requirements.  If Disney is required to apply for and obtain a permit, it would have to limit or eliminate its discharges of zinc, copper and TOC. [Hagemann Decl. ¶14; Russell Decl. ¶21] *see also Northern California River Watch v. City of Healdsburg,* 2004 WL 201502 *6 (N.D. CA) *aff'd* 496 F. 3d 993 (9th Cir. 2007) *cert denied* 552 U.S. 1180 (2008) ["If Healdsburg were required to apply for and obtain in NPDES permit, it would be subject to regulation over and above that imposed by its state-issued permits."].

**B.     Disney's Storm Water Discharges Require a NPDES Permit and Must Comply with Stormwater Regulations Promulgated Under CWA § 402(p)**

**1.     CWA § 402(p) Establishes a Framework for Regulating Storm Water Discharges under the NPDES Permitting Program**

The 1987 amendments to the Clean Water Act added section 402(p) which establishes a framework for regulating storm water discharges under the NPDES permitting program. As is clear from the face of CWA § 402(p) and its legislative history, Congress, in enacting section 402(p), did not repeal or modify the CWA § 301(a) prohibition on point source discharges.  Regardless of whether storm water is involved, qualifying discharges of a pollutant from a point source to a water of the United States are prohibited.  33 U.S.C. § 1311(a).  See *American Mining Congress v. United States EPA*, 965 F.2d 759, 767 (9th Cir. 1992) ["All point sources that discharge pollutants . . . .require a permit. . .The NPDES permit program of the CWA, CWA §§ 301(a), 402(a), 33 U.S.C. §§ 1311(a), 1342(a), regulates point source discharges of pollutants from

inactive mines regardless of whether EPA classifies such discharges as 'associated with industrial activity' under CWA § 402(p)(2)(B), 33 U.S.C. § 1342(p)(2)(B)."] *Environmental Protection Information Center v. Pacific Lumber Co.,* 301 F. Supp.2d *id.* ["As the language of the CWA and Ninth Circuit case law make clear, section 402(p) is not the only CWA section imposing duties and obligations on pollution dischargers; both section 301(a) and 402(a), for example, posit pollution-related mandates on putative polluters, including that these polluters obtain NPDES permits for 'point source' pollutant discharges."]

CWA § 402(p) does not replace CWA § 301(a). It merely adds additional requirements such as preparing and implementing a storm water pollution prevention plan (SWPPP), a monitoring program and annual reports.

**2.    As of October 1, 1984 All Storm Water Discharges Must Be Permitted under CWA § 402(p)**[12]

CWA § 402(p) in part states, "Prior to October 1, 1994, the Administrator or the State (in the case of a permit program approved under section 402 of this Act) shall not require a permit under this section for discharges composed entirely of storm water." Congress then set forth a class of dischargers ("Phase I") which had to be permitted by 1991 whether or not it had been determined they were discharging pollutants. Due to the nature of these entities it was assumed they were, and the burden to prove otherwise was with the putative discharger.  In addition to the requirements under CWA § 301(a), Phase I dischargers were obligated to comply with CWA § 402(p) storm water permitting requirements included developing and implementing a storm water pollution prevention

---

[12]  Other than statutorily listed exceptions, none of which are applicable to Disney.

plan ("SWPPP,") to conduct specific monitoring and comply with annual reporting requirements.

For smaller municipalities and non-industrial discharges ("Phase II" dischargers), CWA § 402(p) established a limited, five-year moratorium on the issuance of NPDES permits until October 1, 1992. 33 U.S.C. § 1342(p)(1).[13] Once the moratorium expired, "all remaining, unpermitted storm water point sources…[were] required to obtain permits under section 402 of the Clean Water Act." 133 Cong. Rec. S 1280 (Jan. 14, 1987) (statement of Sen. Durenburger). The section 402(p) program thus reaffirmed the Clean Water Act's central prohibition on unpermitted point source discharges of pollutants.[14]

After the end of the 14-year moratorium, other than statutorily listed exceptions (none of which are applicable to Disney) all storm water discharges must be permitted under the NPDES program and must comply with all of the storm water regulations.

### 3. Disney Engages in Multiple "Industrial" Activities on the 45-Acre Commercial Site Which Require Permitting under CWA § 402(p)

There is no dispute that Congress requires any "discharger associated with industrial activity" to obtain a NPDES permit. 33 U.S.C. § 1342(p)(2)(B). The Ninth Circuit observes that "[t]he language 'discharges associated with industrial activity' is very broad." *Natural Resources Defense Council, Inc. v. EPA*, 966 F.2d 1292, 1304 (9th

---

[13] Just before that 1992 deadline, Congress extended the permitting moratorium for those smaller storm water dischargers by another 2 years, until October 1, 1994.

[14] In addition, the 1987 amendments ordered EPA to promulgate regulations by specific deadlines in order to facilitate the orderly issuance of the requisite NPDES permits. For example, with regard to industrial activities, Section 1342(p)(4) required EPA to promulgate regulations mandating that persons engaged in industrial activities that discharge storm water apply for a NPDES permit by not later than February 4, 1990. 33 U.S.C. § 1342(p)(4)(A). EPA or the State had to issue a permit for such industrial storm water discharges by not later than February 4, 1991. *Id*. A discharger's compliance with the permit's terms was to be achieved not later than February 4, 1994. *Id*.

Cir. 2008). "It is not necessary that storm water be contaminated or come into direct contact with pollutants: only *association with any type of industrial activity* is necessary." *Id*. (emphasis added). "If an activity is industrial in nature, EPA is not free to create exemptions for permitting requirements for such activity." *Id*. at 1306. *See also American Mining Congress,* 965 F.2d at 772 ["In the (1987 Water Quality Act), Congress provided a temporary (permitting) exemption for some sources of storm water discharge, but not for discharges associated with industrial activity," and that the "legislative history" does not suggest that Congress intended to limit administrative burdens "with respect to industrial dischargers").[15]

Disney engages in multiple "industrial" activities on its 45-acre commercial facility. These auxiliary operations produce toxic pollutants, copper and zinc, which must be controlled. "The definition of a 'facility' engaging in 'industrial activity' is very broad." *Northwest Envt'l Defense Ctr. v. Brown*, 640 F.3d at 1084. As discussed above, Disney's operations consist of transportation services, furniture production, set production, painting operations, hazardous waste storage, shipping of raw and finished materials, refuse storage and disposal. Disney is not a "Mom and Pop" operation. Its "automotive service facility" is a separate auxiliary unit. [Russell Decl. ¶5, 16].

The example provided below from the California Industrial Storm Water General Permit concerning auxiliary operations is directly on point regarding Disney's critical source designation:

---

[15] See also H.R. Rep. No. 99-189 at 62 (July 2, 1985) ("[we] believe that storm water associated with industrial areas must be regulated by permit…"); H.R. Conf. Rep. No. 1004 at 157 (Oct. 15, 1987) ("The permit requirements of the Clean Water Act respecting [industrial] stormwater discharges are not affected by this amendment"); 133 Cong. Rec. H. 991 (Jan 8, 1987) (Statement of Rep. Strangeland) ("[The 1987 amendments] do not provide a specific permit exemption for stormwater discharges associated with industrial activity").

The General Permit is intended to cover all facilities described in Attachment 1, whether the facility is primary or is auxiliary to the facility operator's function. For example, although a school district's primary function is education, a facility that it operates for vehicle maintenance of school buses is a transportation facility that is covered by this General Permit.

The definition of "storm water associated with industrial activity" is provided in Attachment 4, Definition 9, of this General Permit.[16] Facilities that discharge storm water associated with industrial activity requiring a General Permit are listed by category in 40 Code of Federal Regulations (CFR) Section 122.26(b)(14) (Federal Register, Volume 55 on Pages 48065-66) and in Attachment 1 of this General Permit. The facilities can be publicly or privately owned. General descriptions of these categories are . . .

8.      Transportation facilities that conduct any type of vehicle maintenance such as fueling, cleaning, repairing, etc.;

[(emphasis added) (Silver Decl. ¶11).

Disney's transportation services though auxiliary to the facility operations are significant sources of copper and zinc and must be regulated through the NPDES permit system including CWA §§ 301(a), 402(a) and the storm regulations promulgated under 402(p).[17]  [Russell Decl. ¶15, 20-22; Hagemann Decl. ¶11, 16].

---

[16]The definition of "storm water associated with industrial activity" is found at 40 C.F.R. § 122.26(b)(14).

[17]  Storm water and non-storm water NPDES permits derive from the same set of regulations. Thus Disney could file a NOI to be covered by the General Permit and incorporate its non-storm water discharges into its compliance protocols.

### C.   Plaintiffs McCall and Jackson Have Standing and Can Meet the Requirements of Article III

The "injury in fact" requirement in environmental cases is satisfied if an individual shows they have an aesthetic, financial, religious, moral or recreational interest in a particular place, animal or plant and that the interest is impaired by a defendant's conduct. See, e.g., *Friends of the Earth v. Laidlaw*, 528 U.S. 167, 120 S. Ct. 693, 705 (2000) ; *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 562-63 (1992); *Sierra Club v. Morton*, 405 U.S. 727, 734-35 (1972). Under *Laidlaw* an individual can establish "injury in fact" by showing a connection to the area of concern and that person's future life will be less enjoyable or that they have or will suffer an aesthetic, financial, religious, moral or recreational loss if the area in question remains or becomes environmentally degraded. *Sierra Club*, 405 U.S. 727 at 734. Factors of residential contiguity and frequency of use may be relevant to that determination, but are not required.  In fact a person who uses an area for recreational or other purposes does not have to show that he or she lives particularly nearby to establish an injury in fact due to possible or feared environmental degradation. *Ecological Rights Foundation v. Pacific Lumber Company*, 230 F. 3d 1141, 1147-1148 (9th Cir. 2000).  Although Plaintiffs Dennis Jackson and the McCalls live in close proximity to both the Site and the Los Angeles River, factors of residential contiguity and frequency of use though relevant to a standing determination, are not required.

Plaintiffs provide Declarations in conjunction with this Motion which satisfy the requirements for standing.  Eliminating or properly regulating Disney's pollution will prevent further contamination and metals loading of the Los Angeles River.  Compliance

with the terms and conditions of a NPDES permit will assist in redressing Plaintiffs'
recreational and conservational interests by reducing the flow of pollutants into the Los
Angeles River. [Jackson Decl. ¶8; Wm. McCall Decl. ¶8; R. McCall Decl. ¶8).

Evaluating the standing declarations submitted in this case in accord with current
case law, there is no doubt Plaintiffs have come forward with sufficient factual
averments to establish they have standing in this action.

## VIII.  CONCLUSION

Congress enacted the Clean Water Act to "restore and maintain the chemical,
physical, and biological integrity of the Nation's waters". The Los Angeles River is
Clean Water Act § 303(d) listed as impaired for zinc and copper.   Zinc and copper are
listed as toxic pollutants by the EPA.  From its 45 acre industrial/commercial Site,
Disney discharges zinc, copper and TOC to the Los Angeles River – a United States
water.   These discharges are not currently regulated under the NPDES permitting
structure.  If they were, Disney's excess discharges would be eliminated. The elimination
of these discharges will help "restore and maintain the chemical, physical, and biological
integrity of" the Los Angeles River, a National water.


Dated: May 10, 2012                    Respectively Submitted,

                                       LAW OFFICE OF JACK SILVER

                                       /s/ *Jack Silver*
                                       Jack Silver

KERSHAW CUTTER & RATINOFF, LLP

/s/ *John R. Parker*

Attorney for Plaintiffs
DENNIS JACKSON, WILLIAM MCCALL,
ROBIN MCCALL