1   Brooks Cutter, Esq. SB# 121407
    E-mail: bcutter@kcrlegal.com
2   John R. Parker, Jr., Esq., SB# 261771
    E-mail: jparker@kcrlegal.com
3   Kershaw Cutter & Ratinoff, LLP
    401 Watt Avenue
4   Sacramento, CA 95864
5   Tel. 916-448-9800
    Fax 916-669-4499
6

7   Jack Silver, Esq. SB# 160575
8   E-mail: lhm28843@sbcglobal.net
    Law Office of Jack Silver
9   Post Office Box 5469
    Santa Rosa, CA 95402-5469
10  Tel.  (707) 528-8175
11  Fax (707) 528-8675

12

13  Attorneys for Individual Plaintiffs
    DENNIS JACKSON, WILLIAM MCCALL,
14  ROBIN MCCALL

15              UNITED STATES DISTRICT COURT

16            CENTRAL DISTRICT OF CALIFORNIA

17  ENVIRONMENTAL WORLD        )   CASE NO. CV09-4045 DMG (PLAx)
    WATCH, INC., DENNIS JACKSON, )
18  ROBERT HILL, ROBIN MCCALL,  )   **INDIVIDUAL PLAINTIFFS'**
19  and WILLIAM MCCALL,         )   **MEMORANDUM OF POINTS AND**
                                )   **AUTHORITIES IN OPPOSITION**
20                              )   **TO DEFENDANTS' MOTION FOR**
21          Plaintiffs,         )   **SUMMARY JUDGMENT**
    v.                          )
22                              )
23  THE WALT DISNEY COMPANY,    )   Date:        October 5, 2012
    WALT DISNEY ENTERPRISES,    )   Time:        2:00 p.m.
24  INC., DISNEY WORLDWIDE      )   Courtroom:   7
    SERVICES, INC., and DOES 1-30, )  Judge:       Hon. Dolly M. Gee
25  Inclusive,                  )
26          Defendants.         )
27  _____ )

28

1

## TABLE OF CONTENTS

2  I.     INTRODUCTION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   1

3  II.    ISSUES TO BE DECIDED. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   1

4  III.   THE PARTIES ARE IN AGREEMENT AS TO MATERIAL FACTS. . . . .   2

5  IV.    ARGUMENT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   3

6          A.   Disney's Non-Stormwater Discharges Violate CWA § 301(a)
7               and Require a NPDES Permit . . . . . . . . . . . . . . . . . . . . . . . . . . .   4

8               1.   Disney Previously Argued and Lost Its Assertion That It
9                    Does Not Need A NPDES Permit. . . . . . . . . . . . . . . . . . . .   4

10              2.   NPDES Permits Only Apply to the Permittee – Disney
11                   Cannot Discharge Pollution Under Another's NPDES
12                   Permit. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   5

13              3.   Disney's Theory of Being "Effectively" Covered by the
14                   LA-MS4 NPDES Permit is Procedurally Defective and
                     Deprives Citizens of Their Rights. . . . . . . . . . . . . . . . . . .   8

15         B.   Disney's Discharges of Pollutants Are Illicit Discharges and
16              Not Excluded Under the Act. . . . . . . . . . . . . . . . . . . . . . . . . . .   10

17              1.   Disney's Non-stormwater Discharges Are "Illicit". . . . . . . . . .   10
18

19              2.   Exemptions to the CWA Are Express and Cannot Be Implied. .   11

20              3.   By Claiming Its Unaccounted for Loads Are Covered by
21                   the LA-MS4 NPDES  Permit, Disney Is Exempting Itself
22                   From the TMDL Process. . . . . . . . . . . . . . . . . . . . . . . . .   13

23         C.   No NPDES Permit Can Authorize a Discharger to Violate
24              Water Quality Standards. . . . . . . . . . . . . . . . . . . . . . . . . . . . .   13

25         D.   Disney's Discharges NOT "Composed Entirely of Stormwater"
26              Violate  CWA § 301(a). . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   15

27

28

E.    The General Permit Is Intended to Cover All Facilities Whether the Facility Is Primary or Auxiliary to the Facility Operator's Function. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

F.    Because EPA Does Not Have a Mandatory Duty to Issue NPDES Permits, Disney's Argument its Stormwater Discharges Are Exempt Is Irrational . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

G.    EPA Acknowledges Section 402(p)(6) Has No Effect on Section 301(a)'s Unpermitted Discharge Prohibition . . . . . . . . . . . . . . . . . . . 24

VIII.   CONCLUSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

TABLE OF AUTHORITIES

**CASES**

*Amigos Bravos v. EPA*
 324 F.3d 1166 (10th Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   22

*Andrus v. Glover Constr. Co.*
 446 U.S. 608  (1980). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12,23

*Arkansas v. Oklahoma*
 503 U.S. 91  (1992). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   10

*California Sportfishing Protection Alliance v California Ammonia Co.*
 2007 WL 273847, *7 (E.D. CA 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   8

*CARE v. Koopman*
 54 F. Supp. 2d 981 (E.D. WA 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   19

*CARE v Southview Farm*
 34 3d 114 (2nd Cir. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   18

*Committee to Save Mokelumne River v. East Bay Municipal Utility District*
 13 F.3d 305 (9th Cir. 1993). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

*Conservation Law Foundation v. Hannaford Bros. Co.*
 327 F. Supp. 2d 325  (D. Vt. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23, 24

*Dague v. Burlington*
 935 F.2d 1343 (2nd Cir. 1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

*Driscoll v. Adams*
 181 F.3d 1285 (11th Cir.1999). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   16

*Envtl. Def. Ctr., Inc. v. EPA*
 344 F.3d 832 (9th Cir.2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17, 22

*EPIC v. Pacific Lumber* Co.
 301 F. Supp 2d 1102 (N.D. CA  2004) . . . . . . . . . . . . . . . . . . . . . . . . . . 16,18, 19, 20

*Friends of Pinto Creek v. EPA*
 504 F 3d 1007 (9th Cir. 2007). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*Friends of Sakonnet v. Dutra*
  738 F. Supp. 623 (D.R.I. 1990). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

*Humboldt Baykeeper v. UPR*
  2008 WL 4614659 *2 (N.D. CA) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*Milwaukee v. Illinois*
  451 U.S. 304 (1981) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6, 7, 8

*N. Plains Res. Council v. Fid. Exploration & Dev. Co.*
  325 F.3d 1155 (9th Cir.2003). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*Natural Resources Defense Council, Inc. v. Costle*
  568 F.2d 1369 (D.C. Cir. 1977). . . . . . . . . . . . . . . . . . . . . . 2, 5, 14, 22, 25

*NCRW v. Healdsburg*
  496 F 3d 993 (9th Cir. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*NEDC v. Brown*
  640 F.3d 1063 (9th Cir. 2011) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 15, 18, 19

*NRDC v. County of Los Angeles*
  673 F.3d 880 (9th Cir. 2011) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10, 15, 17

*NRDC v. EPA*
  966 F 2d 1292 (9th Cir. 1992). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15, 18

*Piney Run Pres. Ass'n v. County Comm'rs*
  268 F.3d 255 (4th Cir. 2001). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5, 9

*Russian River Watershed Protection Comm. v. City of Santa Rosa*
  142 F.3d 1136 (9th Cir. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

*San Francisco Bay Keeper v. West Bay Sanitation District*
  791 F. Supp. 2d 719  (N.D. CA 2011). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 5

*Santa Monica Baykeeper v. Kramer Metals, Inc.*
  619 F. Supp. 2d 914 (C.D. CA 2011) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9, 13

*Serv. Oil v. United States EPA*
 590 F.3d 545 (8th Cir. 2009). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

*S. Fl. Water Mgmt. Dist. v. Miccosukee Tribe of Indians*
 541 U.S. 95 (2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

*TRW Inc. v. Andrews*
 534 U.S. 19 (2001). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*United States v. Akers*
 785 F.2d 814 (9th Cir. 1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*United States v. Earth Sciences, Inc.*
 599 F.2d 368 (10th Cir. 1979) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*United States v. Gratz*
 1993 U.S. Dist. LEXIS 629 (E.D. Pa. Jan. 26, 1993) . . . . . . . . . . . . . . . . . . . . . . . . 19

*United States v. Ortiz*
 427 F.3d 1278 (10th Cir. 2005). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

*United States v. Phillips*
 367 F.3d 846 (9th Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

*United States v. Velsicol Chem. Corp.*
 438 F. Supp. 945 (W.D. Tenn. 1976). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7


**FEDERAL STATUTES**

33 U.S.C. § 1251(a). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13, 15, 20
33 U.S.C. § 1251(e). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8
33 U.S.C. § 1311(a). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 5, 15, 25
33 U.S.C. § 1342. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15
33 U.S.C. § 1342(1). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12, 17
33 U.S.C. § 1342(2). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12,17
33 U.S.C. § 1342(a). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5, 6, 8, 22
33 U.S.C. § 1342(k). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15
33 U.S.C. § 1342(p). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 24

33 U.S.C. § 1362(14)........................................................... 19

33 U.S.C. § 1365................................................................... 8

## FEDERAL REGULATIONS

40 C.F.R. § 122.2.......................................................... 16, 17

40 C.F.R. § 122.26(b)(2)..................................................... 10

40 C.F.R. § 122.26(c)(1)(*iii*& *iv*)..................................... 17, 18

40 C.F.R. § 122.26(d)(1)(iv)(B)(1)........................................ 14

40 C.F.R. § 122.26(d)(2)(iv)(B)(1)................................... 10, 12

40 C.F.R. § 122.4............................................................... 13

40 C.F.R. § 131.................................................................... 9

40 C.F.R. § 401.15................................................................ 3

55 Fed. Reg. 40230.............................................................. 25

55 Fed. Reg. 40231.............................................................. 25

55 Fed. Reg. 47995....................................................... 10, 12

55 Fed. Reg. 47998................................................................ 7

55 Fed. Reg. 48036.............................................................. 11

55 Fed. Reg. 48037....................................................... 10, 12

## STATE STATUTES

Calif. Water Code § 13260....................................................... 9

# I.   INTRODUCTION

Plaintiffs DENNIS JACKSON, WILLIAM MCCALL AND ROBIN MCCALL ("Individual Plaintiffs") live in close proximity to the 51-acre production facility of Defendants THE WALT DISNEY COMPANY, WALT DISNEY ENTERPRISES, INC., DISNEY WORLDWIDE SERVICES, INC. ("Disney").[1]  For many reasons, including those being litigated here, Individual Plaintiffs do not consider Disney to be a very good neighbor.

Sometime in 2009, the Individual Plaintiffs became aware the Los Angeles River adjacent to their neighborhood was polluted with metals and the cause of the pollution was likely coming from the storm drains systems similar to those found on Disney's 51 acre site.

This case was originally filed to pursue causes of action under both the Resource Conservation Recovery Act ("RCRA") and the Clean Water Act ("CWA" or "Act"). From the onset, the Individual Plaintiffs have targeted one thing - Disney's illegal discharges.  The Individual Plaintiffs have sought to prevent further harm and remediate past damage.  For reasons not relevant to this motion the Individual Plaintiffs dismissed their RCRA claims.  The Individual Plaintiffs continue to live next to Disney, continue to live next to the Los Angeles River and continue to want Disney to be a good neighbor and cease discharging pollutants to the River.[2]

# II.   ISSUES TO BE DECIDED

In its Opening Brief, the Individual Plaintiffs identified the issues to be decided:

A.   Is Disney violating CWA § 301(a), 33 U.S.C. § 1311(a), for discharging pollutants from a point source (its stormwater system) to a water of the United States (the Los Angeles River) without a NPDES permit?

---

[1] In their opening Brief, Individual Plaintiffs identified the Disney campus consisting of 45 acres. Individual Plaintiffs accept Disney's assertion the campus consists of 51 acres.

[2] None of the remaining claims in the operative Complaint involve discharges to Polliwog Park or discharges of hexavalent chromium. The remaining CWA claims only involve the discharge of copper, total organic carbon (TOC) and zinc from Disney's stormwater pipes to the Los Angeles River.

B.     Is Disney violating CWA § 402(p), 33 U.S.C. § 1342(p), for discharging stormwater to the Los Angeles River without being in compliance with all the applicable provisions of § 402(p)?

## III.   THE PARTIES ARE IN AGREEMENT AS TO MATERIAL FACTS

A.     The material facts in this case are not in dispute. [Defs' opening Brief pg. 2, ln. 9 (DOC. 189 pg.9)].

B.     Disney discharges stormwater and non-stormwater to the Los Angeles River from its stormwater system. [Defs' opening Brief pg. 6, lns. 20-21, pg. 7, ln. 1 (DOC. 189 pg.13-14)].

C.     Disney's stormwater and non-stormwater discharges contain zinc and copper. [Defs' opening Brief pg. 23, lns. 13-15 & fn. 26 (DOC. 189 pg. 30)].

D.     The zinc and copper in Disney's stormwater and non-stormwater discharges come from on-site activities.[3] [Defs' opening Brief pg. 23, fn. 26 (DOC. 189 pg. 30)].

E.     The Los Angeles River, which is directly adjacent to Highway 134, is a "stone's throw" from Disney's discharge point. [Defs' opening Brief pg. 23, ln. 17 (DOC. 189 pg. 30)].

F.     The Site contains auxiliary facilities "that conduct any type of vehicle maintenance such as fueling, cleaning, repairing." [Defs' opening Brief pg. 2, lns. 18-19 (DOC. 189 pg.9)].

G.     Disney has not obtained a NPDES permit to cover its discharges of a pollutant from its stormwater system to the Los Angeles River [Defs' opening Brief pg. 7, lns. 3-4 (DOC. 189 pg. 14)].[4]

---

[3] There does not appear to be any dispute Disney's discharges also contain TOC as can be seen from the joint on-site testing. see Individual Plaintiffs' Opening Brief, DOC 186, Hagemann Decl. ¶¶ 10, 12 and 14.

[4] Disney's "administrative burden" argument has consistently been rejected by the courts. *See Natural Resources Defense Council, Inc. v. Costle*, 568 F.2d 1369, 1375-76 (D.C. Cir. 1977). [Regardless of the administrative burden, EPA does not have the authority to categorically exempt any discharge of a pollutant from a point source to a water of the U.S.]

H.    After detecting exceedences above the California Toxics Rule ("CTR") limits at Disney's storm drain and downstream of Disney's storm drain, the Regional Water Quality Control Board-LA Region ("RWQCB-LA") forwarded a copy of its inspection results to the City of Burbank for follow-up, but no action was taken by the RWQCB-LA or the City of Burbank to abate these discharges. [Defs' opening Brief pg. 21, fn. 23 (DOC. 189 pg. 28)].

I.    The prohibitions and conditions in the Los Angeles Municipal Stormwater Permit ("LA MS4") only obligate the permitees to regulate the discharges in accordance with the CWA.  [Defs' opening Brief pg. 4, lns. 1-16 (DOC. 189 pg. 11)].

# IV.    ARGUMENT

In their Opening Brief, the Individual Plaintiffs identified three types of discharges which violate the CWA's requirement that such discharges be permitted under the NPDES permit program: non-stormwater, discharges not entirely composed of stormwater, and stormwater discharges associated with on-site commercial and industrial activity.

The parties agree Disney is discharging a pollutant[5] from a point source[6] to a water of the United States[7].

The parties disagree as to:

1.  "Whether the permit for the (LA) MS4 owned and operated by local municipalities applies to Defendant's discharges into the MS4".[8]

---

[5] Zinc and copper are listed as toxic pollutants. See 40 C.F.R. § 401.15.

[6] *NEDC v. Brown*, 640 F.3d 1063, 1071 (9th Cir. 2011). "Storm sewers are established point sources subject to NPDES permitting requirements . . ."

[7] In 2010, the EPA made a formal finding that the "Los Angeles River is a 'Traditional Navigable Water' from its origins at the confluence of Arroyo Calabasas and Bell Creek to San Pedro Bay at the Pacific Ocean, a distance of approximately 51 miles." [Silver Decl. DOC 187 ¶9, Exh. 7].

[8] See *San Francisco Bay Keeper v. West Bay Sanitation District*, 791 F. Supp. 2d 719, 770 (N.D. CA 2011).

2.  Whether stormwater discharges that contain pollutants added by Disney due to site operations are "discharges composed entirely of stormwater."[9]

3.  Whether Disney's auxiliary facilities require NPDES permitting as an industrial discharger with a "discharge associated with industrial activity."[10]

**A.   Disney's Non-Stormwater Discharges Violate CWA § 301(a) and Require a NPDES Permit**

1.  <u>Disney Previously Argued and Lost Its Assertion That It Does Not Need A NPDES Permit</u>

On September 3, 2009, Disney filed a Fed. R. Civ. P. 12(b) motion to dismiss which was denied in its entirety.  Disney contended it did not need a NPDES permit "because the operative municipal stormwater and urban runoff permit – the Los Angeles County MS4 Permit (which includes the City of Burbank) – grants Burbank 'adequate legal authority' to 'prohibit non-stormwater discharges to the storm drain system . . .'" [DOC 37 pg. 11-12, Order Denying Defendants' Motion to Dismiss].

In denying Disney's motion Judge Pregerson stated:

> Disney offers no support for its contention that Burbank's legal authority to prohibit non-stormwater discharges, under the terms of the MS4 Permit, forecloses Plaintiffs' claim under the CWA.  Further, the MS4 permit states that "[u]nauthorized non-stormwater discharges (even when commingled with stormwater) shall be eliminated or covered by a separate NPDES permit."  [DOC 37 pg. 11-12][11]

In its opening brief Disney has put forth the same argument and again offers no authority to support its contention.

---

[9] See CWA § 402(p) -"Prior to October 1, 1994, the Administrator or the State (in the case of a permit program approved under section 402 of this Act [this section]) shall not require a permit under this section for discharges composed entirely of stormwater."

[10] Individual Plaintiffs also contend all stormwater discharges after October 1, 2004 require permitting due to expiration of the moratorium [CWA § 402(p)].

[11] Disney should be precluded from re-litigating issues already decided in this case. *See United States v. Phillips,* 367 F.3d 846, 856 (9th Cir. 2003) (stating, "[t]he law of the case doctrine precludes a court from reconsidering an issue that it has already resolved."), *cert. denied,* 543 U.S. 980 (2004).

2. <u>NPDES Permits Only Apply to the Permittee - Disney Cannot Discharge Pollution Under Another's NPDES Permit</u>

After discussing the LA-MS4[12] NPDES permit, to which it is not a permitee or a named discharger, and its non-NPDES permit from the City of Burbank, Disney concludes without citing any case authority, that it does not need a NPDES permit.

Absent certain exclusions not applicable to Disney, the CWA categorically prohibits any discharge of pollutants from identifiable "point sources" to waters of the United States *absent the discharger being a permitee under a NPDES permit.  See Piney Run Pres. Ass'n v. County Comm'rs*, 268 F.3d 255, 265-66 (4th Cir. 2001) (Only the permit holder can legally discharge pollutants.); *Russian River Watershed Protection Comm. v. City of Santa Rosa*, 142 F.3d 1136, 1138 (9th Cir. 1998). To comply with the CWA, it is necessary not only to apply for, but also to have a permit. *Committee to Save Mokelumne River v. East Bay Municipal Utility District*, 13 F.3d 305, 309 (9th Cir. 1993); 33 U.S.C. §§ 1311(a), 1342(a).  Having a NPDES permit is the only means by which a discharger of pollutants may escape the total prohibition of discharge from point sources established by the CWA. *Natural Resources Defense Council, Inc. v. Costle*, 568 F.2d 1369, 1374 (D.C. Cir. 1977).

Basing its interpretation solely on the language of section 402(a), Disney maintains, "CWA Section 301(a) and 402 do not require dischargers to obtain permits." [Defs' Opening Brief pg. 7-8, lns. 23, 1 (DOC 189, pg. 14-15)].  In a recent district court case in the Northern District of California, the court framed the question as, "Whether the permit for the MS4 owned and operated by local municipalities applies to Defendant's discharges into the MS4?" *See San Francisco Bay Keeper v. West Bay Sanitation District*, 791 F. Supp. 2d 719, 770 (N.D. CA May 2011).[13] After supplemental briefing on the issue, Judge Chen held: "Plaintiff's position is the correct one—that a permit covers only permittees." Id. at 772.

---

[12] 84 public entities are part of the LA-MS4 NPDES permit including the City of Burbank.  This permit has also been referred to as the Burbank MS4 NPDES permit in Plaintiffs Opening Brief.

[13] This case was not cited by Disney in its Opening Brief.

The Court acknowledges that Defendant's argument is not necessarily foreclosed by the literal language of the CWA. The relevant provision of the Act does not explicitly state that a permit covers only the permit holder and not other dischargers. *See* 33 U.S.C. § 1342(a) (noting that "the Administrator may, after opportunity for public hearing, issue a permit for the discharge of any pollutant" upon certain conditions). But Defendant's position ultimately fails for several reasons.

First, as Plaintiff argues, the Ninth Circuit's recent decision in *NRDC* indicates that a NPDES permit should be interpreted like a contract. *See id.* at 1245 (stating that "[w]e review a permit's provisions and meaning as we would any contract or legal document"). Defendant is not a party to the MS4 permit. Nor is there anything to establish that Defendant is an intended third-party beneficiary of the permit. Accordingly, Defendant's attempt to claim the benefit of the NPDES permit is problematic.

Second, there is no authority to support Defendant's position. Indeed, the case law strongly suggests that Plaintiff's position is the correct one—that a permit covers only permittees. "The legislative history makes clear that Congress intended the NPDES permit to be the only means by which a *discharger* from a point source may escape the total prohibition of [§ ] 301(a)." *Id.* at 265 (emphasis added). Permits are thus specific to the discharger.

Third, there are sound policy reasons why a permit holder only, and not other dischargers, should be allowed to claim the benefit of the permit. When a discharger becomes a permit holder, it "directly subjects [itself] to the administrative apparatus established by Congress to achieve its goals." *Milwaukee v. Illinois, supra,* 451 U.S. at 318, 101 S. Ct. 1784. The permit holder is permitted to discharge some pollutants because of the permit—the benefit—but then is obligated to assume corresponding burdens as a result, including, but not limited to, monitoring and reporting obligations. *See NRDC,* 636 F.3d at 1239 (noting that a "NPDES permit requires its holder—the 'permittee'—to follow the requirements of numerous [CWA] provisions, which include effluent limitations, water quality standards, water monitoring obligations, public reporting mechanisms, and certain discharge requirements"). As the Supreme Court noted in *Milwaukee, supra,* the permit is the means by which regulators exercise detailed control over the discharger; the permit typically addresses the specific context and situation of the permit holder/discharger. 451 U.S. at 320–23 and n. 15, 101 S. Ct. 1784. Defendant's position that a non-permittee can assume the benefit and protection of a permit is incompatible with the CWA's *quid pro*

*quo* scheme; under Defendant's position, a discharger would be allowed to pollute and obtain the benefit of a permit without assuming the obligations and responsibilities of that permit. [*id.* 772-773]

The EPA also interprets the CWA to require Disney to have a separate NPDES permit for its discharges to the Los Angeles River even if these discharges first pass through the LA-MS4.  In responding to comments it lacks the authority to require or issue NPDES permits for discharges that pass through a ms4, the EPA responded:

> The CWA prohibits the discharge of a pollutant except pursuant to an NPDES permit. Section 502(12)(A) of the CWA defines the "discharge of a pollutant" as "any addition of any pollutant to navigable waters from any point source." [FN1] There is no qualification in the statutory language regarding the source of the pollutants being discharged. Thus, pollutants from a remote location which are discharged through a point source conveyance controlled by a different entity (such as a municipal storm sewer [i.e. ms4]) are nonetheless discharges for which a permit is required. [55 FR 47998]

*See also Serv. Oil v. United States EPA*, 590 F.3d 545, 547 (8th Cir. 2009) (discharge through municipal storm sewer subject to liability); *United States v. Ortiz*, 427 F.3d 1278, 1284 (10th Cir. 2005) (polluter violated CWA by discharging pollutants into navigable water via municipal storm sewer); *Dague v. Burlington*, 935 F.2d 1343, 1355 (2nd Cir. 1991) (discharging pollutants to navigable water via culvert owned by third party violated the CWA), *rev'd on other grounds,* 505 U.S. 557 (1992); *Friends of Sakonnet v. Dutra*, 738 F. Supp. 623, 629 (D.R.I. 1990) (violation of CWA to discharge raw sewage into river via pipe owned by third-party); *United States v. Velsicol Chem. Corp.*, 438 F. Supp. 945, 947 (W.D. Tenn. 1976) ("Defendant knows or should have known that the city sewers lead directly into the Mississippi River and this is sufficient to satisfy the requirements of discharging into [a] 'water of the United States.'").

//

3. <u>Disney's Theory of Being "Effectively" Covered by the LA-MS4 NPDES Permit is Procedurally Defective and Deprives Citizens of Their Rights</u>[14]

Disney's argument it is "effectively" covered by the LA-MS4 NPDES permit and insulated from liability is contrary to the comprehensive and thorough process for obtaining permits under the CWA and its regulations. *See Milwaukee v. Illinois* 451 U.S. 304 (1981) at 318. NPDES permits can only be issued ". . . after opportunity for public hearing. . ."[CWA § 402(a), 33 U.S.C. § 1342(a)].  A review of the public record for the current and even the proposed LA-MS4 NPDES permit reveals no mention of the discharges to the Los Angeles River by Disney. *See California Sportfishing Protection Alliance v. California Ammonia Co.,* 2007 WL 273847, *7 (E.D. CA 2007) (Defendant does not point to any place in the Port's NPDES permit stating that it covers defendant's activities). The public document related to the MS4 NPDES permit application describes discharges to the Los Angeles River, but nowhere in the public record is it disclosed Disney is discharging to the Los Angeles River or what Disney is discharging, thus depriving the Individual Plaintiffs of their right to comment on and/or oppose the permit.[15]  Unless the facts are made public, citizens such as the Individual Plaintiffs cannot be fully informed and are deprived of their First Amendment right to petition the government.

NPDES permits can only be issued, "upon condition that such discharge will meet . . . all applicable requirements under sections 301, 302, 306, 307, 308, and 403 of this Act [33 U.S.C. §§ 1311, 1312, 1316, 1317, 1318, 1343]. ."  [CWA § 402(a), 33 U.S.C.

---

[14] Disney confuses concurrent jurisdiction with exclusive jurisdiction. Congress set forth numerous means by which the CWA could be enforced: criminally, civilly and administratively by EPA, the State and local authorities and  civilly by citizens. *See* CWA §§ 101 and 505, 33 U.S.C. §§ 1251and 1365.

[15] *See also* CWA § 101(e), 33 U.S.C. § 1251(e) which states: "Public participation in the development, revision, and enforcement of any regulation, standard, effluent limitation, plan, or program established by the Administrator or any State under this chapter shall be provided for, encouraged, and assisted by the Administrator and the States. The Administrator, in cooperation with the States, shall develop and publish regulations specifying minimum guidelines for public participation in such processes."

§ 1342(a)].  Permit applicants are required to provide documentary evidence in the form of a Report of Waste Discharge[16] (ROWD) including a Reasonable Potential Analysis[17] (RPA)[18] to show the discharge will meet applicable water quality standards.  [See California Water Code § 13260.].   Disney has not met any of these procedural requirements nor can make that showing.  Testing results from RWQCB-LA, Individual Plaintiffs and Disney, prove Disney is violating water quality standards including the CTR [40 C.F.R. part 131], the Los Angeles River Metals TMDL[19] or has a reasonable potential to do so. [Individual Plaintiffs' Opening Brief, DOC 186, Hagemann Decl. ¶¶ 10,12,13].   *See Santa Monica Baykeeper v. Kramer Metals, Inc*., 619 F. Supp. 2d 914, 926 (C.D. CA 2011) (finding the CTR is a water quality standard that applies to all jurisdictional waters.), see also *Piney Run Pres. Ass'n*, 268 F.3d at 265-66. ["Before issuing a permit the permitting authority must, with reference to what is technologically feasible, incorporate 'discharge limitations necessary to satisfy [the state water quality] standard.' *Id.* at 350 (citing § 301 of the CWA)."]

The LA-MS4 Permit Discharge Prohibition Part 1(A)(2)(c) only exempts the permittees from having to prohibit certain non-stormwater discharges.[20] It does not, nor

---

[16] A ROWD requires the applicant to provide such information as the identity of the applicant, locations of facility, facility owner and operator, complete characterization of the discharge and location of the discharge. Applicants must show also compliance with CEQA. [See Decl. of Jack Silver in Support of Individual Plaintiffs' Opposition to Defendants' Motion For Summary Judgment ("Silver Oppos. Decl.") ¶3, Exh. 1 - ROWD Application].

[17] Permit applicants must perform a RPA to determine which pollutants in the discharge have a reasonable potential to violate water quality standards. Limits must be included in the permit for those pollutants that do have such potential. See 40 C.F.R. 122.44(d)(1)(i)].

[18] Public Notice - the ROWD and RPA are made public so citizens can be fully informed and have an opportunity to make comment before a NPDES permit is issued. This information is critical as a citizen is limited to the public record if it seeks to petition the State Water Board and formally oppose the issuance of that permit.

[19] For a discussion of TMDL's see Individual Plaintiffs' Opening Brief, DOC 186, Hagemann Decl. ¶¶ 5 and 6.

[20] NPDES Permit No. CAS004001 Waste Discharge Requirements For Municipal Stormwater and Urban Runoff Discharges Within the County of Los Angeles, and the Incorporated Cities [Defs' Opening Brief - Exh. 7, pg. 371, DOC 195-3 pg. 49].

can it, relieve a non-permittee from the CWA's liability for discharging pollutants from a point source to a jurisdictional water without a NPDES permit. Such a reading is inconsistent with the plain language of the statute and implementing regulations as well as Ninth Circuit and Supreme Court precedence. *See S. Fl. Water Mgmt. Dist. v. Miccosukee Tribe of Indians,* 541 U.S. 95 (2005) at 102; *Arkansas v. Oklahoma,* 503 U.S. 91, 101–02 (1992) (describing NPDES permitting system); *NRDC v. County of LA*, 673 F.3d 880, 885 (9th Cir. 2011) (A NPDES permit requires its holder — the "permittee"—to follow the requirements of numerous Clean Water Act provisions . . .).

**B.    Disney's Discharges of Pollutants Are Illicit and Not Excluded Under the Act**

    1.    Disney's Non-Stormwater Discharges Are "Illicit"

Disney claims its non-stormwater discharges are not "illicit" and that the EPA has exempted these non-stormwater discharges from the CWA's permitting requirements, citing 40 C.F.R. § 122.26(d)(2)(iv)(B)(1) and 55 FR 47995; 48037.  A reading of the regulations and EPA's Final Rule clarifies Disney's non-stormwater discharges meet the definition of "illicit".

According to EPA:

> Today's rule defines the term "illicit discharge" to describe *any discharge* through a municipal separate storm sewer that is not composed entirely of stormwater and that is not covered by an [individual separate] NPDES permit. Such illicit discharges are not authorized under the CWA.[21] Ultimately, such non-stormwater discharges through a municipal separate storm sewer must either be removed from the system or become subject to an NPDES permit (*other than the permit for the discharge from the municipal separate storm sewer*). [Emphasis added] [55 FR 47995].

---

[21] *See also* 40 C.F.R. § 122.26(b)(2) - 'Illicit discharge' means any discharge to a municipal separate storm sewer that is not composed entirely of stormwater except discharges pursuant to a NPDES permit (other than the NPDES permit for discharges from the municipal separate storm sewer) and discharges resulting from fire fighting activities.

2.      Exemptions to the CWA Are Express and Cannot Be Implied

The EPA does not interpret section 405 of the Water Quality Act of 1987 to exclude the types of discharges complained of by the Individual Plaintiffs. Disney conflates on the one hand, the ms4 permit holder's duty under its NPDES permit to effectively prohibit non-stormwater discharges to its ms4, with on the other, Disney's obligation under the CWA not to discharge a pollutant from a point source to a water of the U.S. without "an NPDES permit (*other than the permit for the discharge from the municipal separate storm sewer*)." *ibid.*

According to EPA:

Section 402(p)(3)(B)(ii) of the amended CWA requires that permits for discharges from municipal storm sewers shall include a requirement to effectively prohibit non-stormwater discharges into the storm sewers. Based on the legislative history of section 405 of the WQA [Water Quality Act of 1987], EPA does not interpret the effective prohibition on non-stormwater discharges to municipal separate storm sewers to apply to discharges that are not composed entirely of stormwater, as long as such discharger has been issued a separate NPDES permit. Rather, an "effective prohibition" would require separate NPDES permits for non-stormwater discharges to municipal storm sewers [ms4].

In many cases in the past, applicants for NPDES permits for process waste waters and other non-stormwater discharges have been granted approval to discharge into municipal separate storm sewers, provided that the permit conditions for the discharge are met at the point where the discharge enters into the separate storm sewer.  Permits for such discharges must meet applicable technology-based and water-quality based requirements of Sections 402 and 301 of the CWA. [55 FR 48036-37].

Disney's non-stormwater discharges, including landscape irrigation and hydrant flushing, do not meet CTR limits. Despite this, Disney claims these non-stormwater discharges are exempt from the CWA's prohibitions against polluted point sources

discharges – "the CWA, however, authorizes these discharges."[22] Defs' opening Brief pg.7 , lns. 2-3 (DOC. 189, pg. 14).  To support its contention Disney cites 40 C.F.R. § 122.26(d)(2)(iv)(B)(1). This section of the federal regulations is under **(d)** *Application requirements for large and medium municipal separate storm sewer discharges*, **(2)** *Part 2. Part 2 of the application shall consist of:* ,**(iv)** *Proposed management program.*, **(B)(1)** *A description of a program, including* . . . and describes what a municipal applicant for a NPDES permit must include in its management program.  There is no implied, let alone express, exception for the discharges complained of by the Individual Plaintiffs.  It should be further noted the list of non-stormwater discharges enumerated does not include Disney's hydrant flushing, which was noted by the RWQCB-LA in one of its inspections of the Disney Burbank site.

Exceptions to the CWA are specifically enumerated in the statute itself. [For example, see CWA §§ 402(l) and (2), 33 U.S.C. §§ 1342(l) and (2)].  Exceptions must be express and cannot be implied. *See TRW Inc. v. Andrews*, 534 U.S. 19, 28 (2001)["Where Congress explicitly enumerates certain exceptions to a general prohibition, additional exceptions are not to be implied, in the absence of evidence of a contrary legislative intent." quoting *Andrus v. Glover Constr. Co.*, 446 U.S. 608, 616–617 (1980).] No court has ever found an implied exception to the CWA.

Any claims of exemptions from the permitting requirements of the CWA's broad pollution prevention mandate are narrowly construed to achieve the purposes of the Act. *See NCRW v. Healdsburg* 496 F 3d 993, 1001 (9th Cir. 2007) citing *United States v. Akers,* 785 F.2d 814, 819 (9th Cir. 1986).  Furthermore, Disney has the burden to prove an exception applies. *ibid*. Given its admitted CTR exceedences, it cannot meet that

---

[22] For authority these polluted non-stormwater discharges are exempt or authorized, Disney cites 55 FR 47995; 48037, discussed previously, and 40 C.F.R. § 122.26(d)(2)(iv)(B)(1) which cannot possibly be read to exempt its non-stormwater discharges under the CWA.

burden.

3.    By Claiming Its Unaccounted for Loads Are Covered by the LA-MS4 NPDES Permit, Disney Is Exempting Itself From the TMDL Process

Disney does not currently operate under a NPDES permit.  The Los Angeles River is CWA § 303(d) listed as impaired for zinc and copper.  Disney's discharges and loading have not been assessed.  Therefore, when Disney applies for a permit it will be considered a new source and a new discharger proposing to discharge into a water which does not meet applicable water quality standards. See *Friends of Pinto Creek v. EPA*, 504 F 3d 1007 (9th Cir. 2007),

> The plain language of the first sentence of the regulation is very clear that no permit may be issued to a new discharger if the discharge will contribute to the violation of water quality standards. This corresponds to the stated objectives of the Clean Water Act "to restore and maintain the chemical, physical, and biological integrity of the nation's waters." 33 U.S.C. § 1251(a) (1987). And that "it is the national policy that the discharge of toxic pollutants in toxic amounts be prohibited." [*id.* at 1012].

 See also 40 C.F.R. § 122.4.

A TMDL plan is designed to bring the waters into compliance with applicable water quality standards.  Because the Los Angeles River is CWA § 303(d) listed for metals, in addition to meeting CTR limits, each new discharger's loading must be assessed. Disney's loads have not even been evaluated let alone excluded.

**C.    No NPDES Permit Can Authorize a Discharger to Violate Water Quality Standards**

As discussed, the MS4 NPDES permit is not intended to and does not authorize discharges that exceed water quality standards. The MS4 NPDES permit itself contains no language that permits discharges in excess of CTR limitations. [*Santa Monica Baykeeper v. Kramer Metals*, 619 F. Supp. 2d 914, 926]. Disney's expert Mr. Smalstig misreads the federal regulations claiming, "The federal stormwater regulations *conditionally* authorize the discharge of certain, *generally innocuous*, non-stormwater

flows, including air conditioning condensation, irrigation water, and lawn watering. 40 C.F.R. § 122.26(d)(1)(iv)(B)(l)." [Decl. Smalstig in Support of Disney's Motion for Summary Judgment pg. 7 ¶13, DOC. 197, pg. 8].

As discussed, the conditional exemption only applies to the permittee's duties to effectively prohibit such discharges. Even here, Disney cannot meet the conditional requirement since its discharges contain copper, TOC, and zinc that have a reasonable potential of causing an exceedence of water quality values. Disney's discharges cannot be considered "generally innocuous" when they exceed CTR toxic metal limits even if the receiving water was not CWA § 303(d) listed for these toxic metals.  According to the RWQCB-LA:

> As required by section 402(p) of the Clean Water Act, Part 1 requires *permittees* to "effectively prohibit non-stormwater discharges into the MS4 and watercourses, except where such discharges" are covered by a separate MS4 permit or fall within one of thirteen categories of flows that are *conditionally exempted* from the discharge prohibition. These exempted flows fall under the general categories of natural flows, firefighting flows, and flows incidental to urban activities (i.e. landscape irrigation, sidewalk rinsing). These non-stormwater flows may be exempted *so long as (i) they are not a source of pollutants, (ii) their effective prohibition is not necessary to comply with TMDL provisions, and (iii) they do not violate antidegradation policies.*" [Emphasis added] [See Silver Oppos. Decl. ¶4, Exh. 2 - Jan. 20, 2012 Memo from RWQCB-LA EO re MS4].

Even between Disney and the City of Burbank, Disney's non-stormwater discharges are not exempt, because Disney's discharges are the sources of pollutants and cannot meet the conditions required.

It is established law that the EPA, let alone the City of Burbank, does not have the power to exempt discharges of pollutants from a point source to jurisdictional waters without a NPDES permit. *Costle,* 568 F.2d at 1372. As discussed, the MS4 NPDES Permit only applies to the permittees. The permittees may be relieved from liability for

certain discharges to their MS4, but Disney cannot gain the benefit of the permit defense when it is not the permittee.[23]

**D.    Disney's Discharges NOT "Composed Entirely of Stormwater" Violate CWA § 301(a)**

Dischargers of a pollutant from a point source to a water of the U.S. not "composed entirely of stormwater" are required to obtain a NPDES permit. In 1972 Congress enacted the CWA to "restore and maintain the chemical, physical, and biological integrity of the Nation's waters". CWA § 101(a), 33 U.S.C. § 1251(a). CWA § 301(a), 33 U.S.C. § 1311(a) provides that, subject to certain exceptions (none of which apply to Disney), "the discharge of *any* pollutant by *any* person shall be unlawful." [Emphasis added]. One of these exceptions is if the discharger is a permittee under a NPDES permit authorized by CWA § 402, 33 U.S.C. § 1342. *NEDC v. Brown*, 640 F 3d at 1070 ["The combined effect of §§ 301(a) and 402 is that 'the CWA prohibits the discharge of any pollutant from a point source into navigable waters of the United States without an NPDES permit.' *N. Plains Res. Council v. Fid. Exploration & Dev. Co.,* 325 F.3d 1155, 1160 (9th Cir.2003)"].

In 1987 Congress amended the CWA to add section 402(p) in an attempt to further regulate stormwater discharges. Citing *NRDC v. EPA*, 966 F 2d 1292, 1296 (9th Cir. 1992) the Ninth Circuit recently affirmed its opinion that the "principal effect of the 1987 amendments was to *expand* the coverage of Section 402's permitting requirements." [Emphasis added]. [See *NRDC v. County of Los Angeles,* 673 F.3d 880, 893 (9th Cir. 2011)]. CWA § 402(p) did not replace CWA § 301(a) prohibitions or the requirement to acquire a NPDES permit under 402(a) and (b). It does not matter whether or not the

---

[23]    *See* 33 U.S.C. § 1342(k). The public has an opportunity to comment and challenge the issuance of a NPDES permit. As such under the permit defense or permit shield, compliance with the terms of the NPDES permit is deemed compliance with the CWA.

pollutants are mixed with rainwater[24]; the "amended CWA *absolutely* prohibits the discharge of *any pollutant* by any person, *unless* the discharge is made *according to the terms of an NPDES permit.*" *Driscoll v. Adams,* 181 F.3d 1285, 1289 (11th Cir.1999) (third emphasis in original); *see also EPIC v. Pacific Lumber Co.*, 301 F. Supp. 2d 1102 (N.D. CA  2004),

> Neither section 402(p) nor the rest of the 1987 amendments to the CWA alter this driving CWA principle or this core statutory mission. . . section 402(p) does not, as PALCO implies, apply to all pollution sources in the first instance. As the language of the CWA and Ninth Circuit caselaw make clear, section 402(p) is not the only CWA section imposing duties and obligations on pollution dischargers; both section 301(a) and 402(a), for example, posit pollution-related mandates on putative polluters, including that these polluters obtain NPDES permits for 'point source' pollutant discharges. [*id.* at 1113].

A NPDES permit under CWA §§ 402(a) and (b) is issued for point source discharges, i.e. "any discernible, confined, and discrete conveyance . . ." 40 C.F.R. § 122.2.  A stormwater permit requires the discharger to control *all* stormwater discharges from the site whether or not those discharges are sheet flow or are collected and channeled through pipes and other conveyances.  An industrial facility without any system for collecting and channelizing pollutants still needs to be covered for stormwater discharges under CWA § 402(p). [Silver Decl. DOC 187, ¶11- Exh. 8 - General Permit pg. 14, 28 describing site map to include entire site and drainage areas and sampling of drainage including sheet flow].

According to the EPA:

> Stormwater runoff is generated when precipitation from rain and snow melt events flows over land or impervious surfaces and does not percolate into the ground. *As the [stormwater] runoff flows over the land or impervious*

---

[24] *See also* Judge's Pregerson's prior decision in this case, "[u]nauthorized non-stormwater discharges (even when commingled with stormwater) shall be eliminated or covered by a separate NPDES permit." [DOC 37 pg. 11-12]

*surfaces (paved streets, parking lots, and building rooftops), it accumulates* debris,  chemicals, sediment or other pollutants that could adversely affect water quality if the runoff is discharged untreated. [Emphasis added] [http://cfpub.epa.gov/npdes/home.cfm?program_id=6].

See *also NRDC v. County of Los Angeles*, 673 F 3d 880, 884  (9th Cir. 2011) "Stormwater runoff is surface water generated by precipitation events, such as rainstorms, which flows over streets, parking lots, commercial sites, and other developed parcels of land. . . . *When stormwater flows over urban environs, it collects* 'suspended metals, sediments, algae-promoting nutrients (nitrogen and phosphorus), floatable trash, used motor oil, raw sewage, pesticides, and other toxic contaminants.' *Envtl. Def. Ctr., Inc. v. EPA,* 344 F.3d 832, 840 (9th Cir. 2003)."  [Emphasis added]

CWA  §  402(p)  conditionally  exempts  discharges  composed "entirely of stormwater."  As discussed herein both the EPA and Ninth Circuit define "entirely stormwater" (including "stormwater runoff") as runoff prior to it collecting pollutants generated from on site activities. The definition of "discharge" includes polluted stormwater.  See 40 C.F.R. § 122.2:

Discharge of a pollutant means . . . *Any addition of any* "pollutant" or combination of pollutants to "waters of the United States" from any "point source," . . . This definition includes additions of pollutants into waters of the United States from: *surface runoff* which is collected or channeled by man; *discharges through pipes, sewers, or other conveyances owned by a State, municipality*, or other person which do not lead to a treatment works; and discharges through pipes, sewers, or other conveyances, leading into privately owned treatment works. [Emphasis added]

In its 1987 amendments to the CWA, Congress excluded certain discharges from mining operations, oil and gas exploration, and agriculture, *provided those discharges were composed entirely of stormwater*. CWA §§ 402(l) and (2), 33 U.S.C. §§ 1342(l) and (2).  To qualify for the exemption, the runoff flows must not be contaminated by contact with  any  pollutants  generated  from  the  on-site  activities.  40  C.F.R.  §

122.26(c)(1)(*iii&iv*). *See also NRDC v. EPA*, 526 F.3d 591, 607 (9th Cir. 2008) in which the Ninth Circuit invalidated a regulation exempting from NPDES permit requirements discharges of polluted stormwater runoff contaminated with sediment generated from on-site activities.

In *EPIC v. Pacific Lumber Co.*, 301 F. Supp. 2d 1102, 1113 (N.D. CA 2004) Judge Patel concluded that the § 402(p) exemption did not apply because the discharges alleged were not composed entirely of stormwater. *See also NEDC v. Brown*, 640 F. 3d at 1070-71,(9th Cir. 2011)  (holding that because the polluted stormwater reached jurisdictional waters through discrete and confined conveyances, it was a discharge requiring a NPDES permit).

Several courts have rejected Disney's view, that as long as it rains, Disney's discharges are only covered by CWA § 402(p) and not CWA § 301(a). The facts of the cases vary but the basic reasoning is the same.  Essentially, the courts are applying the "but for" test to these discharges. If the discharger is adding pollutants, the discharge cannot be "entirely composed of stormwater."  The approach is both reasonable and in accord with the underlying mandates of the CWA.

In *United States v. Earth Sciences, Inc.*, 599 F.2d 368, 374 (10th Cir. 1979) the Tenth Circuit concluded defendants violated CWA § 301(a) where snow melt mixed with a sump containing leachate and overflowed into a nearby creek.[25] In *CARE v. Southview Farm,* 34 3d 114, 120 (2nd Cir. 1994) the Second Circuit found that farmers could not claim an exemption for agricultural discharges composed entirely of stormwater when those discharges mixed with animal waste generated by on-site activities. ("We agree with appellants that, while the statute does include an exception for 'agricultural stormwater discharges,' there can be no escape from liability for agricultural pollution

---

[25] Disney's stormwater system contains drop inlets and catch basins. Like the sump in *Earth Sciences,* these devices act to collect pollutants. When it rains, these pollutants are discharged. Such discharges are not entirely composed of stormwater.

simply because it occurs on rainy days."). *See also CARE v. Koopman*, 54 F. Supp. 2d 976, 981 (E.D. WA 1999) ["The agricultural stormwater discharge and return flows from irrigated agriculture exception in 33 U.S.C. § 1362(14) does not act to relieve CAFO farmers from responsibility for over applications and misapplications of CAFO animal wastes to fields in amounts or locations which will then discharge into the waters of the United States."] *See also United States v. Gratz*, 1993 U.S. Dist. LEXIS 629, at *27-*28 (E.D. Pa. Jan. 26, 1993) (arguing that discharge of pollutants into storm drains converts it into stormwater leads to "the illogical result of . . . exempt[ing] defendants from criminal liability for pouring pollutants into storm drains but . . . impos[ing] criminal liability for pouring pollutants down any other point source").

Recently the Ninth Circuit held that sediment and other pollutants washed from logging roads were not exempt from regulation under the CWA. *NEDC v Brown,* 640 F.3d 1063 (9th Cir. 2011)]. The reasoning in the *Brown* case echoes the reasoning of Judge Patel from the Northern District of California.

> PALCO argues nevertheless that the 'composed entirely of stormwater' portion of section 402(p) is satisfied, contending, in the process, that the language of the section does not mean—or means something in addition to—what it plainly says. Unless Congress meant to regulate every discrete discharge that somehow mixes with rainwater (even those coming from private gardens), PALCO argues, the 'composed entirely of stormwater' term must include even those discharges containing noxious and toxic chemicals; as long as the discharged pollutants mix with some amount of rainwater . . . the discharge should be considered to be 'composed entirely of stormwater,' well within the scope of section 402(p). The court cannot agree . . Were the court to accept PALCO's interpretation of the 'entirely of stormwater' term, the court would condone more than an odd, contraindicated construction of plain statutory language; the court would condone polluters' decisions not to seek NPDES permits in all contexts in which the discharged pollutants mixed with rainwater, however small the rainwater quantity. The deleterious consequences of—and perverse incentives inherent in—PALCO's logic are too substantial to countenance, and the court will not find that Congress would sanction such an

environmentally and statutorily strange result. [*EPIC v. Pacific Lumber Co.*, 301 F. 1102, 1111 (N.D. CA 2004)].

The Individual Plaintiffs' view was succinctly stated in the recent case of *Humboldt Baykeeper v. UPR*, 2008 WL 4614659 *2 (N.D. CA), "Defendants argue that the alleged discharges targeted by Plaintiffs consist 'entirely of stormwater' and thus do not require a permit under the CWA. . . Plaintiffs have submitted extensive evidence in support of their position regarding the existence of pollutants on the property that are discharged through point sources. . . *when pollutants are added to stormwater, such substance is not 'composed entirely of stormwater.*'" [Emphasis added].

**E.    The General Permit Is Intended to Cover All Facilities Whether the Facility Is Primary or Auxiliary to the Facility Operator's Function**

The Individual Plaintiffs do not dispute that the primary function of Disney's Burbank Studios is film and TV production.  However, numerous auxiliary operations also exist on the 51 acre complex,[26] including a facility that would be classified as "transportation services" that includes a fleet of limousines for transporting VIPs throughout the Disney campus and other operations including the servicing, fueling, cleaning and detailing of those vehicles.    [See Individual Plaintiffs' Opening Brief, Russell Decl. DOC 192, ¶¶ 4, 6, 16]. This is particularly significant because much of the zinc and copper derive from the vehicular activities on site.  It defies reason that a transportation services operation across the street would be regulated, but the same service operation located within the Disney campus would not.  Because the intent of the CWA "is to restore and maintain the chemical, physical, and biological integrity of the Nation's waters,"[27] it is not surprising that the State Water Resources Control Board supports the Individual Plaintiffs' contention that Disney's transportation operations fall within the regulatory requirements that such activities require permits.

---

[26]Equivalent to about 46 football fields.

[27]33 U.S.C. § 1251(a).

The California General Industrial Stormwater Permit ("General Permit") is intended to cover all facilities engaged in industrial activities *whether the facility is primary or is auxiliary* to the facility operator's function. Although Disney's primary function is film production, the facility it operates for vehicle maintenance of its limousine fleet is a transportation facility to be covered by the General Permit,

> The General Permit is intended to cover all facilities described in Attachment 1, *whether the facility is primary or is auxiliary to the facility operator's function*. For example, although a school district's primary function is education, a facility that it operates for vehicle maintenance of school buses is a transportation facility that is covered by this General Permit.
>
> Facilities that discharge stormwater associated with industrial activity requiring a General Permit are listed by category in 40 Code of Federal Regulations (CFR) Section 122.26(b)(14) (Federal Register, Volume 55 on Pages 48065-66) and in Attachment 1 of this General Permit. The facilities can be publicly or privately owned. General descriptions of these categories are . . .
> 8.   Transportation facilities *that conduct any type of vehicle maintenance such as fueling, cleaning, repairing*, etc.
> [Emphasis added] [Silver Decl. DOC 187, ¶11, Exh. 8 Excerpt General Permit pg. II].

Because Disney's auxiliary facility is a distinct unit within the Disney campus, it is required to be covered by the General Permit.[28]

Disney claims "during at least two routine inspections of the Studio Lot, staff from the County of Los Angeles' Department of Public Works Environmental Programs Division explicitly noted that the Studio Lot '[d]oes not need coverage' under a general or individual stormwater permit." Given the fact that the Public Works Department is not authorized to make that determination, and the fact the documentary evidence of this

---

[28] Both Disney's non-stormwater and stormwater discharges can be covered by the same NPDES permit. There is no need for Disney to have more than one permit as is misstated in its Opening Brief. See Defs' Opening Brief DOC189, pg. 13 lns. 3-7.

determination is really just a checked box on a form, this determination carries no weight or authority. [Defs' Opening Brief, Compendium of Exhibits, Exh. 5]

**F.  Because EPA Does Not Have a Mandatory Duty to Issue NPDES Permits, Disney's Argument its Stormwater Discharges Are Exempt Is Irrational**

There is no legal or rational basis for Disney's argument that the EPA's "residual designation authority" under Section 402(p)(6) creates a power to exempt certain point sources from Section 301(a) and the NPDES program. [Defs' Opening Brief DOC 189 pg. 10, ln. 5] S*ee Costle,* 568 F.2d at 1375-76 (D.C. Cir. 1977) (EPA has no power to exempt any point discharge).  In essence Disney is arguing that because the EPA is required to issue NPDES permits for all stormwater discharges designated under section 402(p)(6), it follows that NPDES permits are not required for any stormwater discharge not designated by the EPA pursuant to Section 402(p)(6).  However, Section 402(p)(6) does not mandate that the EPA issue NPDES permits for designated sources. See *Envtl. Def. Ctr., Inc. v. EPA* (*EDC*), 344 F.3d 832, 843-44 (9th Cir. 2003).

Section 402(p)(6) does not even mention permitting, let alone mandate that the EPA must issue NPDES permits. Nor does the CWA in general create a nondiscretionary duty for the EPA to issue NPDES permits to point sources.  Section 402(a) provides "the Administrator *may* . . . issue a permit for the discharge of any pollutant."  33 U.S.C. § 1342(a) (emphasis added).  As the D.C. Circuit made clear in *Costle*, 568 F.2d at 1372 "[t]he use of the word 'may' in § 402 means only that the Administrator has discretion either to issue a permit or to leave the discharger subject to the total proscription of § 301."  *See also Amigos Bravos v. EPA*, 324 F.3d 1166, 1174 (10th Cir. 2003) ("*Costle* merely stated the EPA must either issue a permit for the offending discharge or leave the discharger subject to the total prohibition expressed in § 301.  The court did not address whether the EPA must take action against a violator. And nothing in §§ 301(a), 301(e), or 402(a)(1) compels such action.") (citation omitted).  Because the EPA is not obligated

to issue any NPDES permits for any Phase II discharges, any implicit or express decision by the agency not to designate certain point sources does not lead to the irrational conclusion that non-designated point sources are no longer subject to Section 301(a)'s unpermitted discharge prohibition.[29]

The District Court in *Hannaford* made a similar misreading by assuming that Congress' grant of authority to the EPA to designate certain non-industrial stormwater discharges for regulation at a national level implied a power for the EPA to exempt non-industrial stormwater discharges from the NPDES permitting program. *Conservation Law Foundation v. Hannaford Bros. Co.*, 327 F. Supp. 2d 325, 330-331 (D. Vt. 2001). Nothing in Section 402(p)(6) states that, should EPA choose not to issue regulations, any point source discharges of stormwater would go unregulated. The *Hannaford* court further embellishes its inferred power of EPA to exempt discharges from the NPDES program through its silence, as also a power to deem those undesignated dischargers as falling into compliance with Section 402(p).  *Hannaford*, 327 F. Supp.2d at 332. However, because the EPA has never had a duty to issue any NPDES permits [with the lone exception of the stormwater sources not subject to the Section 402(p) moratorium], it is illogical to infer a blanket exemption for dischargers from the NPDES program based on EPA's decision not to regulate a discharger at the EPA-level.  The *Hannaford* Court seeks to create an implied authority to relieve dischargers from regulation based on EPA's authority to regulate.  However, that implied exemption of authority runs counter to the long-standing rule that any exemptions from the CWA's permitting requirement be explicit and not implied, as is discussed above.  *See also Andrus v. Glover Constr. Co.*, 446 U.S. 608, 616-17 (1980).  Nor is Congress' decision not to mandate that EPA issue NPDES permits to all of the non-industrial stormwater

---

[29] This same reasoning would also apply to the State Water Board and its 9 regional boards which have the authority within California to also issue NPDES permits.

discharges any different than the long-standing NPDES permitting provision providing that the EPA may, but does not have to, issue NPDES permits. See *Hannaford*, 327 F. Supp.2d at 331.

**G. EPA Acknowledges Section 402(p)(6) Has No Effect on Section 301(a)'s Unpermitted Discharge Prohibition**

The EPA has explicitly acknowledged that Congress' express moratorium precludes any argument that Congress authorized additional relief for nonindustrial and small municipal dischargers from the Section 301(a) prohibition, and that stormwater can be legally discharged from point sources without a NPDES permit after October 1, 1994. A contemporaneous 1994 EPA Guidance Memorandum states that, at the conclusion of the permitting moratorium for Phase II discharges, "the Agency and approved NPDES States are unable to waive the statutory requirement that point source discharges of pollutants to waters of the United States need an NPDES permit." *Policy for End of Moratorium for Stormwater Permitting October 1, 1994* at 3 (Oct. 18, 1994)[30] (Silver Oppos. Decl. ¶5, Exh. 3); *Id*. at pg. 4 ("citizen suits can be brought against operators of phase II point source discharges composed entirely of stormwater to waters of the U.S. that are not authorized by an NPDES permit after October 1, 1994").

Likewise, in response to comments on the Final Interim Phase II Discharge Rule issued August 7, 1995, the EPA again makes clear that Section 1342(p) does not exempt any stormwater discharges after October 1, 1994:

> Commenters argued that 402(p) does not require permits for all discharges of stormwater after October 1, 1994, rather it prohibits the need for such permits before this date. EPA disagrees. CWA section 301(a) states that it is illegal to discharge pollutants to waters of the U.S. except in compliance with Section 402. The current regulations under section 402 establish a permit program for point source discharges. In the 1987 amendments to the CWA, Congress added Section 402(p) to ensure the orderly evolution of the NPDES stormwater program. Section 402(p)(1) did not alter the basic

---

[30]  http://www.epa.gov/npdes/pubs/owm0141.pdf

underlying prohibition in Section 301(a) as it applied to stormwater discharges. Section 402(p)(1) did, however, establish temporary relief from permitting requirements for certain stormwater discharges for a specified period of time. [*Amendment to Requirements for National Pollutant Discharge Elimination System (NPDES) Permits for Storm Water Discharges Under Section 402(p)(6) of the Clean Water Act*, 60 Fed. Reg. 40230, 40231 (Aug. 7, 1995) (emphasis added) (Silver Oppos. Decl. ¶6, Exh. 4].

"If Congress had not intended unregulated phase II sources to be liable for violations of section [1311(a)] on October 1, 1992, there would have been no need to amend section [1342(p)(1)] at all." *id*. Thus, EPA acknowledges that in 1987 Congress provided no authority to EPA to create or maintain an exemption of any polluted stormwater discharges.

It is clear from the above statements that, to the extent Congress provided for a limited moratorium for non-industrial discharges and discharges from small municipalities (so-called Phase II discharges), that moratorium ended on October 1, 1994. After that date, no stormwater point source, whether industrial or non-industrial, was excluded from the Act's clear mandate that all point sources must obtain a NPDES permit. *Costle*, 568 F.2d at 1377. Accordingly, Disney's assertion that Section 402(p)(6) provides authority for EPA to grant an exemption for non-industrial point sources from the CWA's permitting mandate and that the EPA has applied such authority is without merit.

## V.   CONCLUSION

There is no material fact in dispute that Disney is discharging pollutants (copper, TOC and zinc) from its stormwater system, a point source, to the Los Angeles River, a water of the U.S., without a NPDES permit. Thus, Disney is violating the Act, CWA § 301(a), 33 U.S.C. § 1311(a). There is no material dispute that Disney's stormwater discharges polluted by on-site activities are "not entirely composed of stormwater" and violate the Act.

1       Given Disney's limousine fleet of more than 75 vehicles are fueled, detailed,

2   washed and serviced at an auxiliary site within its 51 acre complex, there is no material

3   fact in dispute that Disney is operating transportation services. The fact these services

4   are auxiliary to Disney's other commercial operations does not shield Disney from

5   liability under the stormwater regulations, CWA § 402(p), 33 U.S.C. § 1342(p).

6   Furthermore, the moratorium on requiring permits for all stormwater discharges expired

7   in 1994.

8

9   August 30, 2012                         Respectfully submitted,

10                                          LAW OFFICE OF JACK SILVER

11

12                                                 */s/ Jack Silver*

13                                        Jack Silver

                                     Attorney for Individual Plaintiffs

14                                        DENNIS JACKSON, WILLIAM

15                                        MCCALL and ROBIN MCCALL

16

17

18

19

20

21

22

23

24

25

26

27

28